

# OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

**Lisa Madigan**
ATTORNEY GENERAL

September 21, 2011

Mr. Gino Agnello
Clerk of the Court
United States Court of Appeals for the Seventh Circuit
219 S. Dearborn Street
Chicago, Illinois 60604

Re:  *Aleman v. Hanover Park*, No. 10-3523 (scheduled for argument on September 26, 2011)

Dear Mr. Agnello:

This letter is submitted pursuant to Federal Rule of Appellate Procedure 28(j) to apprise the Court of pertinent authorities that have just come to my attention.

In his reply brief, Aleman, the plaintiff-appellant, argues that if defendants-appellees interrogated him in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981), defendants-appellees may be held liable for damages because statements obtained during the interrogation were used to initiate Aleman's criminal prosecution, citing *Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006).  *See* Reply Brief of Plaintiff-Appellant at 18-19.  *Sornberger* held that a violation of the prophylactic safeguards recognized in *Miranda v. Arizona*, 384 U.S. 436 (1966), may provide a basis for § 1983 liability if the suspect's statements are used against him in a criminal case.  *See* 434 F.3d at 1024-27.

If *Sornberger* favors Aleman (*but see* Brief of Defendants-Appellees Fallon and Micci at 37-38 (distinguishing *Sornberger*)), we cite as supplemental authority decisions of other circuits holding that a police breach of *Miranda*, absent coercion, "does not give rise to a § 1983 action." *Hannon v. Sanner*, 441 F.3d 635, 638 (8th Cir. 2006); *accord Wright v. Dodd*, No. 10-15609, 2011 WL 3611972, *1 (11th Cir. Aug. 18, 2011) (unpublished opinion); *McKinley v. City of Mansfield*, 404 F.3d 418, 432 n.13 (6th Cir. 2005); *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1165 n.6 (10th Cir. 2003); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003); *see*

*also Chavez v. Martinez*, 538 U.S. 760, 772 (2003) (plurality op.) (officer's "failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action").  In addition to the arguments raised in our brief, we respectfully suggest that *Sornberger* should be reconsidered in light of these decisions and, moreover, that because the *Edwards* rule is prophylactic rather than constitutionally mandated, *see Maryland v. Shatzer*, 130 S. Ct. 1213, 1220 (2010), that an *Edwards* violation also is not cognizable under § 1983.

Copies of the authorities not cited in our brief are attached to this letter.

Sincerely,

/s/ *Jane Elinor Notz*

Jane Elinor Notz
Deputy Solicitor General
Counsel for Defendants-Appellees
Officers Fallon and Micci

Westlaw. Case: 10-3523    Document: 45    Filed: 09/21/2011    Pages: 102

Page 1

441 F.3d 635
**(Cite as: 441 F.3d 635)**

▷

United States Court of Appeals,
Eighth Circuit.
Kevin Terrance HANNON, Appellant,
v.
John SANNER; Jeffrey Oxton, Appellees,
Will Brost; Vicki Landwehr, Defendants.

No. 04-2608.
Submitted: Dec. 14, 2005.
Filed: March 28, 2006.

**Background:** Arrestee brought § 1983 action against police officers alleging violation of his rights under rule of *Miranda* and its progeny. The United States District Court for the District of Minnesota, Richard H. Kyle, J., adopting report and recommendation of Raymond L. Erickson, United States Magistrate Judge, granted summary judgment in favor of officers. Arrestee appealed.

**Holding:** The Court of Appeals, Colloton, Circuit Judge, held that remedy for alleged *Miranda* violation is exclusion from evidence of any compelled self-incrimination, not § 1983 action.

Affirmed.

West Headnotes

**Civil Rights 78** ☞1311

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1311 k. Criminal Law Enforcement; Prisons. Most Cited Cases
    Remedy for alleged *Miranda* violation is exclusion from evidence of any compelled self-incrimination, not § 1983 action. 42 U.S.C.A. § 1983.

**\*635** Thomas H. Boyd, argued, Minneapolis, MN ( Karl E. Robinson, Minneapolis, and law student

Holly A. Hartung, admitted under Eighth Circuit Rule 46B, on the brief), for appellant.

Kenneth H. Bayliss, argued, St. Cloud, MN, for appellee Bayliss.

Mark P. Hodkinson and Matthew J. Franken, argued, Minneapolis, MN, filed brief for appellee Jeffrey Oxton.

Before BYE, RILEY, and COLLOTON, Circuit Judges.

COLLOTON, Circuit Judge.
    Kevin Hannon appeals the district court's [FN1] grant of summary judgment in favor of police officers John Sanner and Jeffrey Oxton in Hannon's action filed pursuant to 42 U.S.C. § 1983. We affirm.

    FN1. The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Raymond L. Erickson, United States Magistrate Judge for the District of Minnesota.

    In 2000, Hannon was convicted in Minnesota district court of murdering his girlfriend. The Supreme Court of Minnesota reversed the conviction, holding that the trial court had erred in admitting evidence of a confession that Hannon made to Sanner and Oxton. The state supreme court held that because Hannon had unequivocally invoked his right to counsel in an interview with the officers, and had not knowingly, intelligently and voluntarily waived his right to counsel, the statements should have been suppressed. *State v. Hannon,* 636 N.W.2d 796, 807 (Minn.2001).[FN2] Hannon was retried and convicted **\*636** again of murder. This conviction was affirmed by the Supreme Court of Minnesota. *State v. Hannon,* 703 N.W.2d 498 (Minn.2005).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN2. The pertinent portion of the interrogation of Hannon by the officers was transcribed as follows:

Appellant: You think I killed her?

Detective: Did you-did you kill her because you were upset with her? Did you kill her because-

Appellant: You think I killed-

Detective: Kevin, it's not that we think that, we know that. We need to know why you did that. That's all, OK? Tha-it's no question here as to did you do that. That's not a question here, Kevin, OK? So-

Appellant: *Can I have a drink of water and then lock me up-I think we really should have an attorney.*

Detective: We'll get you a drink of water.

Appellant: I don't want to talk anymore please. (Pause). This is-this is really wrong. This woman has scars all over her from this Paul Mackey. He's callin' her 50 times a week.

Detective: 'Kay. If you want to talk to an attorney, you understand that we have to stop talking to you. OK? And-and then your side of this story will never be known. That's your choice. That's a choice you're making.

Appellant: So, that means what?

Detective: That means we're gonna put this thing and we're gonna convict you of murder.

Appellant: Of murder?

Detective: Absolutely. Yup.

Appellant: Convict me of murdering her?

*Hannon,* 636 N.W.2d at 800-01 (emphasis added by Minnesota court).

While awaiting retrial, Hannon brought an action against Sanner and Oxton, asserting a claim pursuant to 42 U.S.C. § 1983. Hannon's theory was that the officers, by failing to cease questioning of Hannon after he invoked his right to counsel, and by obtaining statements that were used against Hannon in his first trial, violated Hannon's rights under the rule of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. The district court granted summary judgment for the officers and rejected Hannon's claim on several grounds. First, the court concluded that although the Supreme Court of Minnesota ruled that Hannon's confession should be suppressed, federal law requires an unequivocal request for counsel before officers are obliged to cease questioning, *see Davis v. United States,* 512 U.S. 452, 461-62, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), and that Hannon's statements to the officers were "too equivocal to constitute an invocation of the right to counsel under Federal law." (Add. at 13-14). Second, assuming, *arguendo,* that the officers obtained the statement in violation of the *Miranda* rule, the court held that Hannon's exclusive remedy was suppression of the statements, and that § 1983 does not provide a remedy for a violation of *Miranda.* Finally, the court held that the officers were entitled to qualified immunity, because their conduct did not violate a clearly established right of which a reasonable person would have known.

We find it unnecessary to opine whether the officers violated the *Miranda* rule during their interrogation of Hannon, because we agree with the district court that a litigant cannot maintain an action under § 1983 based on a violation of the *Miranda* safeguards. Section 1983 provides a civil action against persons who, under color of law, cause a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." In consider-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing whether a violation of the *Miranda* rule implicates "rights ... secured by the Constitution" within the meaning of § 1983, we begin with our own precedent holding that because "[t]he reading of *Miranda* warnings is a procedural safeguard rather than a right arising out of the fifth amendment itself, ... the remedy for a *Miranda* violation is the exclusion from evidence of any compelled self-incrimination, not a section 1983 action." *Warren v. City of Lincoln,* 864 F.2d 1436, 1442 (8th Cir.1989) (en banc); *accord Brock v. Logan County Sheriff's Dep't,* 3 F.3d 1215, 1217 (8th Cir.1993) (per curiam) ("The remedy for the alleged *Miranda* violation **637** is the exclusion from evidence of any compelled self-incrimination, not a civil rights action."). By their plain terms, *Warren* and *Brock* establish Hannon's remedy for an alleged violation of the *Miranda* rule was suppression of evidence, which he achieved through a ruling of the Supreme Court of Minnesota, not a damages action under § 1983.

Although the Supreme Court recently clarified that *Miranda* announced a "constitutional rule," *Dickerson v. United States,* 530 U.S. 428, 444, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), the decision in *Dickerson* did not undermine the continuing validity of the Court's precedent that the *Miranda* procedural safeguards are "not themselves rights protected by the Constitution," but instead "measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). The Court in *Dickerson* cited *Tucker* and other decisions characterizing *Miranda* as a "prophylactic rule," 530 U.S. at 438 & n. 2, 120 S.Ct. 2326, but concluded that *Miranda* nonetheless was, and always had been, a "constitutional decision," applied against the States, *id.* at 438, 86 S.Ct. 1602, and giving "concrete constitutional guidelines" for courts to follow. *Id.* at 439, 86 S.Ct. 1602. The Court defined *Miranda* as a "constitutional decision" announcing a "constitutional rule," but never described the *Miranda* safeguards as a "constitutional right" equivalent to the Fifth Amendment itself. We thus view

*Dickerson* as maintaining the *status quo* of the *Miranda* doctrine, *see also United States v. Patane,* 542 U.S. 630, 640, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion); *id.* at 644-45, 124 S.Ct. 2620 (Kennedy, J., concurring in judgment), and hence leaving our decisions in *Warren* and *Brock* undisturbed as governing precedent. *See also United States v. Villalba-Alvarado,* 345 F.3d 1007, 1012 (8th Cir.2003) (holding that "we are compelled," after *Dickerson,* "to remain faithful to the established exceptions under *Miranda* ").

Nor do we perceive any material distinction between Hannon's claim and those analyzed in *Warren* and *Brock* based on the fact that evidence allegedly obtained in violation of *Miranda* was admitted against Hannon at trial (before the first conviction was reversed on appeal), while the disputed statements in *Warren* and *Brock* were never used against the suspects in a criminal case. The text of the Fifth Amendment is focused on the use in a criminal case of a defendant's compelled, self-incriminating testimony. *See Chavez v. Martinez,* 538 U.S. 760, 777, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (Souter, J., concurring in the judgment). Statements obtained in violation of the *Miranda* rule are not "compelled," and the use of such statements in a criminal case does not amount to compelled self-incrimination. The admission at trial of statements obtained in violation of *Miranda* thus does not implicate the core of the Fifth Amendment, and it does not result in the deprivation of a "right[ ] ... secured by the Constitution" within the meaning of § 1983, any more than does the eliciting of the statements in the first place. *See Bennett v. Passic,* 545 F.2d 1260, 1263 (10th Cir.1976) ( "Even assuming that Bennett's confession should have been excluded from the evidence at his trial, the court cannot find that any rational argument can be made in support of this civil rights claim for damages.").

We are fortified in this view by the post-*Dickerson* opinions in *Chavez v. Martinez.* A four-Justice plurality in *Chavez* concluded that a police

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

officer's "failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action," *id.* **\*638** at 772, 123 S.Ct. 1994, and a fifth Justice explained that "[t]he exclusion of unwarned statements, when not within an exception [to the *Miranda* rule], is a complete and sufficient remedy." *Id.* at 790, 123 S.Ct. 1994 (Kennedy, J., concurring in part and dissenting in part). This led Justice Scalia to summarize that "[s]ection 1983 does not provide remedies for violations of judicially created prophylactic rules, such as the rule of *Miranda v. Arizona,* as the Court today holds." *Id.* at 780, 123 S.Ct. 1994 (Scalia, J., concurring in part in the judgment) (internal citation omitted). The absence of a criminal case in which Martinez was compelled to be a "witness" against himself was invoked to defeat his "core Fifth Amendment claim" based on statements actually "compelled," *id.* at 772-73, 123 S.Ct. 1994 (plurality opinion), but a civil claim based on the failure to read *Miranda* warnings was rejected simply because a breach of the *Miranda* rule does not give rise to a § 1983 action. *Id.* at 772, 123 S.Ct. 1994 (citing *Warren,* 864 F.2d at 1442); *id.* at 790, 123 S.Ct. 1994 (Kennedy, J., concurring in part and dissenting in part).

In summary, Hannon's action is premised on an alleged violation of the constitutional rule announced in *Miranda* and subsequent decisions. The remedy for any such violation is suppression of evidence, which relief Hannon ultimately obtained from the Supreme Court of Minnesota. The admission of Hannon's statements in a criminal case did not cause a deprivation of any "right" secured by the Constitution, within the meaning of 42 U.S.C. § 1983.

The judgment of the district court is affirmed.

C.A.8 (Minn.),2006.
Hannon v. Sanner
441 F.3d 635

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3611972 (C.A.11 (Ga.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 2011 WL 3611972 (C.A.11 (Ga.)))**

Only the Westlaw citation is currently available. This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Eleventh Circuit Rules 36-2, 36-3. (Find CTA11 Rule 36-2 and Find CTA11 Rule 36-3)

United States Court of Appeals,
Eleventh Circuit.
Byron Scott WRIGHT, Plaintiff–Appellant,
v.
Kenny DODD, Polk County Police Department and Police Men, Baker Harbin, Defendants–Appellees.

No. 10–15609
Non–Argument Calendar.
Aug. 18, 2011.

Byron Scott Wright, Cedartown, GA, pro se.

Appeal from the United States District Court for the Northern District of Georgia. D.C. Docket No. 4:10–cv–001348–RLV.

Before HULL, WILSON and BLACK, Circuit Judges.

PER CURIAM:

**\*1** Byron Scott Wright, an state prisoner proceeding *pro se,* appeals the dismissal of his 42 U.S.C. § 1983 complaint. Wright's § 1983 complaint alleged that he was arrested without a warrant and without first being informed of his *Miranda*[FN1] rights. Wright sought monetary damages and dismissal of the state criminal charges pending against him. The district court *sua sponte* dismissed the complaint, pursuant to 28 U.S.C. § 1915A(b)(1), for failure to state a claim upon which relief may

be granted. After review, we affirm.[FN2]

FN1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966).

FN2. We review *de novo* appeals from a § 1915A(b)(1) *sua sponte* dismissal for failure to state a claim. *Leal v. Georgia Dep't of Corrs.,* 254 F.3d 1276, 1279 (11th Cir.2001).

A complaint fails to state a claim when, taking the complaint's allegations as true, it does not appear that a claim for relief "is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. ——, 129 S.Ct. 1937, 1949 (2009). Although we liberally construe *pro se* pleadings, holding them to a less stringent standard than those drafted by an attorney, *Miller v. Donald,* 541 F.3d 1091, 1100 (11th Cir.2008), we will not rewrite an otherwise deficient pleading to sustain an action. *GJR Invs., Inc. v. Cnty. of Escambia,* 132 F.3d 1359, 1369 (11th Cir.1998), *overruled on other grounds by Iqbal,* 556 U.S. —— 129 S.Ct. 1937 (2009). To state a claim under § 1983, "a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law and (2) such deprivation occurred under color of state law. *Richardson v. Johnson,* 598 F.3d 734, 737 (11th Cir.2010).

Because the allegations in Wright's § 1983 complaint, even construed liberally, fail to allege a claim that is "plausible on its face," the district court properly dismissed the complaint for failure to state a claim upon which relief could be granted. *See Iqbal,* 556 U.S. at ——, 129 S.Ct. at 1949 (quotation marks omitted). Specifically, as to Wright's false arrest claim, the complaint alleges in conclusory fashion that the police arrested Wright without a warrant, but does not allege any facts showing that the police lacked probable cause to arrest him. *See Rankin v. Evans,* 133 F.3d 1425, 1435 (11th Cir.1998) (explaining that the existence of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case: 10-3522    Document: 45    Filed: 09/21/2011    Pages: 102

probable cause is an absolute bar to a § 1983 claim for false arrest).

Wright's allegation that his *Miranda* rights were violated does not give rise to a cognizable claim under § 1983. *See Jones v. Cannon,* 174 F.3d 1271, 1291 (11th Cir.1999). Likewise Wright's request for the dismissal of the pending state criminal charges, which challenges the very fact of his confinement, cannot be granted in the § 1983 context. *See Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct. 1827, 1841 (1973). Furthermore, because Wright's complaint alleges that his criminal proceedings are pending, the district court properly refused to construe it as a petition for a writ of habeas corpus. *See* 28 U.S.C. § 2254(b)(1)(A) (providing that a writ of habeas corpus may not be granted unless the petitioner has exhausted the remedies available in the state courts).

**\*2 AFFIRMED.**

C.A.11 (Ga.),2011.
Wright v. Dodd
Slip Copy, 2011 WL 3611972 (C.A.11 (Ga.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

404 F.3d 418, 22 IER Cases 1254, 2005 Fed.App. 0170P
**(Cite as: 404 F.3d 418)**

▷

United States Court of Appeals,
Sixth Circuit.
Jeffrey MCKINLEY, Plaintiff-Appellant,
v.
CITY OF MANSFIELD, et al., Defendants-Appellees.

No. 03-4258.
Argued: Oct. 27, 2004.
Decided and Filed: April 11, 2005.
Rehearing and Rehearing En Banc Denied July 19,
2005.

**Background:** Former patrol officer brought civil rights and state law suit against city and five of its officers and officials alleging, inter alia, that officials compelled him to be witness against himself and maliciously prosecuted him during course of investigation into officers' misuse of radio scanners. The United States District Court for the Northern District of Ohio, Dan A. Polster, J., entered summary judgment for defendants on civil rights claims and dismissed state claims without prejudice. Former officer appealed.

**Holdings:** The Court of Appeals, Clay, Circuit Judge, held that:
(1) issue preclusion did not bar police officer from pursuing civil rights claim that his Fifth Amendment *Garrity* rights were violated when his compelled statements from second interview in departmental investigation were used to prosecute him on collateral crimes;
(2) use of statements made by police officer during initial interview did not violate *Garrity* immunity;
(3) interrogator was not entitled to qualified immunity on claim that he targeted officer for falsification and obstruction prosecution during second interview;
(4) interrogator could be held liable, notwithstanding that it was prosecutor who used statements;
(5) district court abused its discretion in not grant-

ing further discovery before entering summary judgment for defendants; and
(6) malicious prosecution came would not lie in light of probable cause to prosecute officer without allegedly compelled statements.

Affirmed in part, reversed in part, and remanded.

Bright, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Criminal Law 110 ⊸393(1)**

110 Criminal Law
  110XVII Evidence
    110XVII(I) Competency in General
      110k393 Compelling Self-Incrimination
        110k393(1) k. In general. Most Cited Cases

When a public employer conducts an internal investigation it may dismiss an employee who refuses to answer investigative questions, but it may not use any incriminating statements against the employee in a criminal prosecution regarding the matter under investigation.

**[2] Criminal Law 110 ⊸393(1)**

110 Criminal Law
  110XVII Evidence
    110XVII(I) Competency in General
      110k393 Compelling Self-Incrimination
        110k393(1) k. In general. Most Cited Cases

Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice. U.S.C.A. Const.Amend. 5.

**[3] Criminal Law 110 ⊸42.6**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
    110II Defenses in General
        110k42 Immunity to One Furnishing Information or Evidence
            110k42.6 k. Effect of grant of immunity. Most Cited Cases
        (Formerly 110k42)

**Criminal Law 110 ☞393(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k393 Compelling Self-Incrimination
                110k393(1) k. In general. Most Cited Cases

Fifth Amendment permits public employer to use compelled statements obtained from public employee under grant of *Garrity* immunity during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice, rather than crimes involving subject of investigation. U.S.C.A. Const.Amend. 5.

**[4] Judgment 228 ☞720**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k716 Matters in Issue
                228k720 k. Matters actually litigated and determined. Most Cited Cases

**Judgment 228 ☞724**

228 Judgment
    228XIV Conclusiveness of Adjudication
        228XIV(C) Matters Concluded
            228k723 Essentials of Adjudication
                228k724 k. In general. Most Cited Cases

Under Ohio law, issue preclusion precludes the relitigation of an issue that has been actually and necessarily litigated and determined in a prior action.

**[5] Judgment 228 ☞828.8**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
            228k828.8 k. Nature of state tribunal's proceedings. Most Cited Cases

**Judgment 228 ☞828.17(4)**

228 Judgment
    228XVII Foreign Judgments
        228k828 Effect of Judgments of State Courts in United States Courts
            228k828.17 Determination of Issues Involved and Effect of Judgment
                228k828.17(4) k. Effect of opinion. Most Cited Cases

Under Ohio law, issue preclusion did not bar former police officer from pursuing civil rights claim that his Fifth Amendment *Garrity* rights were violated when his compelled statements from second interview in departmental investigation into misuse of police scanners were used to prosecute him for perjury and obstruction, notwithstanding state appellate court's additional finding, in vacating officer's convictions on basis that use of statements violated department's contractual grant of immunity, that use of statements did not violate his Fifth Amendment *Garrity* rights, where latter finding was not essential to judgment and was mere dicta. U.S.C.A. Const.Amend. 5.

**[6] Criminal Law 110 ☞393(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k393 Compelling Self-Incrimination
                110k393(1) k. In general. Most Cited Cases

Coercive questioning does not violate the Self-Incrimination Clause absent use of the compelled statements in a criminal case. U.S.C.A. Const.Amend. 5.

**[7] Criminal Law 110 ☞393(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k393 Compelling Self-Incrimination
                110k393(1) k. In general. Most Cited Cases

Compelled statements made by police officer during initial interview that was part of departmental investigation into alleged misuse of police scanners, if false, could be used to prosecute him for collateral crimes of falsification and obstruction, notwithstanding Fifth Amendment *Garrity* immunity protecting him from use of statements in criminal prosecution arising from subject of investigation. U.S.C.A. Const.Amend. 5.

**[8] Civil Rights 78 ☞1376(6)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

**Civil Rights 78 ☞1376(10)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(10) k. Employment practices. Most Cited Cases

Question whether interrogator regarded police officer as target of possible perjury prosecution, rather than mere *Garrity* witness, when he questioned officer for second time in departmental investigation into misconduct involving use of police scanners precluded grant of qualified immunity on claim that interrogator violated police officer's Fifth Amendment rights when, during course of second interview, he accused officer of falsification and

obstruction during first interview and threatened him with termination if he did not admit his role in misconduct, which led officer to materially contradict his earlier statements and led to his prosecution, on basis of statements in second interview, for falsification and obstruction. 42 U.S.C.A. § 1983.

**[9] Civil Rights 78 ☞1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and detention. Most Cited Cases

**Civil Rights 78 ☞1126**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1126 k. Particular cases. Most Cited Cases

Police interrogator's failure to read police officer *Miranda* warnings at the outset of second interview in departmental investigation into misuse of police scanners in which officer had *Garrity* immunity was not actionable under § 1983. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[10] Criminal Law 110 ☞42.6**

110 Criminal Law
    110II Defenses in General
        110k42 Immunity to One Furnishing Information or Evidence
            110k42.6 k. Effect of grant of immunity. Most Cited Cases
    (Formerly 110k42)

**Criminal Law 110 ☞393(1)**

110 Criminal Law
    110XVII Evidence
        110XVII(I) Competency in General
            110k393 Compelling Self-Incrimination

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k393(1) k. In general. Most Cited Cases

*Garrity* immunity from prosecution, which was given police officer to compel statements about investigation into police misuse of scanners, extended as far as the matter being investigated, and thus, use of officer's statements at second interview to prosecute him for falsification and obstruction violated his Fifth Amendment *Garrity* rights if interrogators were conducting subsidiary investigation into truth of officer's statements at time they compelled officer to make statements to effect that he had lied during first interview and if officer reasonably believed that he faced termination or other severe sanction if he declined to incriminate himself.

**[11]** Civil Rights 78 ⚖➝1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Civil Rights 78 ⚖➝1359**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1359 k. Employment practices. Most Cited Cases

Police interrogator could be held liable under § 1983 for allegedly violating police officer's Fifth Amendment rights by threatening officer's termination to compel statements that were later used against officer at trial, even though only representative of state who "used" statements at trial was prosecutor, where prosecution was natural consequence of interrogator's action. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[12]** District and Prosecuting Attorneys 131 ⚖➝10

131 District and Prosecuting Attorneys
        131k10 k. Liabilities for official acts, negli-

gence, or misconduct. Most Cited Cases

Prosecutors are absolutely immune from suit when the conduct complained of relates to their role as advocates for the state in the judicial process, even when it is alleged that a prosecutor knowingly presented false evidence against the plaintiff at trial.

**[13]** Civil Rights 78 ⚖➝1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

In actions brought under § 1983 for alleged violations of Fifth Amendment right against self-incrimination, it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes the violation of the Fifth Amendment privilege; in other words, while there may be no cause of action for the wrongful procurement of unused incriminatory statements, it is the wrongful procurement that forms the basis for liability. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[14]** Civil Rights 78 ⚖➝1376(2)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Most Cited Cases

For purposes of qualified immunity in civil rights action, question whether a right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition. 42 U.S.C.A. § 1983.

**[15]** Civil Rights 78 ⚖➝1376(2)

78 Civil Rights

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
        78k1376 Government Agencies and Officers
        78k1376(2) k. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Most Cited Cases

Unlawfulness must be apparent in light of pre-existing law for official to be denied qualified immunity; however, that is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful. 42 U.S.C.A. § 1983.

**[16] Federal Courts 170B ☞625**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
        170BVIII(D)2 Objections and Exceptions
        170Bk625 k. Proceedings preliminary to trial or hearing. Most Cited Cases

Civil rights plaintiff preserved for review his claim that summary judgment was premature due to inadequate opportunity to discover evidence by requesting additional discovery and by objecting to court's limited discovery order in his motion in response to defendants' motion for summary judgment and again requesting additional discovery. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[17] Federal Civil Procedure 170A ☞2553**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)3 Proceedings
        170Ak2547 Hearing and Determination
        170Ak2553 k. Time for consideration of motion. Most Cited Cases

District court abused its discretion in granting summary judgment before affording civil rights

plaintiff sufficient opportunity to conduct discovery, where defendants moved for summary judgment before any discovery occurred and, in response to plaintiff's motion for discovery, permitted plaintiff to depose only one defendant on narrow issue, precluding any discovery regarding other defendants or examination of city's files regarding underlying incident. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(f), 28 U.S.C.A.

**[18] Civil Rights 78 ☞1358**

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
        78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Defendants cannot be held liable for malicious prosecution in violation of Fourth Amendment when they did not make the decision to prosecute the plaintiff. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[19] Civil Rights 78 ☞1037**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1030 Acts or Conduct Causing Deprivation
        78k1037 k. Malicious prosecution and false imprisonment; mental health commitments. Most Cited Cases

**Civil Rights 78 ☞1088(5)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
        78k1088(5) k. Criminal prosecutions. Most Cited Cases

Where there is probable cause to prosecute, a § 1983 action for malicious prosecution in violation of Fourth Amendment will not lie. U.S.C.A.

Const.Amend. 4; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 ⋘1088(5)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(5) k. Criminal prosecutions.
Most Cited Cases

**Civil Rights 78 ⋘1126**

78 Civil Rights
    78II Employment Practices
        78k1124 Public Employment
            78k1126 k. Particular cases. Most Cited Cases

    Prosecutor had probable cause to charge police officer with falsification and obstruction independent of allegedly coerced statements officer made during second interview conducted by police interrogators as part of investigation into misuse of police scanners, and thus malicious prosecution claim would not lie under Fourth Amendment against police officials and city. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**\*421 ARGUED:** Kenneth D. Myers, Cleveland, Ohio, for Appellant. **\*422**Richard P. Goddard , Calfee, Halter & Griswold, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kenneth D. Myers, Cleveland, Ohio, for Appellant. Richard P. Goddard, Calfee, Halter & Griswold, Cleveland, Ohio, for Appellee.

Before: KEITH, CLAY, and BRIGHT,[FN*] Circuit Judges.

    FN* The Honorable Myron H. Bright, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined. BRIGHT, J. (pp. 446-47), delivered a separate opinion concurring in part and dissenting in part.

**OPINION**

CLAY, Circuit Judge.

    Plaintiff Jeffrey McKinley, a former police officer in Mansfield, Ohio, appeals the judgment of the district court granting summary judgment to Defendants the City of Mansfield (the "City") and five of its police officers and officials.[FN1] The district court granted summary judgment on the grounds that McKinley had failed to establish a genuine issue of material fact as to either of the federal constitutional claims he brought in this action under 42 U.S.C. § 1983. McKinley alleges that, in the course of an internal investigation into City police officers' misuse of their radio scanners to invade citizens' privacy, the City and its police officials (1) compelled him to be a witness against himself in violation of the Fifth Amendment to the United States Constitution and (2) maliciously prosecuted him in violation of the Fourth Amendment. The district court dismissed McKinley's state law claims without prejudice.[FN2] We AFFIRM the district court's entry of summary judgment as to McKinley's malicious prosecution claim. But as to McKinley's Fifth Amendment claim, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.

    FN1. McKinley named as defendants the following individuals in their individual and official capacities: Lawrence Harper, the City's police chief during the events of this case; Ronald Kruder, the City's Safety Director; Philip Messer, a City police captain during the events of this case and the current police chief; and Dale Fortney, a police lieutenant detective during the events of this case.

    FN2. McKinley's state law claims include:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

false arrest, abuse of process, intentional infliction of emotional distress, and breach of contract. *See* Joint Appendix ("J.A.") at 13-15 (Compl.).

## BACKGROUND

The following facts are viewed, as they must be, in the light most favorable to McKinley. On February 3, 2000, McKinley, a patrol officer for the Mansfield Police Department, observed an intoxicated William Noble urinating in a parking lot. Advised earlier in the day by his supervisor that all patrol officers were to issue summonses due to overcrowding at the city jail, McKinley began writing Noble a ticket. In the meantime, Noble made a cell phone call in his car as two of McKinley's colleagues, Sgt. David Nirode and officer Gary Foster, arrived on the scene. Upon his arrival, Foster told McKinley and Nirode that he overheard Noble's cell phone call on his police scanner.[FN3] After Foster described the substance of the phone call to McKinley and Nirode, McKinley arrested and incarcerated Noble for public indecency and intoxication.

> FN3. McKinley at one point denied that this conversation occurred but later admitted it in an interview with police that he challenges here on Fifth Amendment grounds.

**\*423** *The Scannergate Investigation* & Garrity *Immunity*

[1] In late February 2000, Defendant Harper, the chief of police, directed Defendant Messer, a captain on the force, to oversee an investigation into officers' misuse of scanners. Harper launched the investigation after hearing several reports of officers using scanners to eavesdrop on citizens' phone calls; the investigation became known as "scannergate." Ultimately, the investigation would involve interviews of more than thirty police officers, searches of officers' lockers, and interviews of some civilians. Messer placed Lieutenant Detective Dale Fortney, also a defendant in this case, in command of the investigation and directed Fortney

to interview certain officers, including McKinley. Fortney and his colleague, Lt. Goldsmith, conducted two interviews of McKinley, the first on February 25, 2000 (the "first interview"), and the second on March 7, 2000 (the "second interview"). Prior to the first interview, McKinley read and acknowledged the following statement in writing:

ADMINISTRATIVE PROCEEDINGS INTERNAL AFFAIRS UNIT

You are hereby advised that you are about to be questioned as part of an official administrative investigation of the Division of Police. You will be asked specific question (sic) which will relate directly and narrowly to the performance of your official duties or fitness as an employee or member of the Division of Police. The purpose of this interview is to assist in determining whether disciplinary action is warranted, and the answers furnished may be used in disciplinary proceedings that could result in administrative action against you.

Because this is an administrative and not a criminal investigation, the Division of Police will not use any of the answers or information gained from the interview in any criminal proceeding against you. Further, the Division of Police will not release this information to any other agency without your approval and will ho[l]d it as confidential, except as mandated by an appropriate and competent authority or as necessary for disciplinary proceedings and appeals of such proceedings.

You are further advised that you are hereby ordered and required to fully and truthfully answer all questions asked of you in this interview.

Your failure to comply with this order constitutes your being in violation of the Rules and Regulations of the Division of Police ....

(J.A. at 71). At Fortney's behest, McKinley added: "I am giving the following statement by reason of an order from a superior officer, ad-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

vising me that refusal to obey could result in disciplinary action.... However, it is my belief and understanding that the Division of Police requires this statement solely and exclusively for internal administrative purposes ...." *Id.* at 73. These promises of use immunity are consistent with the long-established rule that when a public employer conducts an internal investigation it may dismiss an employee who refuses to answer investigative questions, but it may not use any incriminating statements against the employee in a criminal prosecution regarding the matter under investigation. *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

In the first interview, Fortney asked McKinley about officers' use of scanners to eavesdrop and about the events of February 3, 2000, including the Noble phone call. **\*424** McKinley claimed to have no knowledge of the alleged scanner misuse and denied that Foster or anyone else divulged the substance of the Noble call to him. McKinley affirmed the truth of his answers by providing a sworn signature on the interview transcript. The day before, Fortney had taken a statement from Nirode, who represented that Foster overheard Noble's phone call by using his scanner and then related the contents of the call to Nirode and McKinley. Four days after McKinley's first interview, Fortney took a statement from Noble, who confirmed that he had in fact made a cell phone call on February 3 during the minutes preceding his arrest. Apparently due to the inconsistencies between McKinley's first statement and the statements of Nirode and Noble (who only confirmed that a call occurred), Fortney decided to re-interview McKinley.

The second interview in reality consisted of a pre-interview session, which Fortney and Goldsmith did not record, and a recorded interview covering the same topics as the first interview. During the unrecorded pre-interview session-which lasted approximately 10-15 minutes and took place in a different room-Fortney and Goldsmith advised McKinley that they suspected him of lying in the

first interview and that they were giving him another chance to tell the truth.[FN4] In addition, they offered that a union representative, officer Daniel Martincin, be present for the interview.[FN5] Fortney and Goldsmith did not provide the written Internal Affairs Administrative Procedures statement, *see supra,* as they had at the first interview; however, Fortney advised McKinley that he was "still under *Garrity* ", i.e., that just as in the first interview, "if he said things that incriminated himself ... those could not be used against him [criminally]." J.A. at 185 (Fortney Depo.). Finally, at the close of the pre-interview, Goldsmith read the following statement into the tape recorder:

> FN4. In his deposition, Fortney recounted: "I just told [McKinley] that it was obvious, you know, to us that he was lying and we were going to give him another chance, you know, to, even if we had to we could parade about six officers in that could tell different stories than he was telling. He needs to tell the truth and he's still under *Garrity,* he needs to tell the truth and take his chances." J.A. at 184-85 (Fortney Depo.). McKinley does not dispute this characterization of the pre-interview.

> FN5. Officer Martincin is not an attorney.

Today's date is Tuesday, March 7th, 2000.... We've called Jeff McKinley back out to be re-interviewed. He has been advised that he's still under *Garrity.* He was asked if he wanted a rep. present. He stated that he did and Dan Martincin came to the Special Investigative Unit and sat on the pre-interview. We are preparing now to re-interview Jeff McKinley and we'll go over the statement form that he gave to the investigating officers on 2/25/00. It's been determined prior to this interview that he was not truthful at the time he gave the interview on 2/25/00. He will be asked, again, the same questions and will give his responses.

(J.A. at 84.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The interview then began. McKinley does not dispute that he said the things that were recorded, but alleges that the tape and transcript of the interview do not accurately reflect *all* of what he said. Specifically, McKinley alleges, and Fortney admits, that Fortney and Goldsmith selectively recorded McKinley's answers; when the officers suspected that an answer was false, they would stop the tape, confront McKinley with their suspicion, and suggest that he give a truthful answer. **425** The officers would then rewind the tape to the end of the prior question-and-answer exchange and re-ask the question that prompted the objectionable answer. Consequently, the tape recording and transcript of the second interview omit some or all of the answers Fortney and Goldsmith deemed false and the answers that are reflected on the recording and transcript contradict much of what McKinley said in his first interview. Specifically, McKinley admitted to using his own scanner between 1995 and 1998 to eavesdrop on cordless and cell phone calls; offered a detailed account of other officers' use of scanners to do the same; and admitted that Foster had overheard the Noble call and relayed its substance to him and Nirode. But McKinley denied arresting Noble on the basis of his conversation with Foster, instead maintaining that he arrested Noble prior to Foster's arrival and incarcerated Noble pursuant to Nirode's representation that the jail was no longer full.

Sometime after McKinley's second interview, Fortney and Messer concluded the scannergate investigation and turned over the information they had gathered-including McKinley's statements-to Stephen Knowling, the Prosecuting Attorney for Holmes County, Ohio. Knowling is not a defendant herein. The Mansfield Police Department took immediate action against McKinley, first suspending him, then terminating him. Pursuant to the police officers' collective bargaining agreement with the Department, McKinley's case went to arbitration. Finding McKinley's termination disproportionate to the punishments meted out on other officers, the arbitrator ordered that McKinley be re-instated with

back pay and benefits.

*The State Criminal Proceedings Against McKinley*

Prosecuting Attorney Knowling charged McKinley with falsification, a violation of OHIO REVISED CODE § 2921.13 FN6; obstruction of official business, a violation of O.R.C. § 2921.31 FN7; and interference with civil rights, a violation of O.R.C. § 2921.45. On April 11, 2000, pursuant to a summons, McKinley appeared in Mansfield Municipal Court to answer the charges. McKinley moved to dismiss the civil rights charge and the court granted the motion. Still facing the other two charges, McKinley further moved to suppress the statements recorded in his two interviews, but the court declined to do so. On July 26, 2001, after a one-day trial in which the inconsistent statements McKinley made during the two interviews played the central role-the prosecutor introduced McKinley's statements through Officer Fortney-a jury convicted him on two counts of falsification and one count of obstructing official business.

> FN6. Ohio's Falsification statute provides, in relevant part: "No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when any of the following applies: (1) the statement is made in any official proceeding.... (3) The statement is made with purpose to mislead a public official in performing the public official's official function." O.R.C. § 2921.13(A)(1) & (3).

> FN7. Ohio's Obstruction of Official Business statute provides, in relevant part: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." O.R.C. § 2921.31(A).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On June 25, 2002, the Richland County Court of Appeals vacated McKinley's conviction on the ground that it was error for the trial court to admit McKinley's statements. *See* **\*426** *State v. McKinley,* No. 01CA98, 2002 WL 1732136 (Ohio Ct.App. June 25, 2002). The court considered but rejected McKinley's claim that the statements were inadmissible by virtue of the Fifth Amendment as interpreted by *Garrity.* Instead, the court based its holding of inadmissibility on its conclusion that the parties entered a contract whereby McKinley agreed to answer truthfully, and Fortney and the Police Department agreed not to use his statements in a prosecution against him. Interpreting the contract to preclude use of the statements in *any* prosecution, even a prosecution for lying during the interviews and obstructing the department's lawful investigation, the court reversed the trial court's decision to admit the statements and vacated McKinley's convictions.

*McKinley's § 1983 Action*

On November 27, 2002, McKinley filed a complaint in district court asserting claims under 42 U.S.C. § 1983 and several common law causes of action. The complaint named as defendants the city of Mansfield, Ohio, and certain of its police officials, including Lt. Fortney and then-captain now-chief Messer. This appeal is confined to the two constitutional claims McKinley brought under § 1983:(1) that Defendants maliciously prosecuted him in violation of the Fourth Amendment; and (2) that Defendants violated his Fifth Amendment "rights to be free from self incrimination" by compelling him in the second interview to make incriminating statements as to falsification and obstruction, which statements were later used at his trial for those crimes. Brief of Appellant at 3-4. On February 10, 2003, Defendants filed a motion for summary judgment. In response, McKinley filed a motion for leave to conduct discovery and to hold in abeyance a decision on Defendants' summary judgment motion. The district court granted very limited discovery, permitting McKinley to depose Defendant Fortney only and restricting the topic of the de-

position to the second interview. At the conclusion of discovery, McKinley filed (1) a response to Defendants' motion for summary judgment, (2) a motion to strike the transcript of the second interview from Defendants' summary judgment motion, and (3) a motion for sanctions. Defendants replied with their own cross motion for sanctions.

The court denied McKinley's motion to strike and denied both parties' motions for sanctions. The district court granted summary judgment in Defendants' favor, dismissing without prejudice Plaintiff's state law causes of action.

**STANDARD OF REVIEW**

This Court reviews a district court's decision to grant summary judgment *de novo.* E.g., *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir.2001). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The district court, and this Court in its review of the district court, must view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, we view the facts in the light most favorable to McKinley.

**DISCUSSION**
**I. Compelled Self-Incrimination**

[2][3] Before proceeding to our analysis of what McKinley challenges under the Fifth Amendment, we note what he does **\*427** *not* challenge. McKinley accepts the general rule that the Fifth Amendment permits the government to use compelled statements obtained during an investigation if the use is limited to a prosecution for collateral crimes such as perjury or obstruction of justice. *See United States v. Wong,* 431 U.S. 174, 178, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977) ("The Fifth Amendment privilege does not condone perjury."); *see*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

also *United States v. Apfelbaum,* 445 U.S. 115, 131, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980) (holding that "[n]either the [federal use] immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements"); *United States v. Mandujano,* 425 U.S. 564, 576, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) ("In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever."). This rule applies with equal force when the statements at issue were made pursuant to a grant of *Garrity* immunity during the course of a public employer's investigation of its own. *See United States v. Veal,* 153 F.3d 1233, 1243-44 (11th Cir.1998), *cert. denied,* 526 U.S. 1147, 119 S.Ct. 2024, 143 L.Ed.2d 1035 (1999). As a matter of Fifth Amendment right, *Garrity* precludes use of public employees' compelled incriminating statements in a later prosecution for the conduct under investigation. *Garrity,* 385 U.S. at 500, 87 S.Ct. 616. However, *Garrity* does not preclude use of such statements in prosecutions for the independent crimes of obstructing the public employer's investigation or making false statements during it. *See Veal,* 153 F.3d at 1243-44.

Consequently, McKinley acknowledges that the statements he made during the course of the first interview with Fortney and Goldsmith, while off limits in any subsequent prosecution regarding the scannergate crimes, were fair game for his falsification and obstruction prosecutions. But the statements he made in the *second* interview, McKinley suggests, are of an entirely different character. No longer a mere *Garrity* witness, McKinley alleges that by the time of the second interview on March 7, he was the target of a falsification and obstruction investigation. *See* Brief of Appellant at 42-45. After assuring McKinley that his second interview would be conducted according to the same rules as the first, i.e., that the promise of *Garrity* immunity remained in effect, McKinley alleges that Fortney and Goldsmith compelled him to make statements that incriminated him vis-à-vis the crimes of falsification and obstruction. Then, despite the officers'

promise of *Garrity* immunity, these statements were used against him at a trial for falsification and obstruction-a straightforward violation, McKinley asserts, of the Fifth Amendment. The record is clear that the manner of compulsion, while not physical coercion, was nonetheless severe: if McKinley refused to answer, he would face departmental disciplinary proceedings and termination of employment.

The district court dismissed McKinley's reasoning on several grounds. First, the court concluded, "[i]t is the Special Prosecutor who used the transcripts to establish the state's case against him-not defendants." J.A. at 273. (Dist.Ct.Op.) Without evidence that Defendants participated in the Prosecutor's decision, or induced him to rely on the allegedly coerced statements, the court rejected as a matter of law McKinley's theory of police liability. As a second rationale for rejecting McKinley's claim, the court explained that the Ohio Court of Appeals's decision precluded any further adjudication on the issue of whether *Garrity* prohibited the use of McKinley's statements at his criminal trial. The Ohio court determined that *Garrity* **428** itself did not prohibit trial use of the statements-because the prosecution was for false statements and obstruction, not scannergate-but found for McKinley on contractual immunity grounds. *See State v. McKinley,* No. 01CA98, 2002 WL 1732136 (Ohio Ct.App. June 25, 2002).

Finding itself bound by the Ohio court's reading of *Garrity*-on the theory that McKinley could not use his § 1983 civil action to re-litigate issues decided in his state criminal case-the district court rejected McKinley's claim on this basis as well. Finally, the court concluded that McKinley's claim would fail on the merits in any event because he could show no violation of *Garrity* or the Fifth Amendment, let alone a violation of a clearly established constitutional right. The basis for this conclusion was that *Garrity* permits use of employer-compelled statements in a later false statement and obstruction prosecution. The court apparently declined to address McKinley's primary argument-that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

his role in the second interview was that of a falsification and obstruction suspect, rather than a traditional *Garrity* informant, and therefore that it was a violation of the Fifth Amendment to use his compelled statements from the second interview at the false statement and obstruction trial.

### A.

Initially, we must determine whether, as the district court held, McKinley is precluded from making his Fifth Amendment claim in this § 1983 action because the Ohio Court of Appeals rejected the claim in his state criminal appeal.[FN8] *See State v. McKinley,* No. 01CA98, 2002 WL 1732136 (Ohio Ct.App. June 25, 2002) (unpublished opinion).

> FN8. The district court raised the issue of collateral estoppel *sua sponte. See* J.A. at 278 (Dist.Ct.Op.). Because we conclude that collateral estoppel does not bar McKinley from raising his Fifth Amendment claim here, we do not consider whether the district court's decision to raise the question *sua sponte* was erroneous.

As a general rule, a federal civil action brought under § 1983 is not a venue for re-litigating issues that were decided in a prior state criminal case. *See Allen v. McCurry,* 449 U.S. 90, 103-105, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (holding that the principles of collateral estoppel and res judicata apply in § 1983 actions). Because McKinley's state proceedings occurred in Ohio, we must consult Ohio's law of collateral estoppel (also known as "issue preclusion") to determine whether the state appeals court's decision precludes us from considering McKinley's Fifth Amendment claim. *See Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (instructing federal courts to apply the collateral estoppel law of the state which issued the prior judgment); *see also Haring v. Prosise,* 462 U.S. 306, 313-316, 103 S.Ct. 2368, 76 L.Ed.2d 595 (1983) (same); 28 U.S.C. § 1738 (federal courts must give full faith and credit to state court judgments).

[4][5] In Ohio, "issue preclusion precludes the relitigation of an issue that has been actually and necessarily litigated and determined in a prior action." *MetroHealth Med. Ctr. v. Hoffmann-Laroche, Inc.,* 80 Ohio St.3d 212, 685 N.E.2d 529, 533 (Ohio 1997) (internal quotation marks and citations omitted).[FN9] We cannot bar **429 McKinley from asserting his Fifth Amendment claim unless the Ohio appeals court considered the "identical" claim and the court's rejection of the claim was "essential [to its] judgment." *Goodson v. McDonough Power Equip., Inc.,* 2 Ohio St.3d 193, 443 N.E.2d 978, 985 (1983). The Ohio Court of Appeals vacated McKinley's falsification and obstruction convictions on the limited grounds that the state's use of his statements at the trial for those crimes constituted a breach of the police department's promise not to use "any of [his] answers ... from the interview ... in any criminal proceeding." *McKinley,* 2002 WL 1732136, at *3 (quoting the departmental warning Fortney provided to McKinley). While it is true that the court concluded that *Garrity,* as opposed to the police department's more generous immunity contract, would permit use of the statements at a trial for falsification and obstruction, *see id.* at *2-*3, this conclusion was in no sense "essential" to its judgment, the essence of which was that McKinley's convictions were invalid on contractual immunity grounds. *See Goodson, supra,* at 985. Indeed, the Ohio appeals court's comments regarding *Garrity* were mere *dicta.* Accordingly, we hold that McKinley may raise his Fifth Amendment claim in this action.

> FN9. We observe that this understanding of collateral estoppel is consonant with the Supreme Court's view of the doctrine as it applies in the § 1983 arena. As the Court put it in *Allen:* "Under collateral estoppel, once a court has decided an issue or fact *necessary to its judgment,* that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen,* 449 U.S. at 94, 101 S.Ct. 411 (emphasis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

added) (citing *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

**B.**

Section 1983 authorizes anyone deprived of her federal constitutional or statutory rights by state officials to bring a civil action for damages against such officials. 42 U.S.C. § 1983. However a defendant in a § 1983 action may raise the affirmative defense of qualified immunity, which "shields 'government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known.' " *Gardenhire v. Schubert,* 205 F.3d 303, 310-11 (6th Cir.2000) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

But as a precursor to the *Harlow* qualified immunity analysis, a court must first determine whether *any* constitutional violation occurred, let alone the violation of a clearly established right. *E.g., Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir.1999). Consequently, if we find no constitutional violation, then the case must be dismissed at this threshold stage because § 1983 is inapplicable on its face. *Katz,* 533 U.S. at 201, 121 S.Ct. 2151; *see also* 42 U.S.C. § 1983 ("Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... *subjects, or causes to be subjected,* any citizen of the United States ... *to the deprivation of any rights ... secured by the Constitution* ... shall be liable.") (emphasis added). Where a constitutional violation exists, the court must next determine whether the right infringed was clearly established-by decisions of the Supreme Court, this Court, or other Courts of Appeal-at the time the defendant allegedly infringed it. *See Higgason v. Stephens,* 288 F.3d 868, 876 (6th Cir.2002) (citing *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir.1993)). Finally, if the right is clearly established, we cannot impose liability on a state official unless "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was **\*430** objectively unreasonable in light of the clearly established constitutional right[ ]." *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (*en banc* ) (citing *Dickerson v. McClellan,* 101 F.3d 1151, 1157-58 (6th Cir.1996) ). We now consider McKinley's Fifth Amendment claim and whether any of the defendants are entitled to qualified immunity.

**C.**

We conclude that there is a genuine issue of material fact as to whether, at the time of McKinley's second interview, he was the target of an independent falsification and obstruction investigation, and no longer a mere *Garrity* witness. We conclude that there is also a genuine issue of material fact as to whether Defendants compelled McKinley to make statements that would incriminate him as to the crimes of falsification and obstruction. If McKinley was in fact a target of such an investigation, and if Fortney and Goldsmith in fact forced him to make the incriminating statements [FN10] later used against him in his trial for falsification and obstruction, he was "compelled in [a] criminal case to be a witness against himself." U.S. CONST. amend V.

> FN10. Lest there be any confusion regarding whether McKinley's answers in the second interview in fact incriminated him as to the crimes of falsification and obstruction, we observe that he not only provided answers that materially contradicted his earlier answers but also expressly admitted being untruthful in the first interview and doing so with the purpose of protecting fellow officers. *See* J.A. at 89-94 (transcript of second interview).

[6] This core protection against forced self-incrimination, binding on the federal government by virtue of the Fifth Amendment itself, is applicable to the states by virtue of the Fourteenth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Amendment. *Malloy v. Hogan,* 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). While the Supreme Court has devised procedural safeguards to guard against forced self-incrimination before judicial proceedings begin, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and while until recently courts interpreted the Fifth Amendment to prohibit coercive questioning *ipso facto, see Cooper v. Dupnik,* 963 F.2d 1220, 1242-44 (9th Cir.) (*en banc* ), *cert. denied,* 506 U.S. 953, 113 S.Ct. 407, 121 L.Ed.2d 332 (1992) (sustaining a § 1983 action against police officers even though the plaintiff's coerced statements were not used at any proceeding), it is now clear that "mere coercion does not violate the ... Self-Incrimination Clause absent use of the compelled statements in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 769, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion).[FN11] It is only once compelled incriminating statements are used in a criminal proceeding, as a plurality of six justices held in *Chavez v. Martinez,* that an accused has suffered the requisite constitutional injury for purposes of a § 1983 action.[FN12] *Id.* at 769, 772-73, 123 S.Ct. 1994. *See also Lingler v. Fechko,* 312 F.3d 237, 238-40 (6th Cir.2002) (finding no Fifth Amendment violation sufficient to sustain a § 1983 action where **431** police officer-employees who had made incriminating statements in compulsory interviews with superiors were never prosecuted). In this case, it cannot be disputed that McKinley's statements from the second interview were used as evidence against him at trial. J.A. at 165 (trial transcript).

> FN11. The *Chavez* decision may leave room for a challenge to the use of coerced statements in a grand jury proceeding, *see Chavez,* 538 U.S. at 766-67, 123 S.Ct. 1994 (declining to decide when a "criminal case" begins), however the thrust of the opinion rests on the view that the Fifth Amendment is a trial protection. *Id.* at 766-68, 123 S.Ct. 1994.

> FN12. Agreeing on this specific holding were Chief Justice Rehnquist and Justices Thomas, O'Connor, Scalia, Souter, and Breyer. *See id.* at 763, 773, 123 S.Ct. 1994 (Op. of Thomas, J., joined by Rehnquist, C.J., and O'Connor and Scalia, J.J.); *id.* at 777-79, 123 S.Ct. 1994 (Op. of Souter, J., joined by Breyer, J.).

Yet to prevail at the summary judgment stage in this § 1983 action, McKinley must also show that the statements are legally entitled to Fifth Amendment protection in the first place, i.e., that there was in fact a violation of his Fifth Amendment right to be free from forced self-incrimination; and, moreover, that the named defendants are proper defendants, i.e., that they caused the Fifth Amendment violation in question. *See, e.g., Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (holding that a § 1983 plaintiff must first identify and prove that a deprivation of constitutional magnitude occurred); *Baker v. McCollan,* 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (holding that § 1983 reaches only those public officials who *cause* deprivations of constitutional rights); 42 U.S.C. § 1983 (making liable "every person who ... *subjects, or causes to be subjected,* any citizen of the United States [to the deprivation of any constitutional right]") (emphasis added). The district court rejected McKinley's claim on both grounds. The court held that Defendants did not violate McKinley's Fifth Amendment rights because the Fifth Amendment's protection against forced self-incrimination does not extend to perjury or false statements. The court further held that in any event, even if any of the defendants had compelled McKinley to incriminate himself, it is only prosecutors who "use" suspects' incriminating statements against them in criminal proceedings; consequently, the named defendants, all police officers and officials, did not cause the constitutional injury McKinley alleges.

We address first McKinley's argument that Defendants violated his Fifth Amendment rights;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

second, his argument that Defendants, although they are police officers, may nonetheless be held liable under § 1983 for violating his Fifth Amendment rights; and, finally, his assertion that those rights were clearly established at the time they were infringed.

### 1.

[7][8][9] With respect to the substance of McKinley's claim that Defendants "compelled [him] in [a] criminal case to be a witness against himself," U.S. CONST. amend. V., we note again that McKinley objects only to the use at trial of the statements he made during the second interview. This position reflects an accurate understanding of *Garrity,* which would permit the use-in a false statement, perjury, or obstruction trial-of the statements he made during the *first* interview since it was conducted pursuant to the "matter under investigation", i.e., scannergate. *See United States v. Veal,* 153 F.3d 1233, 1242-43 (11th Cir.1998), *cert. denied,* 526 U.S. 1147, 119 S.Ct. 2024, 143 L.Ed.2d 1035 (1999) (holding that a *Garrity-*immunized statement could serve as evidence in a prosecution for falsification and obstruction). Focusing his challenge only on the second interview, McKinley alleges that Fortney at that point viewed him as having committed the crimes of falsification and obstruction by lying during the first interview. Consequently, McKinley asserts, Fortney and Goldsmith violated the rule of *Garrity* because *Garrity* extends as far as "the matter being investigated," *Veal,* 153 F.3d at 1243, and "the matter" now included a separate investigation of McKinley. In any event, McKinley posits, Fortney's conduct violated the Fifth Amendment because,**432** having openly accused McKinley of committing certain crimes (falsification and obstruction), Fortney then compelled McKinley to inculpate himself in the commission of those crimes (by threatening McKinley with termination if he did not admit his role in scannergate and thus materially contradict his earlier statements). And, finally, the fruits of the compulsory interview were introduced against McKinley at a trial for those crimes.FN13

FN13. McKinley also argues that Fortney's failure to read him the *Miranda* warnings at the outset of the second interview is actionable under § 1983. On the contrary, a § 1983 action on that basis is squarely foreclosed by the Supreme Court's decision two terms ago in *Chavez. Chavez,* 538 U.S. at 772, 123 S.Ct. 1994 ("Accordingly, Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and cannot be grounds for a § 1983 action.") (plurality opinion).

There is evidence in the record sufficient to present genuine issues of material fact as to whether Fortney conducted the second interview of McKinley because he suspected that McKinley had committed falsification and obstruction during the first one and as to whether, during the second interview, Fortney and Goldsmith compelled McKinley to incriminate himself insofar as the crimes of falsification and obstruction are concerned. As a starting point, during the 10-15 minute pre-interview before the second interview, Fortney accused McKinley of lying during his first interview and advised him that he now had the chance to come clean and tell the truth. J.A. at 182-85 (Fortney Depo); FN14 Fortney and Goldsmith then elicited, without the tape recorder running, an account from McKinley that satisfied them. *Id.* Second, Fortney admits that he advised McKinley that he was still under the protection of *Garrity,* so that although McKinley was required to answer the officers' questions, his statements could not be used against him in a criminal proceeding. *Id.* at 185. Third, McKinley deduced from Fortney's representation regarding *Garrity* that, just as with the first interview, he would have been disciplined and likely terminated if he did not agree to answer questions at the second interview. While Fortney could not recall whether he instructed McKinley to sign the immunity documents provided during the second interview, *see id.* at 185-86 (Fortney Depo. at 12-13), we conclude that Fortney's representation to McKinley that he "needs to tell the truth and he's still under *Garrity,*"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN15 *id.* at 185, is sufficient to defeat **433** summary judgment on the issue of whether McKinley's presence at the interview was compulsory. Moreover, Defendants do not suggest that McKinley's participation in the second interview was voluntary, instead admitting in their brief that his second interview was also " *Garrity*-immunized." *See* Brief of Appellees at 35. Finally, our conclusion on this point is only strengthened by the conditions of the first interview, in which McKinley was informed that failure to answer truthfully "could result in disciplinary action" and "possible job forfeiture." *Id.* at 161-62 (immunity documents).

FN14. In his deposition testimony, Fortney explained:

We had compared Patrolman McKinley's statement to, you know, other statements we had received and there was, it was obvious to us that there were differences and we felt by the number of people giving differences that he was being untruthful so we explained to him that we're gonna give him another chance to give us a statement and come clean and tell us the truth this time ... I just told him that it was obvious, you know, to us that he was lying and we were going to give him another chance, you know, to, even if we had to we could parade about six officers in that could tell different stories than he was telling. He needs to tell the truth and he's still under *Garrity,* he needs to tell the truth and take his chances.

J.A. at 184-85 (Fortney Depo.).

FN15. Fortney's interpretation of this *Garrity* warning, according to his deposition testimony, was "[t]hat McKinley had to answer our questions truthfully and that if he said things that incriminated himself against the-the case we're investigating, you know, i.e., Scanner Gate, that those

could not be used against him." J.A. at 185 (Fortney Depo.). This may suggest that Fortney in fact viewed the second interview as no more than an additional chapter in the scannergate inquiry. But by no means does Fortney's *post hoc* self-interested statement counteract the evidence in support of McKinley's allegation that in the second interview, he was under investigation for lying. Which representation of the facts-Fortney's or McKinley's-is correct is a question committed to the jury.

A fourth relevant fact is that at the beginning of the second interview, when Fortney first began recording the conversation, Goldsmith read a statement into the microphone that included another accusation of lying, to wit:

We've called Jeff McKinley back out to be re-interviewed. He has been advised the he's still under *Garrity.* He was asked if he wanted a rep. present. He stated that he did and Dan Martincin came to the Special Investigative Unit and sat on the pre-interview.FN16 We are preparing now to re-interview Jeff McKinley and we'll go over the statement form that he gave to the investigating officers on 2/25/00. It's been determined prior to this interview that [McKinley] was not truthful at the time he gave the interview on 2/25/00. He will be asked, again, the same questions and will give his responses.

FN16. Officer Martincin's presence is relevant on the issue whether Fortney and Goldsmith compelled McKinley to incriminate himself. The record discloses that (1) Martincin is not an attorney; and (2) although he was present and could be consulted, he apparently could not terminate the interview. Moreover, at no point have Defendants suggested that McKinley could have refused to answer questions without sanction. As our discussion indicates, the totality of the evidence surrounding the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

two interviews indicates that there are genuine issues of material fact regarding whether Fortney and Goldsmith suspected McKinley of falsification and obstruction and compelled him to give incriminating answers to their questions at the second interview.

*Id.* at 84. Fifth, during the course of the interview, Fortney and Goldsmith at least occasionally stopped the tape, pointed out inconsistencies between what McKinley was currently saying and what he had said in the unrecorded pre-interview, accused McKinley of lying, and encouraged him to tell the truth. *See id.* at 192-203 (Fortney Depo.). At this stage, McKinley asserts that the message Fortney and Goldsmith sent to him was that the "truth" was what he had said during the pre-interview; Fortney and Goldsmith, McKinley submits, were not satisfied until all of his answers matched the answers he gave in the unrecorded pre-interview. [FN17] Fortney does not dispute that the officers recorded over what they concluded were McKinley's untruthful answers with the answers he gave after they "encouraged him to tell the truth." [FN18] J.A. at 201.

> [FN17]. McKinley does not challenge this "selective recording" as such, but appears to assert that it constitutes evidence of Fortney and Goldsmith's coercive tactics. We express no view on whether these tactics might be independently attacked as infringing on McKinley's Fourteenth Amendment due process rights. We do agree, however, that the method of questioning in this case is probative of coercion and is therefore relevant to McKinley's Fifth Amendment claim.

> [FN18]. The following exchange between McKinley's counsel and Fortney bears this out:

>> Q: But for the most part you felt that his answers in the [unrecorded] pre-

interview were accurate compared with the statements of the other officers?

A: Yes, sir.

Q: So you thought those where the truthful answers?

A: Yes, sir.

Q: And ... those answers that you determined were truthful in the pre-interview, those contradicted some of the answers he had given you in the first statement [from the first interview], correct?

A: Yes, sir.

Q: Okay. And so as you're going along and he answers questions on the tape that are different from the ones you had determined to be the truth in the pre-interview, you turned the tape off, reminded him of what was said in the pre-interview and erased his previous answer and gave him a chance to answer what you thought were the truthful answers based on the pre-interview, correct?

A: Yes.

...

Q: Okay. And so you were encouraging him to re-think that answer and give you a different one, right?

A: We were just encouraging him to tell the truth.

Q: But you had already determined that the truth was the answers he gave you previously in the pre-interview, right?

A: Mostly, yes.

Q: Okay. And so you were encouraging

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

him to go back to that version to match what he had said in the pre-interview, right?

A: I can just say we encouraged him to tell the truth and, yes, we did believe that the pre-interview was mostly truthful.

Q: Okay. And that's the part of it you wanted him to say on tape.

A: Yes.

J.A. at 199-201 (Fortney Depo.).

**\*434** Finally, in affidavits submitted to the district court, both Defendant Fortney and Defendant Messer-who was the Captain in charge of the scannergate investigation-made attestations that could support a finding that, prior to the second interview, they suspected McKinley of committing falsification and obstruction.[FN19]

> **FN19.** *See* J.A. at 243 (Fortney Aff.) ("The information obtained from Officers McKinley, Foster, and Nirode, and Mr. Noble during this investigation established that Officer McKinley had lied during his February 25, 2000 statement to Lt. Goldsmith and me and had committed the crimes of falsification and obstructing official business."); *id.* at 66 (Messer Aff.) ("After I had received additional information in the course of the investigation, Lt. Fortney took a second statement from McKinley on March 7, 2000.").

Together, these facts suffice to establish a genuine issue of material fact as to whether Fortney decided to conduct a second interview of McKinley not merely to glean further information regarding scannergate but also because he suspected that McKinley had lied in the first interview and had thereby committed falsification and obstruction. In addition, these facts present a genuine issue of material fact regarding whether Fortney and Gold-

smith compelled McKinley to make incriminating statements as to the crimes of falsification and obstruction.

**[10]** These issues are material because if McKinley was a target and not a mere *Garrity* witness, the Fifth Amendment would preclude use, at the falsification and obstruction trial, of any incriminating statements he was compelled to make in the second interview. This conclusion follows from *Garrity* and from conventional Fifth Amendment principles. As McKinley correctly points out, *Garrity* extends as far as "the matter being investigated." *Veal,* 153 F.3d at 1243. Consequently, where "the matter" includes a subsidiary investigation into the truth of an officer's statements, a decision by internal affairs investigators to compel the officer to make statements and admissions to the effect that he lied-which statements and admissions are then used to convict him of lying in a prior interview-amounts to a direct violation of *Garrity*. This is not a novel or ingenious interpretation of *Garrity* but rather the only way to read the opinion if we are to give meaningful effect to the Fifth Amendment.

**\*435** Like the district court, we find the Eleventh Circuit's decision in *United States v. Veal* to be instructive on this question. In *Veal,* Miami police officers under investigation by the police department and the FBI for murdering a suspect and covering it up were prosecuted for the crime of making false statements during interviews conducted pursuant to the departmental investigation. 153 F.3d at 1237-39. The Eleventh Circuit rejected the officers' contention that *Garrity* prohibited use of their statements at the trial for these collateral crimes. *Id.* at 1243-44. Significantly, in *Veal* the government built its false statement and obstruction case not by reliance on subsequent interviews of the officers but on the basis of physical evidence and experts' analyses of the crime scene; this evidence tended to incriminate the officers and expose their cover-up. *See id.* at 1237-38. Indeed, the investigators in *Veal* did not conduct later interviews of the officers in which they accused the officers of lying during pri-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

or interviews. Consequently, the officers in *Veal* did not-and *could* not-present the Fifth Amendment claim that McKinley asserts here. Rather, the officers in *Veal* submitted that "statements protected by *Garrity* are forever barred from use in any prosecution, including one for perjury, false statements, or obstruction of justice." *Id.* at 1240. By contrast, McKinley *concedes* that his answers in the *first* interview are admissible against him in a prosecution for falsification and obstruction of justice.

The other cases the district court relied upon to deny McKinley's claim are similarly distinguishable; the defendants in those cases did not suggest that the police or their employers compelled them to incriminate themselves in subsequent interviews as to the crimes of perjury, making false statements, or obstruction of justice. *See United States ex rel. Annunziato v. Deegan,* 440 F.2d 304, 306 (2d Cir.1971) ("[A]ppellant was not prosecuted for past criminal activity based on what he was forced to reveal about himself; he was prosecuted for the commission of a crime while testifying, i.e. perjury."); *United States v. Devitt,* 499 F.2d 135, 142 (7th Cir.1974), *cert. denied,* 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466 (1975) (observing same). Where such a claim is colorable, as it is here, the Fifth Amendment is surely implicated. In *Garrity,* the Supreme Court reasoned that questioning a public employee under threat of termination may not lead to the use of the employee's statements at trial. *See* 385 U.S. at 497-98, 87 S.Ct. 616 ("The choice given petitioners was either to forfeit their jobs or to incriminate themselves ... We think the statements were infected by the coercion inherent in this scheme of questioning and cannot be sustained under our prior decisions."). But the Court has not limited this Fifth Amendment principle to cases where the state threatens job loss; the rationale of *Garrity* applies with equal force where the state exacts answers from its contractors under threat of terminating their contracts, *see Lefkowitz v. Turley,* 414 U.S. 70, 78-81, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), and where a state "impose[s] substantial penalties because a witness elects to exercise his

Fifth Amendment right not to give incriminating testimony against himself." *Lefkowitz v. Cunningham,* 431 U.S. 801, 805, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977) (holding that New York could not strip a state Democratic party official of his office on the grounds that he refused to waive his Fifth Amendment privilege against self-incrimination before a grand jury).

Consistent with these precedents, we conclude that McKinley alleges a classic violation of the Fifth Amendment: a decision by internal affairs officers to compel an officer suspected of specific crimes to **436** incriminate himself as to *those* crimes, followed by the subsequent use of the incriminating statements in a trial for *those* crimes. It makes no difference that the crimes at issue in this case are falsification and obstruction, rather than assault or robbery. It similarly makes no difference, as the Supreme Court's cases make clear, that the manner of compulsion was the threat of disciplinary action and termination of employment, rather than physical coercion. Indeed, if McKinley reasonably believed that Defendants would impose substantial penalties on him-such as job loss or disciplinary sanctions [FN20]-if he refused to answer the questions put to him in the second interview, he was compelled to incriminate himself in violation of the Fifth Amendment. *Lefkowitz v. Cunningham,* 431 U.S. at 805-806. On the facts before us, we cannot conclude as a matter of law that McKinley's belief that he would face severe sanctions for declining to incriminate himself was unreasonable.

FN20. In addressing this question, the D.C. Circuit held that an officer claiming the protection of *Garrity* "must have in fact believed [his] statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *United States v. Friedrick,* 842 F.2d 382, 395 (D.C.Cir.1988). The Eleventh Circuit has reasoned similarly. *See United States v. Vangates,* 287 F.3d 1315, 1321-22 (11th Cir.2002) (adopting *Friedrick* 's approach).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

We decline to require proof that McKinley reasonably believed he would be fired. It is sufficient, we think, for a jury to conclude that he reasonably believed that substantial penalties were likely to result from his refusal to answer questions during the second interview; although job termination is surely a "substantial penalty," so, too, are other employer actions, such as ordering a demotion or suspension. *See Dwan v. City of Boston, 329 F.3d 275, 279 (1st Cir.2003)* (observing that to prove his incriminating statements were compelled, an employee must show that he was "threatened or forewarned of [a] sanction for refusing to testify"). Relevant to the question whether McKinley reasonably believed he faced a threat of substantial penalties are the totality of the circumstances surrounding the second interview and the circumstances of the first interview, to the extent they are probative of McKinley's state of mind, and whether that state of mind was reasonable, during the second. *See* discussion *supra.*

Finally, we have made clear our view that if Fortney or any other defendants suspected McKinley of falsification and obstruction-a factual question which must be submitted to a jury-the second interview cannot be viewed as simply part of scannergate. In other words, there is a genuine question as to whether the "matter under investigation" was no longer limited to the misuse of scanners, but had broadened to include an investigation of McKinley for crimes committed by lying during the scannergate inquiry. In sum, because McKinley's incriminating statements were used at his trial for falsification and obstruction, all that is required of McKinley at the summary judgment stage is that he present sufficient evidence to create genuine issues of material fact on the questions whether any of the defendants suspected him of committing falsification and obstruction and whether any of the defendants compelled him to incriminate himself as to

those crimes. At least as to Defendant Fortney-the only named defendant who participated in the second interview-we hold that McKinley presents sufficient evidence to survive summary judgment on these questions.[FN21]

> FN21. We consider McKinley's Fifth Amendment claim as against the other individual defendants and the City *infra* at Part I.D of this opinion.

**2.**

[11] Next we must consider the district court's conclusion that McKinley's § 1983 action cannot lie against Defendants, who are police officers, because "the only representative**437** of the State who 'used' [McKinley's] statements against him in court was the Special Prosecutor." J.A. at 275 (Dist.Ct.Op.). We reject this interpretation of the Fifth Amendment for several reasons.

First, despite its superficial appeal, the district court's bright line rule lacks support in the case law. We are not aware of any reported decision in which a federal court dismissed a § 1983 action based on an alleged Fifth Amendment violation solely on the grounds that the defendants were police officers and thus did not "use" the plaintiff's statements at trial.[FN22] Instead, the cases involve suits against the police and center on whether the requisite "use" at a criminal proceeding occurred. The cases do not question that the police may be held liable under § 1983 for violating someone's Fifth Amendment rights. *See Chavez,* 538 U.S. at 767, 123 S.Ct. 1994; *Burrell v. Virginia,* 395 F.3d 508, 513-15 (4th Cir.2005); *Renda v. King,* 347 F.3d 550, 557-59 (3d Cir.2003); *Lingler v. Fechko,* 312 F.3d 237, 239 (6th Cir.2002); *Deshawn E. v. Safir,* 156 F.3d 340, 346-47 (2d Cir.1998); *Riley v. Dorton,* 115 F.3d 1159, 1164-65 (4th Cir.) (*en banc* ), *cert. denied,* 522 U.S. 1030, 118 S.Ct. 631, 139 L.Ed.2d 611 (1997); *Giuffre v. Bissell,* 31 F.3d 1241, 1255-56 (3d Cir.1994); *Weaver v. Brenner,* 40 F.3d 527, 534-36 (2d Cir.1994) (all involving § 1983 suits against police officers).[FN23]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN22. Nor was the district court apparently aware of such precedents; the court offered no authority for its conclusion that because only prosecutors "use" statements at trial, police officers cannot face liability. *See* J.A. at 273 (Dist.Ct.Op.).

FN23. The Supreme Court's holding in *Chavez,* that use of a coerced statement in judicial proceedings against the plaintiff is a prerequisite to § 1983 liability, does not resolve the question of who the proper bearer of such liability would be. Indeed, no member of the Court questioned the propriety of *who* the plaintiff sued in that case (the police officer) so much as disapprove of *what* the plaintiff sued *about* (the coercion itself, without use in a judicial proceeding). *See Chavez,* 538 U.S. at 768-71, 123 S.Ct. 1994. We note that a district court in California recently observed, in *dicta,* that victims of coercive police questioning may not sue the questioning police officers under § 1983 *even if* their involuntary statements are used at trial because it is the prosecutor who introduces the statements and the judge who admits them into evidence. *Crowe v. County of San Diego,* 303 F.Supp.2d 1050, 1091-92 (S.D.Ca.2004). As is clear from our discussion, we find this reasoning unpersuasive. In *Crowe,* the court's holding was that the plaintiffs' action was barred under *Chavez* because their statements were used only at a grand jury proceeding and at a hearing to determine whether they would be tried as adults or juveniles. *See id.* at 1088-90.

[12] The absence of a *per se* rule barring suits against the police for Fifth Amendment violations is not surprising; the Supreme Court has implicitly acknowledged the propriety of holding police officers liable for Fifth Amendment violations:

The privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental

trial right of criminal defendants. *Although conduct by law enforcement officials prior to trial may ultimately impair that right,* a constitutional violation occurs only at trial.

*United States v. Verdugo-Urquidez,* 494 U.S. 259, 264, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (emphasis added); *see also Chavez,* 538 U.S. at 767, 123 S.Ct. 1994 (quoting the same passage). It is hard to see how law enforcement officials could "ultimately impair" the right against self-incrimination if not by compelling a suspect to make incriminating statements that are later used against him at trial. It is equally hard to see how officials whose conduct ultimately impaired a citizen's Fifth Amendment rights could nonetheless escape**438 civil liability merely because a different state official put the statements into evidence at trial. This is especially true since prosecutors are absolutely immune from suit when the conduct complained of relates to their role as advocates for the state in the judicial process. *E.g., Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Burns v. Reed,* 500 U.S. 478, 485-86, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *Higgason v. Stephens,* 288 F.3d 868, 877-78 (6th Cir.2002). Such immunity exists even when it is alleged that a prosecutor knowingly presented false evidence against the plaintiff at trial. *Buckley,* 509 U.S. at 272-73, 113 S.Ct. 2606; *see also Imbler v. Pachtman,* 424 U.S. 409, 429-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Spurlock v. Thompson,* 330 F.3d 791 (6th Cir.2003). It follows that a rule barring suits against the police for Fifth Amendment violations is a rule barring *any* suits for Fifth Amendment violations. But it cannot be that invasions of the right against compelled self-incrimination are not actionable. The Fifth Amendment's protection against self-incrimination, like the Fourth Amendment's protection against unreasonable searches and seizures, is explicit and personal. Just as people may file suit under § 1983 to redress deprivations of the latter protection, so may they sue to redress deprivations of the former.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

One might think *Chavez* precludes our conclusion because it makes clear that the right against compelled self-incrimination is not violated until incriminating statements are used in a criminal proceeding. But this interpretation of *Chavez* is untenable, not least because it was obvious in *Chavez* that no criminal proceeding had occurred. We read the Fifth Amendment's requirement that a plaintiff's statements be used in a criminal proceeding as essentially one of standing. Where such use of the statements has not occurred, the plaintiff may not sue because he has not suffered the injury against which the Fifth Amendment protects. Where such use has occurred, however, there is no reason to preclude the plaintiff from suing the state officials who actually compelled him to incriminate himself in a clearly unconstitutional and objectively unreasonable way. This is not to say that the plaintiff is relieved of having to show causation. Returning our attention to the case before us, we conclude that for purposes of surviving Defendants' motion for summary judgment, McKinley has done so.

"[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to a deprivation of his constitutional rights." *Baker v. McCollan,* 443 U.S. 137, 142, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (internal quotation marks and citation omitted). Causation in the constitutional sense is no different from causation in the common law sense. Indeed, "[s]ection [1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Thus the Supreme Court rejected the proposition that a police officer who applied for a warrant without probable cause could escape liability for the ensuing arrest merely because the warrant was supplied by a judge. *Malley v. Briggs,* 475 U.S. 335, 345 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). In *Malley,* the defendant police officer argued that "the judge's decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest." *Id.* The Court said that the of-

ficer's " 'no causation' rationale in this case is inconsistent with our interpretation of § 1983 ... Since the common law recognized the causal link between the submission of a complaint and an ensuing **\*439** arrest, we read § 1983 as recognizing the same causal link." *Id.* The same reasoning applies to the present case. Officer Fortney, it is alleged, compelled McKinley to incriminate himself. Fortney took these actions pursuant to an ongoing official investigation. A special prosecutor was appointed. Fortney turned the statements over to the prosecutor and when the prosecutor introduced the statements at McKinley's trial, he did so through Fortney, who was on the witness stand. Viewing the facts in the light most favorable to McKinley, we hold that the alleged deprivation of his constitutional rights-i.e., the use at trial of incriminating statements he was compelled to make-was a "natural consequence of [Fortney's] actions." FN24 *Pape,* 365 U.S. at 187, 81 S.Ct. 473.

FN24. The dissent asserts that Fortney cannot be held liable because his actions comported with *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). This misses the point of *Garrity* and of McKinley's claim in this case. To comport with *Garrity,* a state employer who compels an employee to make incriminating statements must not only promise not to use those statements in a criminal proceeding against the employee, but must also *keep* that promise. McKinley's claim is that Fortney and his colleagues *broke* that promise by compelling him to incriminate himself under the false promise of *Garrity* immunity and by turning the incriminating statements over to the prosecutor, who then prosecuted McKinley for the very crimes about which McKinley was compelled to make incriminating statements. As we have discussed, McKinley has offered enough evidence of this claim to proceed to trial.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Our conclusion that Fortney may be held liable does not mean that causation will be easy to prove in every case. A police officer may defend on the grounds that he attempted to prevent the use of the allegedly incriminating statements at trial, or that he never turned the statements over to the prosecutor in the first place. Such a defense would be of no avail to Fortney, who turned McKinley's statements over to the prosecutor, took the stand at McKinley's trial, and testified about McKinley's having made the statements. But the availability of such a defense insures that liability will befall only those state actors whose conduct caused the constitutional injury at hand.

[13] With these principles in mind, we reject the district court's position that the police may never be liable for violating someone's Fifth Amendment rights. We hold instead that in actions brought under § 1983 for alleged violations of those rights, "it is the person who wrongfully coerces or otherwise induces the involuntary statement who causes the violation of the [Fifth Amendment] privilege." In other words, while there may be no cause of action for the wrongful procurement of *unused* incriminatory statements ... *it is the wrongful procurement ... that forms the basis for liability.*" *Williams v. Fedor,* 69 F.Supp.2d 649, 676 (M.D.Pa.1999), *aff'd without opinion,* 211 F.3d 1263 (3d Cir.2000).

**3.**

We now turn to whether the right McKinley asserts in this action-the right not to be compelled by his superiors, who are state officials, to make incriminating statements that are later used against him at trial-was clearly established at the time of McKinley's second interview. We hold that it was.

[14] We are mindful that determining whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This is precisely what we have **\*440** done. We have stressed that the facts-viewed in the light most favorable to McKinley-present a straightfor-

ward case of forced self-incrimination: Internal affairs investigators suspect that a police officer lied when asked, during an interview conducted as part of an official investigation, about his knowledge of or participation in alleged police misconduct. The investigators are aware that lying under such circumstances is a crime. The investigators order the officer to appear for a second interview and compel him to admit, both expressly and by implication, that he did indeed lie in the initial interview. Finally, the state uses these statements against the officer in a criminal trial for lying during the initial interview, i.e., for falsification and obstructing the internal affairs investigation.

[15] On these facts, the contours of the Fifth Amendment's right to be free from forced self-incrimination are "sufficiently clear that a reasonable official would understand that what [the investigators did] violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 ("The relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). We decline to adopt the view of qualified immunity advanced by Defendants and the district court, namely, that since "there is no federal case on point," J.A. at 278 (Dist.Ct.Op.), Defendants are immune from suit. The Supreme Court's response to this argument is well-suited to the circumstances of this case: "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 535, 105 S.Ct. 2806, 86 L.Ed.2d 411 n. 12 (1985)). In cases where courts have dismissed Fifth Amendment suits against state employers on qualified immunity grounds, they have done so because the complaining employees did not allege that they had been subjected to the kind of compulsion and subsequent prosecution proscribed by *Gar-*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*rity* and its progeny. *See Chan v. Wodnicki,* 123 F.3d 1005, 1008-10 (7th Cir.1997), *cert. denied,* 522 U.S. 1117, 118 S.Ct. 1054, 140 L.Ed.2d 117 (1998) (holding that a police department's after-the-fact transfer of an officer who invoked his Fifth Amendment privilege before a grand jury did not amount to the type of compulsion that is prohibited under *Garrity* and similar cases); *Singer v. State of Maine,* 49 F.3d 837, 845-47 (1st Cir.1995) (holding that a state tax bureau's after-the-fact dismissal of an employee who refused to answer possibly incriminating questions was not a violation of a clearly established right because the employee was not threatened with sanctions prior to questioning nor required to waive her Fifth Amendment privilege); *Wiley v. Doory,* 14 F.3d 993, 996 (4th Cir.1994), *cert. denied, Wiley v. Mayor and City Council of Baltimore,* 516 U.S. 824, 116 S.Ct. 89, 133 L.Ed.2d 45 (1995) ("[A]lthough it is alleged that the officers made statements under the threat of job loss, these statements were not used against them in any criminal proceeding.").

In stark contrast to these cases, McKinley presents sufficient evidence for summary judgment purposes to suggest that he *was* compelled to incriminate himself in precisely the manner held unlawful by the Supreme Court in *Garrity.* The Court's holding in that case bears repeating: "We now hold that the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in **\*441** subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Garrity,* 385 U.S. at 500, 87 S.Ct. 616. Particularly in light of the defendants' obvious familiarity with *Garrity,*[FN25] we take issue with the district court's representation that "there is no federal case on point" because it is hard to imagine a case that could be more on point-in view of the facts before us-than *Garrity* itself. We conclude, therefore, that Defendant Fortney is not entitled to qualified immunity.[FN26]

FN25. Recall that Fortney repeatedly discussed the rule of *Garrity* in his deposition; he and Goldsmith explicitly told McKinley that *Garrity* applied in the second interview; and, finally, the immunity documents supplied in the first interview were clearly inspired by *Garrity* and its rationale.

FN26. The issue whether the other individual defendants are entitled to qualified immunity is not before us because McKinley has not yet had an adequate opportunity to conduct discovery as to those defendants. *See* discussion *infra* Part I.D. If on remand McKinley discovers and produces sufficient evidence that other individual defendants violated his right not to be compelled to incriminate himself, it will be the task of the district court to determine whether those defendants are entitled to qualified immunity.

Finally, we address the criticisms of our dissenting colleague. The dissent suggests that Officer Fortney should be entitled to qualified immunity because we have established a "new right of action." We are unclear how, but it makes no difference since in no sense is McKinley's right to sue Fortney "new." The dissent cannot mean that the use at a criminal proceeding requirement is new. In *Chavez,* the Court was asked whether the Fifth Amendment right against self-incrimination was truly as broad as the Ninth Circuit had interpreted it, which is to say, as a right not only against the use of one's self-incriminating statements in a criminal case but a right against being coercively questioned in the first instance. *See Chavez,* 538 U.S. at 765-68, 123 S.Ct. 1994. *Chavez* established a new rule of law only in the sense that it *limited* the right to sue for Fifth Amendment violations to *only* those cases in which such suits were *already* permissible under clearly established law, i.e., cases in which the plaintiff's incriminating statements had been used in a prior criminal proceeding.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

If the dissent means that our holding is "new" because we have sustained, at the summary judgment stage, a § 1983 action against a police officer on the allegation that he compelled the plaintiff to incriminate himself, we can only conclude the dissent misapprehends the nature of qualified immunity. The doctrine of qualified immunity does not mean that a state actor is qualifiedly immune unless the plaintiff can point to a prior case in which judgment was entered against the same type of state actor on the same facts.[FN27] As we said recently: "Officials do not enjoy qualified immunity simply because the exact action in question has not previously been held unlawful by a court, but 'in light of **442 pre-existing law the unlawfulness must be apparent.' " *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 901 (6th Cir.2004) (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034). And as the Supreme Court said three terms ago: "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). With regard to the present case, pre-existing law makes apparent the unlawfulness of compelling someone to make incriminating statements that are later used against him at trial. Furthermore, as we discuss *supra* at Part I.C.2 of this opinion, there is no holding to the effect that Fifth Amendment violations are not actionable under § 1983. On the contrary, there are holdings to the effect that where the requisite use at a criminal proceeding occurs, a right of action against the police may be had. *See, e.g., Weaver v. Brenner,* 40 F.3d 527, 534-35 (2d Cir.1994); *Deshawn E. v. Safir,* 156 F.3d 340, 345-47 (2d Cir.1998); *Giuffre v. Bissell,* 31 F.3d 1241, 1255-56 (3d Cir.1994); *see also Griffin v. Strong,* 983 F.2d 1540, 1543-44 (10th Cir.1993).

> FN27. As it happens, there *is* a case where judgment was entered against a police officer in a § 1983 action for violating someone's Fifth Amendment right against self-incrimination. *See Griffin v. Strong,* 983 F.2d 1540 (10th Cir.1993). The

plaintiff was tried and the incriminating statements he was compelled to make were used at trial. *Id.* at 1541. After the convictions were overturned, the plaintiff sued the police officer who compelled him to make the statements. The Tenth Circuit held, as a matter of law, that the officer had compelled the plaintiff to make the statements, reversed the district court's holding to the contrary and instructed the court to enter judgment in favor of the plaintiff. *Id.* at 1544; *Griffin v. Strong,* 827 F.Supp. 683, 685 (D.Utah 1993) (decision on remand).

Accordingly, we hold that a reasonable officer would understand that what Fortney and his colleagues are alleged to have done violates the Fifth Amendment right against self-incrimination. *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034.

**D.**

Although we hold that police officers may face liability under § 1983 for violating suspects' Fifth Amendment rights and that McKinley has presented sufficient evidence on this score as to Defendant Fortney, it remains to determine whether any of the other officers named as defendants in this case, or the City of Mansfield, are entitled to summary judgment.

As is clear from our discussion *supra,* the evidence upon which McKinley relies centers exclusively on the second interview conducted by Defendant Fortney and his colleague, Lt. Goldsmith, who is not a defendant herein. As to the other individual defendants, all of whom are superiors to Fortney, McKinley merely hypothesizes liability for these officials, on the apparent theory that they must have participated in the alleged Fifth Amendment violation since they are "up the chain of command." *See* Brief of Appellant at 47-48 ("Fortney and anyone else up the chain of command who knew that the second interview was to take place and that [McKinley] was suspected of lying in the first interview, had an obligation to offer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[McKinley] the protections of the Fifth Amendment."). State officials are liable under § 1983 only if their conduct "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights ... secured by the Constitution." 42 U.S.C. § 1983. Because McKinley does not support this hypothesis with record evidence tending to show that such higher-ups knew of the second interview or shared Fortney's alleged suspicion that McKinley lied in the first interview, we would ordinarily affirm the dismissal of his claims as against the other officer-defendants and the City. However, McKinley submits that the reason he can offer no evidence implicating the other individual defendants and the City in the alleged violation of his Fifth Amendment rights is that the district court granted summary judgment before affording him a sufficient opportunity to conduct discovery. *See Vance v. United States,* 90 F.3d 1145, 1148 (6th Cir.1996) (citation omitted) (holding that summary judgment is improper under such circumstances). We agree.

Defendants moved for summary judgment before any discovery occurred. **\*443** McKinley responded with a motion seeking leave to conduct discovery and to hold in abeyance a decision on Defendants' motion for summary judgment until he conducted discovery and responded to Defendants' motion. In his motion, McKinley specifically requested that he have an opportunity to "view the investigative file created and kept by the Mansfield Police during their internal 'scannergate' investigation" and to "depose the named defendants and possibly others whose names may appear in the investigative file." J.A. at 125-26. The court's response was to permit McKinley only to "depose Defendant Officer Dale Fortney on whether he selectively recorded McKinley's statements in the second interview." *Id.* at 129 (Dist.Ct.Ord.).

[16][17] By his motion for leave to conduct discovery, McKinley clearly fulfilled his "obligation to inform the district court of [his] need for discovery" prior to a decision on the summary

judgment motion. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.,* 280 F.3d 619, 627 (6th Cir.2002). Moreover, we note, McKinley objected to the court's limited discovery order in his motion in response to Defendants' motion for summary judgment and again requested additional discovery. *See* J.A. at 133. He makes the same argument in his brief to this Court. *See* Brief of Appellant at 49. Consequently, McKinley has preserved for appeal his claim that summary judgment was premature due to an inadequate opportunity to discover evidence regarding all of the defendants. *See Abercrombie,* 280 F.3d at 627 (citing *Vance,* 90 F.3d at 1149).[FN28] We review such claims for abuse of discretion, *see id.,* and conclude that in this case, the district court abused its discretion because at the time of its highly restrictive discovery order, *no* discovery had occurred and the court offered no explanation for limiting discovery to only a deposition of Fortney, and regarding only his tactics during the second interview. *Compare Abercrombie, supra,* at 628 (upholding, in a case where substantial discovery had already occurred, a stay of discovery where the record showed that the specific additional material sought would be duplicative and the district court explained as much in its order).

> FN28. McKinley is not precluded from raising this claim merely because he cited only the summary judgment order in his Notice of Appeal. *See Abercrombie,* 280 F.3d at 627 n. 3 ("That Abercrombie appealed only from the grant of summary judgment and not the order staying discovery is ... of no moment. A stay of discovery is not a final appealable order.").

Accordingly, we hold that on remand the district court must grant McKinley a reasonable opportunity to conduct further discovery. At a minimum, he should be entitled to any documents that are relevant to the constitutional injury he alleges and to depose the named defendants and anyone else reasonably likely to offer relevant information regarding the decision to interview McKinley a second

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

time. We express no view on whether such further discovery will be fruitful for McKinley's case. At this early stage, it suffices for us to conclude that the district court erroneously limited McKinley's ability to discover evidence implicating Fortney's superiors and the City in the alleged Fifth Amendment violation in a case where he has presented sufficient evidence to withstand summary judgment regarding Fortney's liability for the alleged violation.

## II. Malicious Prosecution

We now address whether-despite evidence that at least Defendant Fortney may have violated McKinley's Fifth Amendment rights-the district court nonetheless properly dismissed McKinley's claim that Defendants maliciously prosecuted**444** him. In evaluating McKinley's malicious prosecution claim, the district court first noted that prosecutors alone make the decision to prosecute and, furthermore, they are absolutely immune from civil liability for their prosecutorial decisions. Second, the court cited this Court's decision in *Skousen v. Brighton High Sch.,* 305 F.3d 520 (6th Cir.2002), for the proposition that a police officer may not be held liable for malicious prosecution when he did not make the decision to prosecute.

The court further observed that there was no evidence suggesting that any of the defendants influenced or even participated in Prosecutor Knowling's decision to bring charges. The court dismissed as "weak" McKinley's argument that the defendants should face § 1983 liability for passing "false" evidence (the tape and transcript of the second interview) to Knowling. The court's primary basis for dismissing this argument was that even without relying on the second interview, the evidence of falsification and obstruction of official business-which consisted of the discrepancies between McKinley's first statement and the statements of Nirode, Foster, and Noble-*at least* amounted to probable cause to charge McKinley with those offenses. Finding that no constitutional violation occurred and therefore seeing no need to proceed to the issue of qualified immunity, the court concluded its analysis of the

malicious prosecution claim. We, too, are convinced that because there was probable cause-independent of the fruits of the second interview-to support the prosecution of McKinley, the malicious prosecution claim must be dismissed.

[18] As the district court correctly held, the named defendants "cannot be held liable for malicious prosecution when [they] did not make the decision to prosecute [the plaintiff]." *Skousen,* 305 F.3d at 529. McKinley presents no evidence suggesting that defendants conspired with, influenced, or even participated in, Prosecutor Knowling's decision to bring charges against him.[FN29] *Skousen,* in which the plaintiff alleged that a police officer had falsely accused her, clearly forecloses a malicious prosecution claim based solely on officers' turning over evidence to the prosecuting authorities. *Id.*

> [FN29]. McKinley may not have been able to access evidence on this question due to limits the district court imposed on his ability to conduct discovery. However, because there was probable cause to prosecute, we need not determine whether the district court erred in limiting discovery as far as McKinley's malicious prosecution claim is concerned.

[19] In any event, even if McKinley *could* implicate defendants in the decision to prosecute, there was probable cause, independent of the contested second interview, to support the decision. While the state of the law of malicious prosecution is somewhat uncertain in this circuit, *see Darrah v. City of Oak Park,* 255 F.3d 301, 308-12 (6th Cir.2001) (discussing confusion in the wake of *Frantz v. Village of Bradford,* 245 F.3d 869 (6th Cir.2001)),[FN30] it **445** nonetheless remains firmly established that where there is probable cause to prosecute, a § 1983 action for malicious prosecution will not lie. *Darrah,* 255 F.3d at 312; *see also Albright v. Oliver,* 510 U.S. 266, 273-75, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Spurlock v. Satterfield,* 167 F.3d 995, 1006 (6th Cir.1999). In-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

deed, in *Darrah* we resolved the issue presented here in a straightforward manner: "[I]f this court finds that there was probable cause to prosecute [the plaintiff], regardless of any alleged false statements made by [the investigator at the probable cause hearing], then she cannot make out a malicious prosecution claim under the Fourth Amendment." *Darrah,* 255 F.3d at 312. Just as we did in *Darrah,* the district court below assessed the totality of the evidence implicating McKinley in the crimes for which he was charged, while disregarding the challenged second interview.

FN30. In *Frantz,* a panel of this Court issued a puzzling opinion regarding the propriety of Fourth Amendment malicious prosecution claims. The panel interpreted the Supreme Court's plurality opinion in *Albright v. Oliver,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) to mean that the Fourth Amendment could not serve as the basis for a § 1983 malicious prosecution action unless the plaintiff brings before the court additional allegations of violations of his Fourth Amendment right to be free from illegal seizures. *Frantz,* 245 F.3d at 875-77. The *Darrah* panel concluded that *Frantz,* a 2001 opinion, appears to contradict a 1999 opinion of this Court, which did not question the viability of an independent malicious prosecution action brought under § 1983. *See Spurlock v. Satterfield,* 167 F.3d 995, 1006 (6th Cir.1999). The panel in *Darrah* determined that it was bound by *Spurlock,* under the rules of this circuit, but nonetheless evaluated and dismissed the plaintiff's claim under both the *Frantz* bright line approach and the traditional probable cause framework outlined in *Spurlock. Darrah,* 255 F.3d at 310-12.

[20] The district court's conclusion that probable cause existed is a legal question to be reviewed by this Court *de novo. See, e.g., Darrah,* 255 F.3d

at 312. In this case, the finding surely withstands review. At the time Knowling decided to charge McKinley with falsification and obstruction of official business-sometime after March 20, 2000, the date of the Foster statement-Knowling had at least the following unchallenged evidence at his disposal: Nirode's February 24 statement, which alleges that Foster told Nirode and McKinley about overhearing the Noble phone call on his scanner and divulged the contents of the call; McKinley's February 25 statement (the first interview), which is materially inconsistent with Nirode's statement insofar as it denies that Foster said anything about the Noble call; Noble's February 29 statement, which confirms that Noble made the cell phone call in question; and finally, Foster's March 20 statement, which is consistent with Nirode's statement fact-for-fact, and therefore materially inconsistent with McKinley's first statement. These statements easily constitute "facts and circumstances ... sufficient in themselves to warrant a man of reasonable caution in the belief," *Brinegar v. United States,* 338 U.S. 160, 175-76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), that McKinley committed falsification and obstruction of official business.FN31

FN31. Ohio's falsification statute provides: "No person shall knowingly make a false statement when ... [t]he statement is made in any official proceeding ... [or] the statement is made with purpose to mislead a public official in performing the public official's official function." OHIO REV. CODE § 2921.13(A)(1). As for obstruction of official business:

No person, without privilege to do so and with purpose to prevent, obstruct or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

*Id.* § 2921.31(A).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In conclusion, we hold that because there was probable cause, independent of the statements he made at the challenged second interview, to prosecute McKinley, the district court properly dismissed McKinley's malicious prosecution claim.

## CONCLUSION

In sum, with respect to McKinley's claim that Defendants "compelled [him] in a criminal case to be a witness against himself," U.S. CONST.amend. V., we hold that McKinley has presented sufficient evidence to defeat summary judgment as to Defendant Fortney and that the district **446 court prematurely granted summary judgment as to the other defendants because McKinley did not have an adequate opportunity to conduct discovery. Consequently, on this claim, we REVERSE and REMAND the case to the district court for proceedings consistent with this opinion. As to McKinley's claim that Defendants maliciously prosecuted him, we hold that probable cause supported the decision to prosecute. Accordingly, we AFFIRM the district court's entry of summary judgment on this claim. Finally, because we remand in part, we instruct the district court to reinstate McKinley's state law claims.

BRIGHT, Circuit Judge, concurring in part and dissenting in part.

I concur in affirming the district court's entry of summary judgment as to McKinley's malicious prosecution claim. I, however, would affirm the district court's entry of summary judgment as to McKinley's Fifth Amendment claim to all appellees, including Officer Fortney.

McKinley concedes, and the rule is, that no Fifth Amendment violation occurs until the wrongfully obtained statement is introduced against a defendant in a criminal proceeding. See Chavez v. Martinez, 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) ("a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case."). Therefore, if McKinley's Fifth Amendment rights were violated, the vi-

olation occurred when the prosecutor introduced the transcript of the second interview at McKinley's trial.[FN1]

> FN1. A Fifth Amendment constitutional violation is different than a violation of the Fourth Amendment, where the violation occurs at the time of the improper search or seizure. See Heck v. Humphrey, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994); Shamaeizadeh v. Cunigan, 182 F.3d 391 (6th Cir.1999).

If, as the majority now holds, Officer Fortney might be deemed a participant in the violation, he would nonetheless not be liable. Even assuming a scenario in this case that Officer Fortney knowingly collaborated with the prosecutor to introduce the evidence in question at trial, that would not save McKinley's right of action. In this case Officer Fortney did not violate McKinley's privilege against self-incrimination in the interviews because he advised McKinley that the statements would not be used against him in any criminal proceedings. The interviews were properly conducted in accordance with the rule announced in Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

The remaining question is whether McKinley's Fifth Amendment right should be deemed violated when Officer Fortney turned the result of the interviews over to the prosecutor who introduced the statements at McKinley's trial. To hold Officer Fortney to have violated McKinley's Fifth Amendment privilege against self-incrimination by turning over this evidence would require the assumption that Officer Fortney could foresee that the prosecutor would offer the tainted evidence at trial, that defense counsel would not object, and that the trial judge would err in admitting the evidence.

The assumptions made above would create a new right of action, not previously decided by a court and not clearly established at the time Officer Fortney turned the evidence over to the prosecutor.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

As such, Officer Fortney should be protected by qualified immunity. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (holding that "government officials performing discretionary functions generally are shielded **\*447** from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Moreover, the tainted evidence was rejected on appeal and the conviction overturned. That result could serve as a determination that McKinley's Fifth Amendment privilege against self-incrimination was not in fact violated. *Cf. Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).

Accordingly, I would affirm as to Officer Fortney.

C.A.6 (Ohio),2005.
McKinley v. City of Mansfield
404 F.3d 418, 22 IER Cases 1254, 2005 Fed.App. 0170P

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

345 F.3d 1157
**(Cite as: 345 F.3d 1157)**

▷

United States Court of Appeals,
Tenth Circuit.
Jimmie MARSHALL, Plaintiff–Appellant,
v.
COLUMBIA LEA REGIONAL HOSPITAL; Nurse
Jane Doe; City of Hobbs; Captain Tony Knott; Ser-
geant Walter Roye; Officer Rodney Porter, Defend-
ants–Appellees.

Nos. 02–2184, 02–2190.
Sept. 29, 2003.

Arrestee brought § 1983 action against police
officer, city, and hospital, alleging that his traffic
stop and arrest were motivated by racial discrimina-
tion and that he was subjected to a coerced blood
test, in violation of the Fourth and Fourteenth
Amendments and state tort law. The United States
District Court for the District of New Mexico, C.
Leroy Hansen, J., granted summary judgment for
defendants, and arrestee, proceeding pro se, ap-
pealed. The Court of Appeals, McConnell, Circuit
Judge, held that: (1) issues of fact existed as to
whether driver was targeted for pretextual traffic
stop and arrest on basis of his race; (2) warrantless
administration of blood test on driver was not justi-
fied by exigent circumstances, under New Mexico
law; (3) issues of fact existed as to whether driver
consented to blood test; (4) issues of fact existed as
to whether police chief was negligent in hiring,
training, and supervision of police officer, and
whether city had an official policy or custom of, or
was deliberately indifferent to, civil rights viola-
tions by its officers; and (5) medical defendants
were not liable for any violation of Equal Protec-
tion Clause or Fourth Amendment.

Affirmed in part and reversed and remanded in
part.

West Headnotes

**[1] Civil Rights 78 ☞1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1088 Police, Investigative, or Law En-
forcement Activities
            78k1088(4) k. Arrest and detention. Most
Cited Cases
    Allegations that arrestee's *Miranda* rights were
violated when he was questioned by police without
presence of counsel did not subject officers to liab-
ility under § 1983. 42 U.S.C.A. § 1983.

**[2] Federal Courts 170B ☞776**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)1 In General
                170Bk776 k. Trial de novo. Most Cited
Cases
    Court of Appeals reviews a district court's
grant of summary judgment de novo.

**[3] Arrest 35 ☞63.4(2)**

35 Arrest
    35II On Criminal Charges
        35k63 Officers and Assistants, Arrest
Without Warrant
            35k63.4 Probable or Reasonable Cause
                35k63.4(2) k. What constitutes such
cause in general. Most Cited Cases
    (Formerly 349k78)
    Probable cause for an arrest exists where facts
and circumstances within an officer's knowledge
of which he had reasonably trustworthy informa-
tion are sufficient to warrant a prudent man in be-
lieving that an offense has been or is being commit-
ted. U.S.C.A. Const.Amend. 4.

**[4] Arrest 35 ☞60.3(2)**

35 Arrest
    35II On Criminal Charges
        35k60.3 Motor Vehicle Stops

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

35k60.3(2) k. Particular cases. Most Cited Cases

(Formerly 35k63.5(6))

**Arrest 35** 🗝63.4(16)

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
      35k63.4(16) k. Possession, disposal, or concealment of article; flight or hiding. Most Cited Cases

(Formerly 35k63.5(6))

Under New Mexico law, probable cause existed for traffic stop, citation, and arrest, where driver drove for two miles without responding to police officer's emergency lights. U.S.C.A. Const.Amend. 4; NMSA 1978, § 30–22–1.

**[5] Civil Rights 78** 🗝1420

78 Civil Rights
  78III Federal Remedies in General
    78k1416 Weight and Sufficiency of Evidence
    78k1420 k. Criminal law enforcement; prisons. Most Cited Cases

Section 1983 claims of racially discriminatory traffic stops and arrests should be held to a clear evidence standard. 42 U.S.C.A. § 1983.

**[6] Federal Civil Procedure 170A** 🗝2491.5

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
      170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose

and their actions had a discriminatory effect. 42 U.S.C.A. § 1983.

**[7] Federal Civil Procedure 170A** 🗝2491.5

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(C) Summary Judgment
      170AXVII(C)2 Particular Cases
      170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Genuine issues of material fact existed as to whether driver was targeted for pretextual traffic stop and arrest on basis of his race, precluding summary judgment for police officer in driver's § 1983 action alleging violations of Equal Protection Clause. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

**[8] Civil Rights 78** 🗝1088(3)

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1088 Police, Investigative, or Law Enforcement Activities
    78k1088(3) k. Searches and seizures. Most Cited Cases

State actors administering a blood test without warrant or consent may be subject to suit under § 1983. 42 U.S.C.A. § 1983.

**[9] Searches and Seizures 349** 🗝42.1

349 Searches and Seizures
  349I In General
    349k42 Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant
    349k42.1 k. In general. Most Cited Cases

**Searches and Seizures 349** 🗝44

349 Searches and Seizures
  349I In General
    349k42 Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant
    349k44 k. Presence of probable cause.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Most Cited Cases

Searches and seizures inside the home without a warrant are presumptively unreasonable unless the police can show both probable cause and the presence of exigent circumstances. U.S.C.A. Const.Amend. 4.

**[10] Searches and Seizures 349 ☞78**

349 Searches and Seizures
    349I In General
        349k78 k. Samples and tests; identification procedures. Most Cited Cases

A warrantless blood test, performed without consent, is presumptively unreasonable unless the state actors involved had probable cause and exigent circumstances sufficient to justify it. U.S.C.A. Const.Amend. 4.

**[11] Searches and Seizures 349 ☞53.1**

349 Searches and Seizures
    349I In General
        349k53 Scope, Conduct, and Duration of Warrantless Search
            349k53.1 k. In general. Most Cited Cases

The scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement.

**[12] Automobiles 48A ☞419**

48A Automobiles
    48AIX Evidence of Sobriety Tests
        48Ak417 Grounds for Test
            48Ak419 k. Grounds or cause; necessity for arrest. Most Cited Cases

Warrantless administration of blood test on arrested driver was not justified by exigent circumstances, under New Mexico law, inasmuch as officers would not have been able to obtain a search warrant under the circumstances of the case; no probable cause existed to believe that driver had caused a death or great bodily injury, or that he had committed any felony while under the influence of alcohol or a controlled substance. U.S.C.A.

Const.Amend. 4; NMSA 1978, § 66–8–111, subd. A.

**[13] Federal Civil Procedure 170A ☞2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Genuine issues of material fact existed as to whether arrested driver consented to blood test, precluding summary judgment for police officers who allegedly ordered test, in driver's § 1983 action alleging that administration of warrantless blood test violated Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[14] Searches and Seizures 349 ☞201**

349 Searches and Seizures
    349VI Judicial Review or Determination
        349k201 k. Questions of law or fact. Most Cited Cases

Whether a search is consensual is a question of fact to be determined by the totality of the circumstances.

**[15] Civil Rights 78 ☞1343**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1343 k. In general. Most Cited Cases

**Civil Rights 78 ☞1345**

78 Civil Rights
    78III Federal Remedies in General
        78k1342 Liability of Municipalities and Other Governmental Bodies
            78k1345 k. Acts of officers and employees in general; vicarious liability and respondeat superior in general. Most Cited Cases

Municipalities can be sued for monetary, de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

claratory, or injunctive relief for deprivations of constitutional or civil rights, but a municipality cannot be held liable for the actions of its employees under the theory of respondeat superior. 42 U.S.C.A. § 1983.

**[16] Civil Rights 78 ⇌1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In general. Most Cited Cases

Plaintiffs seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom causing their injury. 42 U.S.C.A. § 1983.

**[17] Civil Rights 78 ⇌1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In general. Most Cited Cases

An unconstitutional deprivation of civil rights is caused by a municipal policy if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipality itself.

**[18] Civil Rights 78 ⇌1351(1)**

78 Civil Rights
   78III Federal Remedies in General
      78k1342 Liability of Municipalities and Other Governmental Bodies
         78k1351 Governmental Ordinance, Policy, Practice, or Custom
            78k1351(1) k. In general. Most Cited Cases

An unconstitutional deprivation of civil rights is caused by a municipal custom if it is caused by an act that, although not formally approved by an appropriate municipal decision maker, has such widespread practice as to have the force of law.

**[19] Federal Civil Procedure 170A ⇌2491.5**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases

Issues of fact existed as to whether police chief was negligent in hiring, training, and supervision of police officer, and whether city had an official policy or custom of, or was deliberately indifferent to, civil rights violations by its officers, precluding summary judgment for city in § 1983 action brought by driver allegedly targeted for traffic stop and arrest on basis of his race. 42 U.S.C.A. § 1983.

**[20] Constitutional Law 92 ⇌3733**

92 Constitutional Law
   92XXVI Equal Protection
      92XXVI(E) Particular Issues and Applications
         92XXVI(E)15 Motor Vehicles
            92k3733 k. Alcohol and drug-related issues; testing. Most Cited Cases
     (Formerly 92k250.5)

**Health 198H ⇌709(1)**

198H Health
   198HV Malpractice, Negligence, or Breach of Duty
      198HV(C) Particular Procedures
         198Hk709 Examinations on Behalf of Third Parties
            198Hk709(1) k. In general. Most Cited Cases

Medical defendants involved in allegedly un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

lawful warrantless administration of blood test on arrested driver did not treat arrestee differently from others similarly situated, and were not motivated by a discriminatory purpose, and therefore defendants were not liable for any violation of Equal Protection Clause. U.S.C.A. Const.Amend. 14.

**[21] Constitutional Law 92 ⬧3040**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3038 Discrimination and Classification
        92k3040 k. Intentional or purposeful action requirement. Most Cited Cases
    (Formerly 92k211(1))

**Constitutional Law 92 ⬧3041**

92 Constitutional Law
  92XXVI Equal Protection
    92XXVI(A) In General
      92XXVI(A)5 Scope of Doctrine in General
        92k3038 Discrimination and Classification
        92k3041 k. Similarly situated persons; like circumstances. Most Cited Cases
    (Formerly 92k211(1))

To sustain a claim under the Equal Protection Clause, a plaintiff must provide evidence that he was treated differently from others who are similarly situated to him, and that the acts forming the basis of the claim were motivated by a discriminatory purpose. U.S.C.A. Const.Amend. 14.

**[22] Searches and Seizures 349 ⬧85**

349 Searches and Seizures
  349I In General
    349k85 k. Liability for wrongful search and seizure; actions. Most Cited Cases

Medical defendants who administered allegedly unlawful warrantless blood test on arrested driver, at behest of police officers, did not act unreasonably and thus were not liable for any Fourth Amendment violation. U.S.C.A. Const.Amend. 4.

**[23] Civil Rights 78 ⬧1442**

78 Civil Rights
  78III Federal Remedies in General
    78k1441 Appointment of Counsel
      78k1442 k. In general. Most Cited Cases

The decision of whether to appoint counsel in a civil case under § 1983 is left to the discretion of the trial court. 42 U.S.C.A. § 1983.

*1159    Jimmie    Marshall,    pro    se    as Plaintiff–Appellant.

Barbara A. Patterson and Rodney M. Schumacher, Atwood, Malone, Turner & Sabin P.A., Roswell, New Mexico, for Defendants–Appellees Nurse Jane Doe and Columbia Lea Regional Hospital.

Gregory L. Biehler and Zachary S. Rigdon, Beall & Biehler, Albuquerque, New Mexico, for Defendants–Appellees City of Hobbs, Captain Tony Knott, Sergeant Walter Roye and Officer Rodney Porter.

Before LUCERO, BALDOCK, and McCONNELL, Circuit Judges.

McCONNELL, Circuit Judge.

This case involves troubling allegations regarding possible police misconduct by an officer in Hobbs, New Mexico. We are not in a position to judge the truth of those allegations at this early stage in the litigation, but we conclude that the district court acted prematurely in granting summary judgment on all claims.[FN1]

    FN1. After examining the briefs and appellate record, and taking note that the Plaintiff–Appellant has presented this appeal *pro se,* this panel has determined unanimously that oral argument would not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

materially assist the determination of this appeal. *See* Fed. R.App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

In December, 1996, police officer Rodney Porter stopped Plaintiff–Appellant Jimmie Marshall, an African–American part-time resident of Hobbs, New Mexico, for an alleged traffic violation. Officer Porter arrested Marshall, administered field sobriety tests, and took him to the **1160** Columbia Lea Regional Hospital for a blood test. Among other legal claims, Mr. Marshall alleges that the traffic stop and arrest were made on account of his race and without probable cause, in violation of the Fourth Amendment and the Equal Protection Clause, and that the coerced blood test violated his rights under the Fourth Amendment and state tort law. The defendants are Officer Porter, who conducted the traffic stop and arrest, and Sergeant Walter Roye, who ordered the blood test. Additionally, plaintiff contends that Hobbs police chief Tony Knott and the City of Hobbs are liable for those actions under supervisory and municipal liability theories respectively. We will refer to these parties collectively as the "Hobbs Defendants." Other defendants include nurse Iris Goad and her employer, Columbia Lea Regional Hospital (the "Medical Defendants"), on account of their involvement in the blood test. Plaintiff seeks damages and other appropriate relief under 42 U.S.C. § 1983 .

In a pair of orders dated June 18, 2002, the district court granted summary judgment for the defendants as to all claims. For the reasons set forth below, we reverse the judgment of the district court insofar as it granted summary judgment in favor of the Hobbs Defendants on the Equal Protection claim and the Fourth Amendment blood-test claim, and remand for further proceedings on these and the related state law claims. With respect to the remaining claims against the Hobbs Defendants, as well as all claims asserted against the Medical Defendants, we affirm the district court's grant of summary judgment.

# I. Background

## A. *Mr. Marshall's Arrest and Blood Test*

On December 26, 1996, Jimmie Marshall, an African–American self-employed electrician, was driving his gold Toyota pickup in Hobbs, New Mexico, when he noticed a police car parked by the side of the road with its lights off. According to Mr. Marshall, the police officer—later identified as Officer Rodney Porter—followed his pickup for several blocks. While Mr. Marshall was stopped at an intersection with his left-turn signal blinking, Officer Porter pulled up alongside the pickup and "gaz[ed] intently at [Marshall's] face," which Marshall infers was for the purpose of ascertaining his race. Officer Porter contends that Mr. Marshall failed to stop at the stop sign, which Mr. Marshall denies. Officer Porter then activated his emergency lights, but Mr. Marshall continued to drive for more than two miles before coming to a stop at his residence. Mr. Marshall claims that he evaded the officer for several miles because he was fearful to stop his vehicle outside of the presence of witnesses, on account of the reputation of the Hobbs Police Department for racist practices. At that time, Mr. Marshall did not know Officer Porter and did not have any information about him. In the criminal complaint filed as a result of the incident, Officer Porter stated that Mr. Marshall accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, which Marshall denies. However, Officer Porter made no mention of these allegations in the affidavit he filed in this case describing the events of December 26, 1996, nor were they mentioned in Defendants' later pleadings.

On the street in front of Mr. Marshall's residence, the two men emerged from their vehicles. Officer Porter had drawn his pistol. His first words were to accuse Mr. Marshall of being on crack, which Marshall has consistently denied. Defendants have proffered no evidence in support of this accusation. Officer Porter states that Mr. Marshall had the odor of **1161** alcohol on his breath, which

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Marshall does not deny, stating that he had imbibed one drink with his brother Alfred. Officer Porter arrested Mr. Marshall on various charges, including the traffic violation, driving under the influence, and resisting arrest. On the written citation form, in the space for indicating the gender of the person receiving the citation, Officer Porter wrote "B/M," presumably meaning black male.

After arresting Mr. Marshall, Officer Porter proceeded to search Marshall's truck. The search revealed a .40 caliber pistol under the driver's seat (apparently lawful), and Officer Porter claimed also to have found a small amount of a "green leafy substance," a contention Marshall denies. Mr. Marshall was taken to the city jail, where several sobriety tests were performed on him. Mr. Marshall passed two breathalyzer tests, but had difficulty completing the recitation of the alphabet (the "ABC test"). There is conflicting testimony about whether the horizontal gaze stymosis test was administered, and whether Mr. Marshall passed the finger-number test.[FN2]

> FN2. Mr. Marshall's affidavit contains an allegation that Officer Porter used an offensive racial epithet. This contention was later repudiated by Mr. Marshall on the ground that it had been inserted by a legal assistant without his knowledge. Because it has been repudiated, we disregard the allegation for purposes of evaluating the grant of summary judgment.

Officer Porter then transported Mr. Marshall to the Columbia Lea Regional Hospital for blood testing. Mr. Marshall claims his request to put on his shoes was refused, despite the winter weather, and that his socks became soaked with urine that had pooled on the back floor of the police car. While waiting for Sergeant Roye to arrive at the hospital, Officer Porter interrogated the handcuffed Mr. Marshall for over twenty minutes, again accusing him of being on crack. ("I know you came from a crack house. You might as well admit it, because I know you went there to get some crack.") During this interrogation Mr. Marshall stated that the blood test might test positive for marijuana.

Thereafter, Sergeant Roye and Nurse Iris Goad entered the room. When Nurse Goad approached Mr. Marshall, he said, "Ma'am, you don't have my consent oral or written to take my blood. But if you're going—and I rather you not stick me with that needle. But if you're go going to take my blood, I'm not going to resist, but you don't have my consent oral or written." At that point Sergeant Roye told Nurse Goad, "Go-ahead and give it to him. I'll consent." Mr. Marshall then held his handcuffed arms in front of him for the blood test. The record contains a "consent form," initialed by Officer Porter, which states: "Refused to sign. Gave verbal consent." Two vials of blood were taken. The laboratory tests subsequently found no evidence of alcohol or other illegal drugs, but revealed the presence of THC, the active ingredient in marijuana, in Marshall's bloodstream.

After the events in the hospital, Mr. Marshall was returned to the jail, where he was confined for several hours before his mother obtained his release on bail. Later, he was charged in a criminal complaint with (i) possession of a controlled substance (marijuana), (ii) resisting, evading or obstructing a police officer, (iii) negligent use of a firearm (possession while intoxicated), (iv) reckless driving, (v) running a stop sign, and (vi) driving under the influence. In May of 1997, the Assistant District Attorney for Lea County entered a *nolle prosequi* because the evidence in Marshall's case was suppressed. The record does not contain any further information about that proceeding, or the legal basis for the suppression of the evidence.

**\*1162** B. *Officer Porter's Alleged Pattern of Misconduct*

Slightly more than a year before the events in question here, Officer Porter was forced to resign from the Midland, Texas, police force after an internal investigation uncovered evidence of serious misconduct. In response to Mr. Marshall's subpoena, Midland Police Chief John Urby provided

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

documents from his department's internal investigation showing an extensive pattern of misconduct and violation of citizens' constitutional rights by Officer Porter when he was on the Midland force. The Hobbs Defendants filed a motion *in limine* to exclude those documents from admission as evidence in this case. The district court has not yet ruled on that motion.

If admissible, the Midland documents provide evidence that in more than thirty cases, Officer Porter falsely charged arrestees with possession of narcotics, seriously mishandled narcotics evidence, or both. Further, in other cases, Officer Porter was accused of planting evidence on arrestees, as well as using evidence to barter for sexual favors. According to the documents, Officer Porter denied the charges until after failing a polygraph test, when he admitted mishandling evidence.

The internal investigation concluded that Officer Porter's "credibility, integrity, and honesty have been impeached." Mem. from Deputy Chief John Urby to Chief Richard Czech dated Aug. 22, 1995, at 1, App. at 204. Deputy Chief Urby wrote, "Officer Porter failed to recognize that ... he also had the responsibility of insuring that the rights of citizens were not violated." By the end of the investigation, even a good friend and staunch supporter of Officer Porter had concluded that "[t]hese acts leave us with no alternative except termination. Any other decision would make us guilty of negligent retention." Mem. from Lt. Jerry Compton to Deputy Chief John Urby dated Aug. 22, 1995, at 2, App. at 203. In a memo from then-Chief Richard Czech to Officer Porter, Porter was told:

I cannot express in any terms the seriousness of this violation. Your trust as a police officer [is] to treat people fairly and equally under the law and under the constitution and as far as this police department is concerned you have violated these rights. You violated the very laws that you have been intrusted and sworn to uphold. You have breached the integrity of this Department and your credibility and honesty is to be questioned.

As a result of your misconduct I am terminating your employment effective immediately.

Mem. from Chief Richard Czech to Officer Rodney Porter dated Aug. 23, 1995, at 2, App. at 201.

According to Mr. Marshall, a review of Officer Porter's arrest reports on cases where he had not logged in drug evidence

shows that an overwhelming number of the suspects were black. Most of the rest were Hispanic surnamed. Virtually all were stopped for minor traffic violations such as seat belts, failing to signal a turn, failing to stop at a stop sign, or making a wide turn so as to touch the stripe of the other lane. Also, in many [cases] Porter either claimed to have secured consent or went ahead and conducted searches anyway.

Pl.'s Mem. in Support of Pl.'s Resp. to Defs.' Mots. for Summ. J., App. at 172. He claims that this pattern closely resembles the facts of his own case, and establishes a *modus operandi* under which Officer Porter targets individuals on the basis of their race and subjects them to traffic stops, arrests, and searches for pretextual drug violations not based on any evidence.

In further support of his equal protection claim, Mr. Marshall presented evidence**1163** regarding several lawsuits alleging civil rights violations against African–American citizens of Hobbs pending at the time his complaint was filed. Mr. Marshall also provided newspaper articles dealing with the racial tensions between the Hobbs Police Department and its African–American citizens, including an incident involving Officer Porter in which an allegedly racially motivated arrest at a high school football game resulted in a riot.[FN3]

FN3. These cases, as well as others involving alleged civil rights violations by the Hobbs Police Department, are discussed *infra* note 13.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C. *Procedural History*

In November of 1999, Mr. Marshall filed an action in federal district court against the Hobbs Defendants and the Medical Defendants. The Medical Defendants filed a motion to dismiss. On July 27, 2000, the district court issued a memorandum opinion and order criticizing the complaint for its vague and conclusory character and for failing to set forth any specific claims or causes of action. The court granted Mr. Marshall leave to amend the complaint to "make good faith allegations on an equal protection violation or any constitutional violation except under the Fifth and Fourteenth Amendment, supported by the facts and the law."

On August 24, 2000, Mr. Marshall filed his First Amended Complaint alleging (i) Fourth Amendment violations for unreasonable search and seizure, (ii) Fourteenth Amendment substantive due process violations, (iii) Fourteenth Amendment equal protection violations, (iv) common law battery, (v) negligence *per se* (unconsented touching of the body), (vi) supervisory liability as to Chief Knott, and (vii) municipal liability as to the City of Hobbs. Once again, the Medical Defendants filed a motion to dismiss, on which the district court ruled on June 19, 2001. The district court noted the inconsistency in the phrasing of its first order, which barred Mr. Marshall from making any Fourteenth Amendment claims but granted leave to make good faith allegations regarding equal protection claims. The district court explained that it had intended to dismiss the substantive due process claims but to afford Mr. Marshall another chance to develop the equal protection claims. The court then dismissed Mr. Marshall's substantive due process claims, but denied the Medical Defendants' motion with regard to the remainder of the claims asserted in his First Amended Complaint.[FN4]

> **FN4.** Plaintiff does not challenge the dismissal of his substantive due process claim, and thus we do not consider it on appeal.

In late 2001, both sets of defendants filed mo-

tions for summary judgment. Mr. Marshall responded with three separate filings.[FN5] The district court held that Mr. **\*1164** Marshall's first reply contained only conclusory statements and did not raise any substantial issue of material fact in opposition to Defendants' claims. *Marshall v. Columbia Lea Regional Hosp.,* No. CIV 99–1363, slip op. at 4 n. 3 (D.N.M. June 18, 2002), App. at 369. As to his second response, the court held that it violated local rules and was "deficient in many respects, including but not limited to the fact that it did not set forth specific facts, as provided in Rule 56, showing that there was a genuine issue for trial." *Id.* (citing Fed.R.Civ.P. 56(e)). Mr. Marshall's final response was the only filing setting forth specific facts supported by exhibits challenging Defendants' summary judgment motion. Attached to this filing was the Midland, Texas evidence summarized above, accompanied by an affidavit by the Midland police chief attesting that the materials were accurate copies of records that were made and maintained as part of the regular business activities of the Midland police department. Mr. Marshall introduced this evidence in support of his claims of equal protection violations and of municipal and supervisory liability against Chief Knott and the City of Hobbs. The district court ruled that this third response was a surreply filed out of time and without permission of the court.

> **FN5.** In addition to his three filings responding to the summary judgment motions, on January 3, 2002, Mr. Marshall filed a Second Motion to Amend Plaintiff's Complaint, followed a week later by Plaintiff's Corrected Motion for Order to Allow His Second Amendment to the Complaint. In these filings, Mr. Marshall attempted to develop and articulate his causes of action, and asserted claims of negligent retention and supervision of Officer Porter and Sergeant Roye by Chief Knott and the City of Hobbs. On February 7, 2002, the magistrate judge filed an order denying the Second Motion to Amend

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff's Complaint. He noted that the Initial Pretrial Report required that all pre-trial motions be fully briefed by January 10, 2002, and that Mr. Marshall's motions failed to meet the deadline. The magistrate judge further noted that the case had been pending for over two years, that full-blown discovery had already been terminated for two months, and that the defendants had briefed their motions for summary judgment over a month before Mr. Marshall's motions were filed. Mr. Marshall filed no objection to this ruling. *See* Fed.R.Civ.P. 72(a).

Despite its conclusion that Plaintiff's three filings "utterly failed to comply with the local and federal rules," the district court "deem[ed] it more equitable to evaluate the merits of Defendants' proof as to each claim challenged by them." The court noted that in doing so, it "evaluated the merits" of Mr. Marshall's "factually supported submission" despite its procedural defects. *Marshall* at 4, App. at 369. We presume this included the attachments. *See* Fed.R.Civ.P. 56(e). Reaching the merits, the district court issued two orders, both dated June 18, 2001, granting summary judgment in favor of the two sets of Defendants.

In its order granting summary judgment in favor of the Hobbs Defendants, the court first addressed Mr. Marshall's Fourth Amendment challenges to his traffic stop and subsequent arrest. The court concluded that the odor of alcohol on Mr. Marshall's breath and the alleged discovery of a "green leafy substance" in his pickup were inadequate to establish probable cause for Mr. Marshall's arrest. The district found, however, that the initial traffic stop "was based on an observed, though unspecified, traffic violation," which provided sufficient cause for the stop. *Marshall* at 4, App. at 369. Moreover, it was undisputed that after Officer Porter had activated his emergency lights, Mr. Marshall continued to drive and did not pull over for approximately two miles, which

provided legally sufficient cause to arrest Marshall for the misdemeanor offense of resisting, evading or obstructing an officer. *Id.* at 7, App. at 372.

The district court then addressed and rejected Mr. Marshall's remaining constitutional claims. The district court concluded that the warrantless blood test was constitutional under the Supreme Court's ruling in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Based on Mr. Marshall's performance on the field sobriety tests, the court found that there was probable cause to justify the blood test, since passing the breathalyzer test "did not rule out the presence of other drugs in his bloodstream." *Marshall* at 7, App. at 374. Further, although state law provides that a person under arrest for a motor vehicle offense may decline to submit to chemical tests without a warrant, and warrants are limited to cases involving serious accidents and felonies, the court noted that this "potential statutory violation is not one of constitutional dimension however. A violation of state law cannot give rise to a claim under section 1983. *See* **\*1165***Jones v. City and County of Denver,* 854 F.2d 1206, 1209 (10th Cir.1988)." *Id.* at 10, App. at 375.

Next, in a single paragraph, the district court rejected Mr. Marshall's equal protection claim:

> As stated above, the Court has concluded that the traffic stop, the arrest, and the blood test were all based upon probable cause, according to objective legal standards. In other words, the Court has concluded that all three of these government actions were based upon Mr. Marshall's conduct rather than his race. There is nothing in the record before the Court to indicate differential treatment of Mr. Marshall.

*Id.* at 11, App. at 376. The court made no mention of Mr. Marshall's evidence regarding Officer Porter's career in Midland, Texas.

Finally, the court dismissed Mr. Marshall's supervisory and municipal liability claims against Chief Knott and the City of Hobbs on the ground

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that no constitutional violations had occurred. Having dismissed all the federal claims, the district court declined to exercise supplemental jurisdiction over the remaining state law claims.

The district court filed a separate order granting summary judgment in favor of the Medical Defendants. The court reasoned that since the Medical Defendants were only involved in the blood test, they could be liable, if at all, only for that procedure. Relying on the reasoning set forth in the order pertaining to the Hobbs Defendants, the court dismissed all the federal claims with prejudice, and the state claims without prejudice.

D. *The Current Appeal*

[1] Although Mr. Marshall was represented by counsel in district court, he proceeds *pro se* in this appeal. He appeals the district court's determination that the traffic stop and subsequent search were reasonable, and we interpret this claim as raising a Fourth Amendment challenge. Further, he contends that the blood test was in violation of his Fourth Amendment rights, and that the district court erred in dismissing his supervisory and municipal liability claims. Finally, Mr. Marshall challenges the district court's dismissal of his state law claims. In a reply brief, Mr. Marshall additionally challenges the district court's dismissal of his Equal Protection claims. Because Mr. Marshall is proceeding *pro se* in this appeal, we liberally interpret his appeal to challenge all issues presented below that are addressed in his appellate briefs. *Croft v. Harder,* 927 F.2d 1163, 1164 (10th Cir.1991) (citing *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)).[FN6]

FN6. On appeal, Mr. Marshall contends that his *Miranda* rights were violated when he was questioned by police without presence of counsel. This issue was not presented in Mr. Marshall's original complaint or the First Amended Complaint, and is thus not properly before this Court. Moreover, violations of *Miranda* rights do not subject police officers to liability under § 1983.

*Bennett v. Passic,* 545 F.2d 1260, 1263 (10th Cir.1976). We therefore dismiss this claim. Additionally, as stated in note 4, *supra,* we do not consider Mr. Marshall's substantive due process claim.

## II. Analysis

[2] This Court reviews the district court's grant of summary judgment *de novo. Mattioda v. White,* 323 F.3d 1288, 1291 (10th Cir.2003). Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We "examine[ ] the record and draw[ ] reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Mattioda,* 323 F.3d at 1291 (internal quotation marks omitted).

*\*1166* A. *Fourth Amendment Challenges to the Traffic Stop and Arrest*

The first issue raised in Mr. Marshall's appellate brief is the validity of the traffic stop and arrest under the Fourth Amendment. Mr. Marshall concedes that the "perceived" traffic violation "may have provided sufficient grounds for the initial stop," but maintains that "Officer Porter did not have justifiable reasons to arrest and seize the plaintiff/appellant."

[3] Probable cause exists "where facts and circumstances within an officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that an offense has been or is being committed." *Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985). In granting summary judgment with respect to this claim, the district court explained: "Defendants have presented evidence that Officer Porter's decision to stop Mr. Marshall was based on an observed, though unspecified, traffic violation," which "provides sufficient grounds to support the initial stop." *Marshall* at 4, App. at 369. Moreover, the court went on, it is "undisputed that after Officer Porter activated his emergency lights, Mr. Marshall continued to drive and did not pull over

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

until he had reached his neighborhood, approximately two miles away," which provides "solid grounds to cite Mr. Marshall for resisting or evading an officer." *Id.* at 5, App. at 370. We agree.

[4] Whether or not Mr. Marshall failed to obey the stop sign, which is disputed, the actual "stop" did not occur until after Mr. Marshall had driven for two miles without responding to the police officer's emergency lights. This behavior violated N.M. Stat. Ann. § 30–22–1 (forbidding "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren, or other signal, by a uniformed officer in an appropriately marked police vehicle"), and constituted probable cause to support the stop, the citation, and the arrest. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 354, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001) (holding that even a minor violation is sufficient cause to justify an arrest).

Mr. Marshall does not deny that he drove two miles before stopping, but he mistakenly maintains that his delay in stopping was excusable because he needed to "get to a place that he felt safe" before complying with the officer's order to stop. That is not the law. Drivers are required to respond promptly when a police officer signals them to stop. Neither belief in innocence nor apprehensions regarding the police justify failure to obey a lawful order. *Cf. United States v. Villa–Chaparro,* 115 F.3d 797, 802 (10th Cir.1997) (driver's failure to stop in response to flashing police lights contributes to a finding of reasonable suspicion).

B. *Equal Protection Claims*

That Mr. Marshall's stop and arrest were based on probable cause does not resolve his more troubling claim that he was targeted by Officer Porter on account of his race. In *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court held that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection

may be violated even if the actions of the police are acceptable under the Fourth Amendment. As the court noted in *United States v. Avery,* 137 F.3d 343, 352 (6th Cir.1997), "[t]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures."

**\*1167** Racially selective law enforcement violates this nation's constitutional values at the most fundamental level; indeed, unequal application of criminal law to white and black persons was one of the central evils addressed by the framers of the Fourteenth Amendment. *See generally* William Nelson, *The Fourteenth Amendment: From Political Principle to Judicial Doctrine* 43–48 (1988); John Frank & Robert Munro, *The Original Understanding of "Equal Protection of the Laws,"* 1972 *Wash. U. L.Q.* 421, 445–46. In its modern form, however, racially selective law enforcement has only recently come to public attention, and state and federal law enforcement authorities are struggling to develop practical means for distinguishing between legitimate and illegitimate uses of race in the investigation and prevention of crime. *See generally* Samuel R. Gross & Debra Livingston, *Racial Profiling Under Attack,* 102 Colum. L.Rev. 1413 (2002); Albert W. Alschuler, *Racial Profiling and the Constitution,* 2002 U. Chi. Legal F. 163 (2002). Recently at the behest of President Bush, the Department of Justice promulgated guidelines designed to end racial profiling in federal law enforcement. *See* Department of Justice, Fact Sheet on Racial Profiling (June 17, 2003), *available at* http:// www.usdoj.gov/opa/pr/2003/June racial_profiling_fact_sheet.pdf (last visited Aug. 12, 2003).

[5] It is one thing for law enforcement administrators to identify the problem and to undertake administrative steps to eliminate the improper use of racial and ethnic stereotypes in law enforcement. It is more difficult to craft judicially manageable standards for determining liability under § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Broad discretion has been vested in executive branch officials to determine when to prosecute, *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996), and by analogy, when to conduct a traffic stop or initiate an arrest. Police officers and departments should not lightly be put to the expense and risk of trial on charges of racial discrimination that may be easy to make and difficult to disprove. Not only does litigation divert prosecutorial resources and threaten an excessive judicial interference with executive discretion, but it could induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws. For example, police may be induced to direct their law enforcement efforts in race-conscious ways by focusing law enforcement on neighborhoods with relatively few low-income, minority persons. Perhaps for these reasons, the Supreme Court has held that "to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Id.* at 465, 116 S.Ct. 1480 (quoting *United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). Claims of racially discriminatory traffic stops and arrests should be held to a similarly high standard.

Neither this Court nor the Supreme Court has set forth the standards of proof needed for a plaintiff to withstand a motion for summary judgment in a case of an alleged racially discriminatory stop and arrest by a single officer. In analogous contexts, however, the Court has "taken great pains to explain that the standard is a demanding one." *Armstrong,* 517 U.S. at 463, 116 S.Ct. 1480. In *Wade v. United States,* 504 U.S. 181, 186, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992), the Court held that a defendant is not entitled to an evidentiary hearing on a claim of a prosecutor's racially discriminatory refusal to request a downward departure on the basis of "generalized allegations of improper motive." He must "make ... a substantial threshold showing." *Id.* (internal quotation marks omitted). In

*Armstrong,* the Court held that a defendant is not entitled **\*1168** to discovery on a claim that the prosecuting attorney singled him out for prosecution on the basis of his race unless he can show "that similarly situated individuals of a different race were not prosecuted." 517 U.S. at 465, 116 S.Ct. 1480.

[6] The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called "ordinary equal protection standards." *Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480 (quoting *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose, *Armstrong,* 517 U.S. at 465, 116 S.Ct. 1480. These standards have been applied to traffic stops challenged on equal protection grounds. *Chavez v. Illinois State Police,* 251 F.3d 612, 635–36 (7th Cir.2001); *Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 533–36 (6th Cir.2002). The discriminatory purpose need not be the only purpose, but it must be a motivating factor in the decision. *Villanueva v. Carere,* 85 F.3d 481, 485 (10th Cir.1996) (quoting *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.

In general, the absence of an overtly discriminatory policy or of direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population. *See, e.g., Chavez,* 251 F.3d at 626. This requires a reliable measure of the demographics of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the relevant population, *id.* at 640–45, a means of telling whether the data represent similarly situated individuals, *id.,* and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population. *Armstrong,* 517 U.S. at 469–70, 116 S.Ct. 1480. This case, however, is different, and perhaps more susceptible to traditional modes of proof before a jury. Here, Mr. Marshall seeks to prove the racially selective nature of his stop and arrest not by means of statistical inference but by direct evidence of Officer Porter's behavior during the events in question, Officer Porter's own statements and testimony (the credibility of which can be evaluated by a jury), and Officer Porter's alleged record of racially selective stops and arrests in drug cases under similar circumstances in Midland, Texas.

A challenge to the specific acts of a particular police officer bears some resemblance to a claim of racial discrimination in the use of peremptory jury challenges, which also involves the acts of a single state actor (the prosecutor) in the course of a single incident (the selection of the jury). In such cases, the Supreme Court has instructed that the court should "consider all relevant circumstances," including the prosecutor's " 'pattern' of strikes against black jurors," and the prosecutor's "questions and statements," which may "support or refute an inference of discriminatory purpose." *Batson v. Kentucky,* 476 U.S. 79, 96–97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Similarly, a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context.

The district court held that "[t]here is nothing in the record before the Court to *1169 indicate differential treatment of Mr. Marshall." *Marshall* at 11, App. at 376. We cannot agree. Viewing the evidence in the light most favorable to the nonmoving party, Mr. Marshall, and drawing reasonable inferences in his favor, we conclude that the court below erred in granting summary judgment on Mr.

Marshall's equal protection claim. We will analyze each fact Marshall invokes in support of his claim, starting with the events surrounding the traffic stop itself.

Mr. Marshall testified that he did not fail to stop at the stop sign or commit any other traffic violation in Officer Porter's presence. This testimony was not sufficient to establish lack of probable cause for the ultimate stop and arrest two miles down the road, but if accepted as true by the trier of fact, would be evidence that the officer's initial decision to pull Mr. Marshall over was pretextual. Moreover, Mr. Marshall testified—and Officer Porter did not dispute—that he was aware of the police car following him for several blocks before he came to the intersection where the alleged traffic violation occurred.[FN7] Since drivers aware of being observed by the police tend to be particularly cautious about traffic regulations, this lends credence to his account of the events.

> FN7. In the criminal complaint form filled out by Officer Porter on the day in question, he stated: "On 12–26–96 I saw a Gold Toyota pickup bearing N.M. 721 HTR traveling West on Alston from Thorp. The vehicle continued West and failed to stop at the stop sign at Grimes." If Officer Porter first saw Marshall near the intersection of Alston and Thorp, and observed as the pickup "continued West" to the intersection of Grimes and Snyder, this seems to confirm Mr. Marshall's claim that the police car followed him for several blocks. *See* map of Hobbs, New Mexico, *available at* http://maps.yahoo.com.

Second, Mr. Marshall testified, and Officer Porter did not deny, that the officer made eye contact with him while stopped at the intersection prior to activating his emergency lights. From these facts it might reasonably be inferred that Officer Porter was ascertaining Mr. Marshall's race. The Hobbs Defendants have pointed to no testimony by Officer Porter or other evidence in the record that would

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

supply a nondiscriminatory explanation for this behavior. The sequence of events is potentially significant, since this was the same intersection at which Officer Porter alleges that Mr. Marshall committed the traffic violation (presumably failure to stop at a stop sign). If, as it appears, Officer Porter took steps to determine Mr. Marshall's race after he committed the violation but before the police officer activated his emergency lights, it might reasonably be inferred that Mr. Marshall's race played a part in the decision to initiate the stop.

The first words out of Officer Porter's mouth when he confronted Mr. Marshall after the stop were a cryptic accusation that Mr. Marshall was on crack. ("Is a few rocks worth all that?") Officer Porter reiterated this accusation during interrogation at the station house, and again at the hospital. Neither Officer Porter in his affidavit, nor the other Hobbs Defendants in their submissions to this Court or the district court deny that these exchanges took place or dispute Mr. Marshall's description of their content. Further, Defendants failed to offer any evidence explaining why Officer Porter made the accusations.[FN8] We refer to **1170** these exchanges as "accusations" rather than an "interrogation" because, as reported by Mr. Marshall, the tone and content was accusatory and conclusory rather than interrogative. We do not suggest that a police officer requires probable cause, or even reasonable suspicion, before asking a suspect who has been arrested for probable cause questions about possible criminal activity, but in the context of this case as a whole, a jury might reasonably infer from these exchanges that Officer Porter was acting on the basis of stereotype or prejudice rather than evidence.

> FN8. In his affidavit, Officer Porter states that he "smelled the odor of alcoholic beverage on his person" and "observed a green leafy substance on the front seat of the vehicle Mr. Marshall was driving." Moreover, he states that Mr. Marshall's performance on the horizontal gaze sty-

mosis test "indicat[ed] Mr. Marshall was under the influence of a drug or alcohol." Even accepting all of these statements as true (except for the odor of alcohol, Mr. Marshall disputes each), we note that they supply no reason for Officer Porter to have suspected Mr. Marshall of drug use at the time he first lodged the accusation, and no reason for Officer Porter to suspect Mr. Marshall of being on crack, as opposed to alcohol or marijuana.

The record also reflects that on the citation form, in the box designated for the gender of the cited driver, Officer Porter wrote "B/M," making a racial designation where none was called for. Possibly, this reflects unwritten police policy or has some other nondiscriminatory explanation, but the Hobbs Defendants have not suggested one. A jury might also think it significant—at least as it bears on Officer Porter's credibility—that the officer wrote on the original criminal complaint that Mr. Marshall accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, but later made no mention of these remarkable corroborating facts in his sworn affidavit in this case about what happened that day. Cf. *McGarry v. Board of County Com'rs,* 175 F.3d 1193, 1200 (10th Cir.1999) (in employment discrimination context, change of story tends to show pretext); *Cole v. Ruidoso Mun. Schools,* 43 F.3d 1373, 1382 (10th Cir.1994) (same).

The record thus contains evidence—disputed, to be sure—that Mr. Marshall did not commit the traffic violation for which he was initially stopped, that Officer Porter ascertained Mr. Marshall's race before initiating the stop, that he made repeated accusations that Mr. Marshall was on crack with no apparent basis, that he made an apparently unnecessary note of Marshall's race, and that his account of the events changed dramatically between the date of the incident and the date of his affidavit. Other than to insist that Mr. Marshall committed the traffic violation and thus that there was probable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause for the stop and the arrest, the Defendants offer no nondiscriminatory explanation for these aspects of Officer Porter's conduct in this case.

It is a close question whether this is sufficient to require the Hobbs Defendants to go to trial on the allegations of racial discrimination. *Compare Johnson v. Crooks,* 326 F.3d 995, 999–1000 (8th Cir.2003) (finding it error not to dismiss equal protection claim where police officer observed a motorist's race, followed her closely for eleven miles, stopped her for a traffic violation she denied, and later contacted her apparent employer), *with id.* at 1001 (Lay, J., dissenting on the same facts). But there is more.

Mr. Marshall presented evidence regarding extensive alleged misconduct by Officer Porter during his prior employment as a police officer in Midland, Texas. In a memo terminating Officer Porter's employment, the Midland police chief stated that Porter had failed "to treat people fairly and equally under the law." Mem. from Midland Police Chief Richard Czech to Rodney Porter, dated Aug. 23, 1995, at 2, App. at 201. In his third filing in district court in response to the Defendants' motions for summary judgment, Mr. Marshall contended that an analysis of Officer Porter's arrest records obtained from the Midland investigation would establish a **\*1171** pattern of discrimination against blacks and Hispanics, and a *modus operandi* similar to that in his case. If admissible, these documents, together with the other facts of record pertaining to the events of December 26, 1996, may be sufficient to create a triable issue on Mr. Marshall's claim of racially selective law enforcement.

[7] The district court made no reference to the Midland evidence in its orders granting summary judgment. Additionally, Defendants have not offered any analysis or explanation of these documents either before the district court or in their appellate briefs, nor have they briefed the admissibility of these documents to this Court. Without the benefit of the parties' views, we decline to analyze the documents and thus reach no conclusion regard-

ing their probative value. That question must be addressed on remand. Once the documents have been analyzed, the district court will be able to determine whether they establish a "pattern" of traffic stops and arrests that raises an inference of racial discrimination, *cf. Batson,* 476 U.S. at 97, 106 S.Ct. 1712, or provide evidence that similarly situated individuals of a different race received differential treatment, *cf. Armstrong,* 517 U.S. at 465–66, 116 S.Ct. 1480.

In their Reply in Support of Hobbs Defendants' Motion for Summary Judgment, the Hobbs Defendants raised certain objections to the admissibility of the Midland documents. As far as the record reveals, the district court never ruled on those objections, though it "evaluated the merits" of Mr. Marshall's "factually supported submission" to which these materials were attached. We therefore reverse the grant of summary judgment in favor of the Hobbs Defendants on the equal protection claims, and remand to the district court to determine the admissibility of the Midland documents and to reconsider the Hobbs Defendants' motion for summary judgment in light of this opinion.

C. *Fourth Amendment Challenge to the Warrantless Blood Test*

The next issue raised by Mr. Marshall in his appellate brief is whether administration of a blood test without a warrant was in violation of the Fourth Amendment. The district court held that the blood test was justified under *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). The Hobbs Defendants also contend that Mr. Marshall consented to the blood test, making it constitutional under *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We consider each of these arguments in turn.

1. *Was the warrantless blood test justified under Schmerber v. California?*

[8] It is undisputed that, at the instruction of Officers Porter and Roye, a nurse employed by Defendant Columbia Lea Regional Hospital admin-

istered a blood test to Mr. Marshall without first obtaining a warrant from a neutral magistrate. Mr. Marshall contends that this violated "[t]he right of the people," protected by the Fourth Amendment as applicable to the states through the Fourteenth Amendment, "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. State actors administering a blood test without warrant or consent may be subject to suit under § 1983. *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1207 (10th Cir.2003).

[9][10] It is a basic principle of Fourth Amendment law that searches and seizures inside the home without a warrant are presumptively unreasonable unless the police can show both probable cause and **1172** the presence of exigent circumstances. *United States v. Davis,* 290 F.3d 1239, 1242 & n. 3 (10th Cir.2002) ("Probable cause accompanied by exigent circumstances will excuse the absence of a warrant."); *see also Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) ("Absent exigent circumstances, [the] threshold may not be reasonably crossed without a warrant."); *Welsh v. Wisconsin,* 466 U.S. 740, 749, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In *Schmerber,* the Court held that intrusions into the body deserve at least as much protection as is afforded to intrusions into the home. 384 U.S. at 770, 86 S.Ct. 1826 ("Search warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions of the human body are concerned."). It follows that a warrantless blood test, performed without consent, is presumptively unreasonable unless the state actors involved had probable cause and exigent circumstances sufficient to justify it.

[11] In this case, we assume, as the district court held, that Mr. Marshall's mixed performance on the field sobriety tests provided probable cause for the blood test. The harder question is whether

there were exigent circumstances. This requires careful consideration of the legal and factual context, in light of the purposes of the exigent circumstances doctrine. "[T]he scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement." *Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973). Although the opinion did not use the terminology of "exigent circumstances," *Schmerber* is the governing precedent regarding the application of the exigent circumstances doctrine to warrantless blood tests. *See Illinois v. McArthur,* 531 U.S. 326, 331, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (describing *Schmerber* as involving "exigent circumstances"); *Winston v. Lee,* 470 U.S. 753, 759, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (same).

The defendant in *Schmerber* was hospitalized after an automobile accident that resulted in serious injuries to himself and a passenger. *Schmerber,* 384 U.S. at 758, 86 S.Ct. 1826. Based on various symptoms of drunkenness, including the smell of alcohol on his breath, police arrested him for driving under the influence. *Id.* at 768–69, 86 S.Ct. 1826. Although ultimately prosecuted for a misdemeanor, he was subject to prosecution for a felony because of the injury to the passenger. *Id.* at 768 n. 12, 86 S.Ct. 1826. At the instructions of the police, but over the defendant's objection and without a warrant, medical personnel at the hospital administered a blood test, which produced evidence of his intoxication. *Id.* at 758–59, 86 S.Ct. 1826.

The Court held that the warrantless blood test did not violate the Fourth Amendment. The Court opened its discussion noting that bodily intrusions, such as blood tests, affect the "interests in human dignity and privacy which the Fourth Amendment protects" no less than searches of dwellings. *Id.* at 769, 86 S.Ct. 1826. Search warrants are "ordinarily required" for searches of dwellings, and the "importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disputable and great." *Id.* at 770, 86 S.Ct. 1826. The Court noted, however, that under the "special facts" of the case, "there was no time to seek out a magistrate and secure a warrant" before the blood alcohol level had diminished. *Id.* at 770–71, 86 S.Ct. 1826. Because the police "might reasonably have believed that ... the delay necessary to obtain a warrant, under the circumstances, **\*1173** threatened the destruction of evidence," the Court held that the warrantless search comported with the Fourth Amendment. *Id.* at 770, 86 S.Ct. 1826 (internal quotation marks omitted). However, the Court specifically limited its holding to the facts before it:

> [W]e reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today [h]old that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits ... intrusions under other conditions.

> *Id.* at 772, 86 S.Ct. 1826.

The district court upheld the warrantless blood test in this case on analogy to *Schmerber*. As in *Schmerber*, police had probable cause to suspect Mr. Marshall of the crime of driving under the influence, and as in *Schmerber*, the "delay necessary to obtain a warrant under the circumstances threatened destruction of the evidence." *Marshall* at 10, App. at 375.

Mr. Marshall's brief can be liberally construed to argue that *Schmerber* is distinguishable in at least one important respect: state law does not authorize New Mexico police to compel a blood test in a misdemeanor case involving no physical injury, *even with a warrant*. When a crime is not important enough to justify a warranted search, it is not important enough to justify an "exigent circumstances" search. Under the facts of *Schmerber*—a serious accident with the potential of a felony prosecution—state law authorized police to procure a warrant for a blood test, and if time and circum-

stances had permitted, the police could have done so. It was only "the delay necessary to obtain a warrant," which created the "emergency," that justified the warrantless search. *Schmerber*, 384 U.S. at 770, 86 S.Ct. 1826. By contrast, in this case no warrant was available by law for a test of Mr. Marshall's blood.

N.M. Stat. Ann. § 66–8–111(A) (Michie 1998) FN9 provides in relevant part:

> FN9. Since Mr. Marshall's arrest, the statute has been slightly modified. The changes, however, have no bearing on the issue raised by this case. *See* N.M. Stat. Ann. § 66–8–111(A) (Michie, LEXIS through 2003 Sess.).

> If a person under arrest for violation of an offense enumerated in the Motor Vehicle Code ... refuses upon request of a law enforcement officer to submit to chemical tests designated by the law enforcement agency as provided in section 66–8–107 NMSA 1978, none shall be administered except when a municipal judge, magistrate or district judge issues a search warrant authorizing chemical tests as provided in section 66–8–107 NMSA 1978 upon his finding in a law enforcement officer's written affidavit that there is probable cause to believe that the person has driven a motor vehicle while under the influence of alcohol or a controlled substance, thereby causing the death or great bodily injury of another person, or there is probable cause to believe that the person has committed a felony while under the influence of alcohol or a controlled substance and that chemical tests as provided in section 66–8–107 NMSA 1978 will produce material evidence in a felony prosecution.

The statute describes two scenarios under which a magistrate can issue a warrant for chemical tests, including a blood test: (i) upon probable cause to believe that a person has driven while under the influence of alcohol or a controlled substance and has thereby caused the death or great bodily injury of another person; and (ii)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

upon probable cause to believe that the person **\*1174** has committed a *felony* while under the influence of alcohol or a controlled substance and that chemical tests will produce material evidence in a *felony* prosecution. Under New Mexico law, the driver's license of a person arrested for driving under the influence may be revoked if he refuses to submit to a chemical test. N.M. Stat. Ann. § 66–8–111(B). But if the subject refuses to submit to the test, the statute expressly forbids the police from administering it without a warrant. *Id.* § 66–8–111(A).

[12] Reading the facts in the record in the manner most favorable to the party opposing summary judgment, we infer that no search warrant could lawfully have been obtained to compel a test of Mr. Marshall's blood. Because there is no evidence that Mr. Marshall caused death or great bodily injury, or even an accident, the first scenario clearly does not apply. Nor was a warrant authorized under the second scenario. Under New Mexico law, a first conviction of driving under the influence of a controlled substance is a petty misdemeanor. *See id.* § 66–8–102(E) FN10 (prescribing no more than 90 days' imprisonment and/or a $500 fine for first offense); *id.* § 31–1–2(L) (categorizing crimes with sentences of less than six months as petty misdemeanors). Nothing in the record indicates that Mr. Marshall had a prior conviction for driving under the influence.FN11 Nor could Mr. Marshall's alleged drug possession justify a warrant for a blood test. New Mexico Statutes § 30–31–23(B)(2) provides that possession of less than eight ounces of marijuana is not a felony. Even assuming that Officer Porter's vague references to a "green leafy substance" on the front seat of Mr. Marshall's truck established probable cause for an arrest for possession of marijuana, which the district court specifically rejected, *Marshall* at 6, App. at 371 (citing *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)), it certainly did not establish probable cause for arrest for the possession of the eight ounces required for a felony.

FN10. Although since Mr. Marshall's arrest, this statute has been modified. several times, the maximum penalty has remained constant. *See* notes to N.M. Stat. Ann. § 66–8–102(E) (Michie, LEXIS through 2003 Sess.).

FN11. Moreover, Supreme Court precedent suggests that when the legality of a search depends on the classification of a crime, which in turn depends on whether the defendant was a repeat offender, police officers must assume that they are investigating the lesser offense in the absence of actual knowledge of the prior offense. *Welsh,* 466 U.S. at 747 n. 6, 104 S.Ct. 2091.

We can reasonably infer from the evidence, therefore, that Officer Porter would not have been able to obtain a search warrant under the circumstances of this case, even if he had time to do so. Because the exigent circumstances in *Schmerber* were based entirely on the "emergency" circumstances created by the delay necessary to obtain a warrant, it follows that *Schmerber* is distinguishable. It would be strange to hold that a police officer may obtain a blood sample on the basis of exigent circumstances *without* a warrant, when he could not have lawfully conducted the same search *with* a warrant. The rationale for the exigent circumstances doctrine is to avoid the loss of evidence due to the time required for obtaining a warrant—not to enable police to obtain evidence in cases of alleged violations too trivial to support a warrant.

This conclusion in no way conflicts with this Court's long line of cases holding that violations of state law by state officials in the course of state law enforcement activities do not create actionable Fourth Amendment claims. *See, e.g.,* **\*1175** *United States v. Green,* 178 F.3d 1099, 1105 (10th Cir.1999) (quoting *United States v. Le,* 173 F.3d 1258, 1264 (10th Cir.1999) ("It is, however, well established in this circuit that in federal prosecutions the test of reasonableness in relation to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.") (internal quotation marks omitted)); *United States v. Price,* 75 F.3d 1440, 1443–44 (10th Cir.1996) (same). Our point is not that the Hobbs Defendants are subject to liability under § 1983 for violation of the New Mexico statute, but rather that the New Mexico statute determines whether the exigent circumstances recognized in *Schmerber* are present here.

The Supreme Court has instructed that under the doctrine of exigent circumstances, the lawfulness of a search is determined by balancing privacy concerns against those of law enforcement. *McArthur,* 531 U.S. at 331, 121 S.Ct. 946. Exigent circumstances, in the context of a search by state officials for evidence of a state offense, is measured in part by the relative importance given by state law to the evidence sought through the warrantless search. *See Welsh,* 466 U.S. at 750–51, 754, 104 S.Ct. 2091 (finding no exigent circumstances on the basis of minimal state interest as expressed through classification of offense under state law); *Howard v. Dickerson,* 34 F.3d 978, 982 (10th Cir.1994) (same); *Patzner v. Burkett,* 779 F.2d 1363, 1369 (8th Cir.1985) (same); *see also United States v. Flowers,* 336 F.3d 1222, 1229–1231 (10th Cir.2003).

*Welsh* provides an illustration of this principle. There, the defendant's car swerved off the road, coming to a stop in an open field. *Welsh,* 466 U.S. at 742, 104 S.Ct. 2091. A witness, noticing the car driving erratically, contacted the police, but by the time they arrived defendant Welsh had walked away from the scene. *Id.* By checking the vehicle identification number, police were able to identify the car as belonging to Welsh, and proceeded to his home without first obtaining a warrant. *Id.* Police entered his home and took him to the station house to administer a breathalyzer test. *Id.* at 743, 104 S.Ct. 2091. Welsh refused to take the test and as a result was charged and convicted in two separate, but related, proceedings: one concerning his refusal

to submit to a breathalyzer test and the second relating to driving while intoxicated. *Id.* The Wisconsin Supreme Court upheld the convictions, ruling that the warrantless arrest was justified under the doctrine of exigent circumstances. *Id.* at 747–48, 104 S.Ct. 2091.

The Supreme Court reversed both convictions. Although the government argued that the need to preserve the evidence of Welsh's blood alcohol level created exigent circumstances, the Court held that preservation of evidence did not justify a warrantless in-home arrest if the offense for which probable cause was said to exist is "relatively minor." *Id.* at 750, 104 S.Ct. 2091. In determining the "gravity of the underlying offense," the Court looked to the substantive state law, finding that it is "the best indication of the State's interest." *Id.* at 751, 754, 104 S.Ct. 2091. In that case, the offense which Welsh was suspected to have committed was "a noncriminal, civil forfeiture offense, for which no imprisonment is possible." *Id.* at 754, 104 S.Ct. 2091. The Court concluded that "[g]iven this expression of the State's interest, a warrantless home arrest cannot be upheld simply because evidence of the petitioner's blood-alcohol level might have dissipated while police obtained a warrant." *Id.* at 754, 104 S.Ct. 2091. The Court did not specify how serious a crime must be under state law to justify application of the exigent circumstances doctrine, though it cited with apparent approval a state supreme court decision adopting a **\*1176** rule holding that "misdemeanors are excluded." *Id.* at 753, 104 S.Ct. 2091 (quoting *State v. Guertin,* 190 Conn. 440, 461 A.2d 963, 970 (1983)); *see also United States v. Aquino,* 836 F.2d 1268, at 1271 n. 4 (10th Cir.1988).

Similarly, this Court has held that "[t]o determine the existence of an exigency, a court must consider the gravity of the offense." *Howard,* 34 F.3d at 982; *see also Flowers,* 336 F.3d at 1229–31. As in *Welsh,* this Court in both *Howard* and *Flowers* considered state law relevant in determining whether a particular alleged crime was serious enough to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

support a warrantless arrest under the exigent circumstances doctrine. We see no reason why a similar analysis would not be applicable to the exigent circumstances doctrine as applied to warrantless searches as well as warrantless arrests. *See* William A. Schroeder, *Factoring the Seriousness of the Offense into Fourth Amendment Equations—Warrantless Entries into Premises: The Legacy of Welsh v. Wisconsin, 38 U. Kan. L.Rev.* 439, 450 (1990) ("Most judicial and scholarly discussions of warrantless fourth amendment entries are predicated on alleged exigencies do not distinguish between entries to search and entries to seize or arrest."); *see also id.* at 457–58.

New Mexico's statutes clearly signal the State's limited interest in coerced testing of the blood of a motorist charged with a petty misdemeanor. More significantly, New Mexico's determination regarding the absence of exigency is clearly displayed by the fact that New Mexico law does not grant a magistrate authority to issue a warrant for this search. If a state does not permit obtaining evidence from the bloodstream, even under the protection of a warrant based on probable cause, it perforce demonstrates minimal interest in the evidence to be obtained by the search. State actors then cannot turn around and seek shelter under the exigent circumstances exception to the Fourth Amendment's warrant requirement. *See Welsh,* 466 U.S. at 753–54, 104 S.Ct. 2091.

This approach is assumed within *Schmerber* itself. After noting that warrants are generally required absent specific emergency circumstances, *Schmerber* held that "The officer in the present case ... might reasonably have believed that he was confronted with an emergency, in which the delay necessary to *obtain a warrant,* under the circumstances, threatened the destruction of the evidence." 384 U.S. at 770, 86 S.Ct. 1826 (emphasis added and internal quotation marks omitted). Implicit in this holding is that exigent circumstances exist only when a warrant would be available but for the shortage of time. That is not true in this case.

## 2. Did Marshall Consent to the Blood Test?

Defendants contend in the alternative that the search administered to Mr. Marshall was consensual, and therefore constitutional. *See Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041 (search pursuant to consent does not violate the Fourth Amendment); *Dubbs,* 336 F.3d at 1207 (same); *United States v. Pena–Sarabia,* 297 F.3d 983, 986 (10th Cir.2002) (same).

Immediately prior to the blood test, Mr. Marshall told Nurse Goad, "Ma'am, you don't have my consent oral or written to take my blood. But if you're going—and I rather you not stick me with that needle. But if you're go going to take my blood, I'm not going to resist, but you don't have my consent oral or written." Defendants claim that Mr. Marshall's statement should be interpreted as assenting to the blood test, thereby removing any liability under the Fourth Amendment.

Defendants' argument is based on New Mexico's statutory scheme governing blood **1177** tests administered to motorists suspected of driving under the influence of a controlled substance. Under New Mexico's Implied Consent Act, N.M. Stat. Ann. § 66–8–111, a motorist may refuse to submit to a chemical test, but if he does so, his driver's license may be revoked.

Defendants contend that Mr. Marshall is trying to have it both ways. They argue that the statement to Nurse Goad was craftily constructed to refuse consent for the purpose of constitutional liability, while avoiding revocation of his license under New Mexico law. In other words, Mr. Marshall raised the objection to preserve a future § 1983 claim against Defendants, but assented to the search in order to save his driver's license. Mr. Marshall, by contrast, claims that he expressed unqualified objection to the blood test, and that his decision not to offer physical resistance while handcuffed and in the presence of two officers cannot be construed as consent.

[13][14] Whether a search is consensual is a

© 2011 Thomson Reuters. No Claim to Orig. U.S. Gov. Works.

question of fact to be determined by the totality of the circumstances. *United States v. Pena,* 143 F.3d 1363, 1366 (10th Cir.1998). We find that there is a genuine issue of material fact regarding whether Marshall consented to the search, and remand to the district court for further factfinding.[FN12]

> FN12. The Hobbs Defendants have not raised or briefed qualified immunity to this Court, and we will not address the issue *sua sponte.* Because they raised the issue in district court but prevailed on an alternative ground which has now been reversed, they are free to raise the defense on remand.

### D. *Municipal and Supervisory Liability*

Mr. Marshall's claims of supervisory and municipal liability were dismissed by the district court on the ground that these claims are premised on constitutional violations. Since we have reversed the grant of summary judgment and remanded to the district court the Equal Protection claim and the Fourth Amendment claim based on the blood test, we reverse the district court's disposition of these claims and remand for further proceedings.

[15][16][17][18] Municipalities can be sued for monetary, declaratory, or injunctive relief for deprivations of constitutional or civil rights. *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality, however, cannot be held liable for the actions of its employees under the theory of *respondeat superior. Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000) (citing *Monell,* 436 U.S. at 691, 98 S.Ct. 2018). Plaintiffs seeking to impose liability on a municipality under section 1983 must identify a municipal "policy" or "custom" causing their injury. *Board of County Com'rs v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. 2018). An unconstitutional deprivation is caused by a municipal "policy" if it results from decisions of a duly constituted legislative body or an official whose acts may fairly be said to be those of the municipal-

ity itself. *Brown,* 520 U.S. at 403–04, 117 S.Ct. 1382. Similarly, "custom" has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law. *Id.* at 404, 117 S.Ct. 1382.

[19] In the district court, Mr. Marshall based his claims for municipal and supervisory liability in large part on the evidence from the Midland investigation and various racial incidents involving the Hobbs police force, which, he contended, demonstrated negligence in hiring, training, and supervision on the part of Captain Knott and the "deliberate indifference," or possibly "official **\*1178** policy or custom" of the City.[FN13] Because these issues were not addressed by **\*1179** the district court and will be affected by the court's ruling on the admissibility and significance of the Midland evidence, we remand to the district court to address these claims in the first instance.

> FN13. Hobbs, a town of under 30,000 residents, has been involved in a number of legal actions challenging the conduct of its police department. In March of 1999, several individuals filed a class action lawsuit against the department on behalf of all African–American citizens of Hobbs. Compl., *Johnson v. City of Hobbs,* No. CIV 99–348 (D.N.M. Jan. 11, 2002). The suit alleged that police engaged in a pervasive pattern and practice of unlawful searches and seizures, physical abuse and police harassment. *Id.* ¶¶ 26–28. The parties reached a settlement agreement in May of 2001, mandating that the department "take all steps necessary ... to communicate and continue to communicate to its employees that the HPD does not tolerate racially derogatory remarks and/or conduct by its employees." Stipulated Agreement at 2–3, *Johnson* (No. CIV 99–348). Among other things, the agreement requires officers to receive additional train-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing in diversity issues (particularly racial profiling, racial targeting, and inappropriate communication), use-of-force procedures, and integrity and ethics. *Id.* at 27–28. The settlement also requires the maintenance of statistics regarding individual officers' behavior patterns as well as the race of citizens subjected to police contacts. *Id.* at 4–10. Allegations that the police department has not complied with its obligations under the agreement are the subject of ongoing litigation. *See* Pls.' Mot. for Order for Sanctions and for Compliance with Stipulated Agreement, *Johnson* (No. CIV 99–348).

Also in 1999, two African–American citizens filed a complaint against four Hobbs Police officers (including Officer Porter), Chief Tony Knott and the City of Hobbs. Compl., *Hodge v. Rhoads,* No. CIV 99–561 (D.N.M. Nov. 8, 2000). The events arose from a riot that erupted during a high school football game. *Id.* ¶¶ 19–39. The officers were sued for various civil rights violations on the night of the riot and for harassment of the plaintiffs on subsequent occasions. *Id.* ¶¶ 68–69, 73–74. Chief Knott and the City were sued for perpetuating a pattern of abuse and for maintaining inadequate training. *Id.* ¶¶ 106–27. Damages were recovered against two officers for wrongful arrest, but the remaining defendants, including Officer Porter and Chief Knott, were found not liable. *See* Special Verdict, *Hodge* (No. CIV 99–561). In undisclosed agreements, the City settled the supervisory and municipal liability claims. *See Hodge,* at 1.

The events of this riot also spawned another case, *Collopy v. City of Hobbs,* No. CIV 00–807 (D.N.M. Dec. 13, 2000), *rev'd and remanded,* 27 Fed.Appx. 980

(10th Cir.2001). Collopy served as the special master, in juvenile court, over the prosecution of Hodge (the named plaintiff in *Hodge v. Rhoads* ) for his conduct at the football game and the ensuing riot. In his capacity as the special master, Collopy found Hodge not guilty, and noted in his verdict that Hodge's "civil rights may have been violated." *Collopy,* 27 Fed.Appx. at 982–83. Thereafter, Collopy filed a complaint against the City and Chief Knott alleging that Chief Knott violated his First Amendment rights by retaliating against him for his verdict in Hodge's case. After a full trial, including an appeal to this Court, the jury found that Captain Knott had retaliated against Collopy for exercise of his First Amendment rights, and awarded nominal damages. Special Verdict, *Collopy* (No. CIV 00–807). On Collopy's motion, that judgment was recently vacated because of pending settlement negotiations. Order Granting Pl.'s Unopposed Mot. to Vacate J., *Collopy* (No. CIV 00–807).

Hobbs and its police department have been defendants in several other civil rights suits. *See Perez v. City of Hobbs,* No. CIV 92–103 (D.N.M. Jan. 4, 1994) (jury awarded $3.3 million on an excessive force/wrongful death suit brought under § 1983); *Kaspar v. City of Hobbs,* 90 F.Supp.2d 1313 (D.N.M.2000), *appeal dismissed for want of jurisdiction,* 32 Fed.Appx. 521 (10th Cir.2002), *dismissed pursuant to settlement sub nom. Chapman v. City of Hobbs,* No. CIV 99–262 (D.N.M. July 10, 2002) (section 1983 suit for Fourth Amendment violations against several police officers, Chief Knott, and the City); *Olivas v. City of Hobbs,* 50 Fed.Appx. 936 (10th Cir.2002) (civil rights suit against sever-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

al police defendants, including Officer Porter, and the City of Hobbs, alleging that evidence was planted during an investigation; one jury found that evidence had been planted, but due to a jury note suggesting improper jury instructions, a second trial was required, in which the jury absolved all defendants of liability); *Carter v. Hobbs Police Dep't,* No. 97–2045, 1998 WL 31437 (10th Cir. Jan.28, 1998) (affirming dismissal of a complaint against various Hobbs police defendants as frivolous; the complaint alleged two separate claims of false arrest, conspiracy with magistrates, interception of mail, denial of medical treatment, and coercion to change plea to no contest); *Powell v. Carter,* No. 98–2225, 1999 WL 314587 (10th Cir. May 19, 1999) (affirming dismissal of claims of malicious prosecution, false arrest, and false imprisonment against Hobbs police defendants).

E. *The Medical Defendants*

The district court granted summary judgment in favor of the Medical Defendants on all claims. Although the district court's order granting summary judgment in favor of the Medical Defendants was based on its order granting summary judgment in favor of the Hobbs Defendants, which we have reversed in part, we affirm the district court's decision with respect to the Medical Defendants on other grounds.

Mr. Marshall's initial and amended complaints failed to specify which claims were directed at the Medical Defendants, as opposed to those directed at the Hobbs Defendants exclusively. The district court reasoned that since the Medical Defendants were only involved in the blood test, their potential liability is necessarily limited to that procedure. Adopting this assumption, we interpret Mr. Marshall's complaint as asserting that the seizure of his blood violated his Equal Protection and Fourth Amendment rights, and that this act constituted battery and negligence *per se* under New Mexico law.

[20][21] To sustain a claim under the Equal Protection Clause, a plaintiff must provide evidence that he was treated differently from others who are similarly situated to him, and that the acts forming the basis of the plaintiff's claim were motivated by a discriminatory purpose. *See Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272–74, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979); *Village of Arlington Heights,* 429 U.S. at 264–66, 97 S.Ct. 555. Mr. Marshall admits that there are no facts showing disparate treatment or racially motivated discrimination by the Medical Defendants. Thus, we uphold the district court's dismissal of the equal protection claim against the Medical Defendants.

As to the Fourth Amendment, the evidence in the record, interpreted in the manner most favorable to Mr. Marshall, does not support liability on the part of the Medical Defendants. The record shows that Iris Goad, the nurse on duty at Columbia Lea Regional Hospital, administered the blood test at the behest of police officers Porter and Roye, who signed the consent form. She knew that Mr. Marshall verbally refused to consent but did not otherwise resist the taking of his blood. Neither she nor any other employee of the Hospital was otherwise involved, or had any further knowledge about the circumstances.

We are not aware of any decisions of the Supreme Court or of this court regarding the liability of medical personnel for performing a warrantless and coerced blood test at the instruction of a police officer, but other cases provide a close and persuasive analogy. First, nurses have been permitted to rely on the representations of other nurses that parental consent has been obtained for the medical examinations of children. *Dubbs,* 336 F.3d at 1217 & n. 15. If it is reasonable for nurses to rely on other nurses regarding consent, we see no reason to doubt it is reasonable for nurses to rely on police officers regarding probable cause and exigent circumstances.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Similarly, courts have held that police officers may ordinarily rely on determinations made by other officers regarding the constitutional legitimacy of police procedures. In *1180Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971), the Supreme Court noted that "police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid [had properly determined the existence of] probable cause." See also Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir.1998) (for qualified immunity purposes, female officer called in by another officer to conduct pat-down search of female suspect is entitled to rely on first officer's determination of probable cause); Ramirez v. Butte–Silver Bow County, 298 F.3d 1022, 1027–28 (9th Cir.2002), cert. granted on other grounds sub nom. Groh v. Ramirez, 537 U.S. 1231, 123 S.Ct. 1354, 155 L.Ed.2d 195 (2003) (in the qualified immunity context, distinguishing between officers who lead the search and "are responsible for ensuring that they have lawful authority for their actions," and line officers who "may accept the word of their superiors that they have a warrant and that it is valid"); Caldarola v. Calabrese, 298 F.3d 156, 166–67 (2d Cir.2002) (reversing denial of qualified immunity because an officer is entitled to rely on factual accuracy of information supplied by his superiors).

The same is true of private persons assisting the police. In Warner v. Grand County, 57 F.3d 962, 965 (10th Cir.1995), this Court held that a private party who assisted in a search could not be sued under § 1983 when she "followed the ostensibly legitimate orders of a state official for the mere purpose of assisting the state with its investigatory powers." See also Rodriques v. Furtado, 950 F.2d 805, 815 (1st Cir.1991) (holding that a doctor could not be sued for performing a body cavity search pursuant to an allegedly defective search warrant).

[22] Many of these decisions arose in the context of a claim of qualified immunity, rather than on the merits of the constitutional claim. Here, the Medical Defendants do not assert qualified immunity, but argue that performing a search at the behest of the ostensibly legal order of a police officer is not unreasonable and hence not a violation of the Fourth Amendment. We agree. The qualified immunity cases which we have cited did not rest on the lack of "clearly established statutory or constitutional rights," Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), but rather on the theory that private parties or police officers relying on the orders or determinations of other law enforcement officials are entitled to qualified immunity because such reliance is "objectively reasonable." See, e.g., Baptiste, 147 F.3d at 1260 (actor entitled to qualified immunity if actions are objectively reasonable). Since the Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness,' " Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)), this rationale goes to the merits of the § 1983 claim, not just to the availability of qualified immunity. See Dubbs, 336 F.3d at 1217 n. 15.

Nurses and other medical personnel have neither the training nor the information that would be necessary to second-guess police determinations regarding probable cause, exigent circumstances, and the like. If police officers, trained in Fourth Amendment law and specifically charged to conduct their activities in conformance with the Constitution, are entitled to rely on legal or factual determinations made by other officers, then nurses should be able to do the same. To hold medical personnel liable would impose a greater constitutional duty on medical professionals than on law enforcement, an outcome having no basis in either logic or precedent. See Rodriques, 950 F.2d at 815, cited approvingly in *1181Warner, 57 F.3d at 965; Ruppel v. Ramseyer, 33 F.Supp.2d 720, 729 (C.D.Ill.1999) (under state law, medical personnel are not liable for damages for police-ordered blood tests).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

While not conclusive on the federal question of liability under § 1983, it is noteworthy that New Mexico, like many other states, has enacted a statute requiring that medical personnel, rather than police, administer blood tests to DUI suspects, and immunizing them from liability when acting pursuant to police requests:

Only a physician, licensed professional or practical nurse or laboratory technician or technologist employed by a hospital or physician shall withdraw blood from any person in the performance of a blood-alcohol test. No such physician, nurse, technician or technologist who withdraws blood from any person in the performance of a blood-alcohol test that has been directed by any police officer ... shall be held liable in any civil or criminal action for assault, battery, false imprisonment or any conduct of any police officer, except for negligence....

N.M. Stat. Ann. § 66–8–103. Subject to minor variations, similar laws have been passed by most states in this circuit. *See* Kan. Stat. Ann. § 32–1132(c); Okla. Stat. tit. 47 § 752(A)-(B); Utah Code Ann. § 41–6–44.10(5); Wyo. Stat. Ann. § 31–6–106. This suggests a strong legislative consensus consistent with our legal conclusion here.

We therefore conclude that the district court correctly granted the Medical Defendants' motion for summary judgment.

F. *State Law Claims*

After dismissing all of Marshall's federal claims on summary judgment, the district court dismissed the remaining claims pursuant to 28 U.S.C. § 1367(c)(3). As we have reinstated certain federal claims against the Hobbs Defendants, we remand the related state law claims to the district court for reconsideration.

### III. Conclusion

For reasons set forth above, we AFFIRM the district court's grant of summary judgment as to all claims against the Medical Defendants. We RE-

VERSE the grant of summary judgment in favor of the Hobbs Defendants on the Equal Protection claim and on the Fourth Amendment claim arising from the warrantless blood test, as well as the related supervisory and municipal liability claims and state law claims, and REMAND for further proceedings consistent with this opinion.

[23] Finally, we note that although Mr. Marshall was represented by counsel before the district court, he proceeds *pro se* on this appeal. The decision of whether to appoint counsel in a civil case under § 1983 is left to the discretion of the trial court. *Shabazz v. Askins,* 14 F.3d 533, 535 (10th Cir.1994). We have previously cited to the Fourth Circuit's understanding that "if it is apparent to the district court that a pro se litigant has a colorable claim but lacks the capacity to present it, the district court should appoint counsel to assist him." *McCarthy v. Weinberg,* 753 F.2d 836, 838 (10th Cir.1985) (citing *Gordon v. Leeke,* 574 F.2d 1147, 1153 (4th Cir.1978)); *see also Miller v. Glanz,* 948 F.2d 1562, 1572 (10th Cir.1991) (same). Because we hold that certain of Mr. Marshall's claims survive the Hobbs Defendants' summary judgment motion, on remand the district court should consider whether to appoint counsel to assist him in presenting his surviving claims.

C.A.10 (N.M.),2003.
Marshall v. Columbia Lea Regional Hosp.
345 F.3d 1157

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

316 F.3d 128
**(Cite as: 316 F.3d 128)**

⚑

United States Court of Appeals,
Second Circuit.
Thomas JOCKS,
Plaintiff–Appellee–Cross–Appellant,
v.
Augusto TAVERNIER and The New York City Po-
lice Department, Defendants–Appellants,
Michael A. Oggeri, Defendant–Cross–Appellee,
City of New York, Nassau County Police Depart-
ment, and County of Nassau, Defendants.

Docket Nos. 00–7943, 00–7965, 00–7735,
00–7737, 00–7743.
Argued Sept. 25, 2001.
Decided: Jan. 8, 2003.

Arrestee brought § 1983 action against city and
police officers, alleging false arrest and malicious
prosecution in violation of the Fourth and Four-
teenth Amendments. The United States District
Court for the Eastern District of New York, 97
F.Supp.2d 303, Thomas C. Platt, Senior District
Judge, J., dismissed claim against one officer,
entered judgment, upon jury verdict, in favor of ar-
restee against another officer, awarded sanctions
against city, and denied officer's motion for indem-
nification by city. Parties appealed. The Court of
Appeals, John M. Walker, Jr., Chief Judge, held
that: (1) off-duty officer acted under color of law in
restraining arrestee; (2) off-duty officer's conduct
constituted arrest; (3) evidence presented question
for jury as to whether off-duty officer lacked prob-
able cause to arrest; (4) arrestee's conduct could not
constitute emergency measures; (5) submission of
erroneous emergency measures jury instruction
warranted new trial; and (6) evidence presented
question for jury as to whether arresting officer
falsified arrestee's statement.

Vacated and remanded.

West Headnotes

**[1] Civil Rights 78 ⟪⟫1326(8)**

78 Civil Rights
    78III Federal Remedies in General
        78k1323 Color of Law
            78k1326 Particular Cases and Contexts
                78k1326(8) k. Police or peace officers;
prisons. Most Cited Cases
    (Formerly 78k198(7))

Off-duty police officer who displayed his
shield, identified himself as a police officer to ar-
restee, and drew his firearm acted under color of
law in taking arrestee into custody, for purposes of
arrestee's § 1983 action against officer. 42 U.S.C.A.
§ 1983.

**[2] Civil Rights 78 ⟪⟫1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1088 Police, Investigative, or Law En-
forcement Activities
            78k1088(4) k. Arrest and detention. Most
Cited Cases
    (Formerly 78k133)

**Civil Rights 78 ⟪⟫1088(5)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohib-
ited in General
        78k1088 Police, Investigative, or Law En-
forcement Activities
            78k1088(5) k. Criminal prosecutions.
Most Cited Cases
    (Formerly 78k134)

Claims for false arrest or malicious prosecu-
tion, brought under § 1983 to vindicate the Fourth
and Fourteenth Amendment right to be free from
unreasonable seizures, are substantially the same as
claims for false arrest or malicious prosecution un-
der state law. U.S.C.A. Const.Amends. 4, 14; 42
U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[3] False Imprisonment 168 ⟊2**

168 False Imprisonment
   168I Civil Liability
      168I(A) Acts Constituting False Imprisonment and Liability Therefor
         168k1 Nature and Elements of False Imprisonment
         168k2 k. In general. Most Cited Cases

Under New York state law, to prevail on a claim of false arrest a plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.

**[4] Arrest 35 ⟊57.4**

35 Arrest
   35II On Criminal Charges
      35k57.2 What Is an Arrest
         35k57.4 k. Particular cases. Most Cited Cases
   (Formerly 35k68(3))

**Civil Rights 78 ⟊1088(4)**

78 Civil Rights
   78I Rights Protected and Discrimination Prohibited in General
      78k1088 Police, Investigative, or Law Enforcement Activities
         78k1088(4) k. Arrest and detention. Most Cited Cases
   (Formerly 78k133)

Off-duty police officer's conduct of displaying his shield, identifying himself as police officer to arrestee, physically restraining arrestee, transporting him at gunpoint and detaining him until police officers arrived constituted an arrest, for purposes of arrestee's § 1983 false arrest claim. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[5] Arrest 35 ⟊63.4(2)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest Without Warrant
         35k63.4 Probable or Reasonable Cause
            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

A law enforcement officer has probable cause to arrest when he has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[6] Arrest 35 ⟊63.4(2)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest Without Warrant
         35k63.4 Probable or Reasonable Cause
            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

Under some circumstances, a police officer's awareness of the facts supporting a defense to the suspected crime can eliminate probable cause to arrest the person suspected of committing the crime. U.S.C.A. Const.Amend. 4.

**[7] Arrest 35 ⟊63.4(2)**

35 Arrest
   35II On Criminal Charges
      35k63 Officers and Assistants, Arrest Without Warrant
         35k63.4 Probable or Reasonable Cause
            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

A grand jury's decision to indict is distinct from the probable cause determination necessary to support an arrest. U.S.C.A. Const.Amend. 4.

**[8] Arrest 35 ⟊63.4(2)**

35 Arrest
   35II On Criminal Charges

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

35k63 Officers and Assistants, Arrest Without Warrant
35k63.4 Probable or Reasonable Cause
35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

Defenses which negate the existence of a crime should similarly negate probable cause to arrest. U.S.C.A. Const.Amend. 4.

**[9] Arrest 35 ⬤➾63.4(2)**

35 Arrest
35II On Criminal Charges
35k63 Officers and Assistants, Arrest Without Warrant
35k63.4 Probable or Reasonable Cause
35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

Just as probable cause to arrest a suspect may exist although the suspect is in fact innocent, probable cause may also exist where the police do not know of the existence or validity of an exculpatory defense. U.S.C.A. Const.Amend. 4.

**[10] Civil Rights 78 ⬤➾1429**

78 Civil Rights
78III Federal Remedies in General
78k1425 Questions of Law or Fact
78k1429 k. Criminal law enforcement; prisons. Most Cited Cases
(Formerly 78k244)

Evidence presented question for jury as to whether off-duty police officer lacked probable cause to arrest assault suspect, in suspect's § 1983 false arrest and malicious prosecution claims against officer; suspect testified that he struck officer with telephone receiver after officer pulled gun and threatened suspect with it, so that officer would know that suspect was acting in self-defense, under New York law, but officer testified that suspect struck him first and then the officer identified himself as a police officer and drew his weapon. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; N.Y.McKinney's Penal Law § 35.15.

**[11] Arrest 35 ⬤➾63.4(2)**

35 Arrest
35II On Criminal Charges
35k63 Officers and Assistants, Arrest Without Warrant
35k63.4 Probable or Reasonable Cause
35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

**Assault and Battery 37 ⬤➾9**

37 Assault and Battery
37I Civil Liability
37I(A) Acts Constituting Assault or Battery and Liability Therefor
37k8 Defenses
37k9 k. In general. Most Cited Cases

**Civil Rights 78 ⬤➾1088(4)**

78 Civil Rights
78I Rights Protected and Discrimination Prohibited in General
78k1088 Police, Investigative, or Law Enforcement Activities
78k1088(4) k. Arrest and detention. Most Cited Cases
(Formerly 78k133)

Suspect's actions in throwing telephone receiver at off-duty police officer after telling officer to get off the phone so he could use it because there was an emergency created by a stalled truck on the highway did not constitute emergency measures, under New York law, barring suspect's defense to assault on that ground, as would show lack of probable cause to arrest suspect, for purposes of suspect's § 1983 false arrest claim. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; N.Y.McKinney's Penal Law § 35.05.

**[12] Malicious Prosecution 249 ⬤➾0.5**

249 Malicious Prosecution
249I Nature and Commencement of Prosecution
249k0.5 k. Nature and elements of malicious prosecution in general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Formerly 249k16)

A malicious prosecution claim under New York law requires the plaintiff to prove (1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding, and (4) actual malice as a motivation for defendant's actions.

**[13] Civil Rights 78 ⟲1088(5)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1088 Police, Investigative, or Law Enforcement Activities
      78k1088(5) k. Criminal prosecutions. Most Cited Cases
  (Formerly 78k134)

There must be a post-arraignment seizure to support a § 1983 malicious prosecution claim; the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[14] Federal Courts 170B ⟲763.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)1 In General
        170Bk763 Extent of Review Dependent on Nature of Decision Appealed from
          170Bk763.1 k. In general. Most Cited Cases

A trial court's conclusion that the jury's verdict was not against the weight of the evidence is not reviewable on appeal because of Seventh Amendment concerns. U.S.C.A. Const.Amend. 7.

**[15] Federal Civil Procedure 170A ⟲2336**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2333 Trial Errors

        170Ak2336 k. Instructions. Most Cited Cases

A new trial is required if errors in instructing the jury, considered as a whole, prejudiced the objecting party.

**[16] Federal Civil Procedure 170A ⟲2336**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2333 Trial Errors
        170Ak2336 k. Instructions. Most Cited Cases

Submission of erroneous jury instruction on emergency measures defense, as could allow jury to improperly find that arrestee's conduct of striking off-duty police officer with telephone receiver after telling officer to get off the phone because there was an emergency created by a stalled truck on the highway was justified, under New York law, as would support finding that officer lacked probable cause to arrest, warranted new trial in arrestee's § 1983 false arrest and malicious prosecution claims against arresting officer. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983; N.Y.McKinney's Penal Law § 35.05.

**[17] Arrest 35 ⟲63.4(11)**

35 Arrest
  35II On Criminal Charges
    35k63 Officers and Assistants, Arrest Without Warrant
      35k63.4 Probable or Reasonable Cause
        35k63.4(7) Information from Others
          35k63.4(11) k. Other officers or official information. Most Cited Cases

**Civil Rights 78 ⟲1088(4)**

78 Civil Rights
  78I Rights Protected and Discrimination Prohibited in General
    78k1088 Police, Investigative, or Law Enforcement Activities

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

78k1088(4) k. Arrest and detention. Most Cited Cases

(Formerly 78k133)

Police officer had probable cause to arrest suspect for assault based upon off-duty police officer's statement that suspect struck him with a telephone receiver and injured him, barring suspect's § 1983 false arrest claim against police officer. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[18] Criminal Law 110 ⬤══411.3**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
            110XVII(M)10 Warnings
                110k411.3 k. Necessity in general. Most Cited Cases

(Formerly 110k412.2(3))

The appropriate remedy for violations of *Miranda* rights is exclusion of the evidence at trial. U.S.C.A. Const.Amend. 5.

**[19] Civil Rights 78 ⬤══1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and detention. Most Cited Cases

(Formerly 78k133)

*Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

**[20] Civil Rights 78 ⬤══1088(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities

78k1088(4) k. Arrest and detention. Most Cited Cases

(Formerly 78k133)

Making provocative statements in front of a suspect who has insisted on having his lawyer present and asking if the statements are accurate is a run-of-the-mill *Miranda* violation, which can taint the evidence, but is not independently actionable as a civil rights claim. U.S.C.A. Const.Amend. 5.

**[21] Civil Rights 78 ⬤══1429**

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1429 k. Criminal law enforcement; prisons. Most Cited Cases

(Formerly 78k244)

Evidence presented question for jury as to whether arresting police officer falsified arrestee's statement following arrest, for purposes of arrestee's § 1983 malicious prosecution claim; arrestee claimed that the statement written by the officer was false, that it had been edited to favor the police, and that arrestee refused to sign the statement for that reason, and officer testified that the statement was an accurate account of what arrestee told him. U.S.C.A. Const.Amends. 4, 5; 42 U.S.C.A. § 1983.

**[22] Contempt 93 ⬤══20**

93 Contempt
    93I Acts or Conduct Constituting Contempt of Court
        93k19 Disobedience to Mandate, Order, or Judgment
            93k20 k. In general. Most Cited Cases

Municipality's corporation counsel's inability to produce municipal police department captain as a witness in civil rights trial until the afternoon of the day after the issuance of district court's order for captain's appearance that morning was insufficient for a finding of contempt, and thus imposition of sanctions against municipality on that basis was barred; corporation counsel was reasonably diligent

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

in carrying out the court's instructions.

**\*131** Richard W. Young, Babylon, NY, for Plaintiff–Appellee Thomas Jocks.

Raymond E. Kerno, (Cronin & Byczek, LLP, on the brief), Mineola, NY, for Defendant–Appellant Augusto Tavernier.

Fay NG, Assistant Corporation Counsel (Michael D. Hess, Corporation Counsel of the City of New York, Elizabeth S. Natrella, Assistant Corporation Counsel, on the brief), New York, NY, for Defendants–Appellees City of New York and the New York Police Department.

Steven Jay Harfenist, Friedman & Harfenist, Lake Success, NY, for Defendant–Appellee Michael A. Oggeri.

Before: WALKER, Chief Judge, LEVAL and SO-TOMAYOR, Circuit Judges.

JOHN M.WALKER, Jr., Chief Judge.

Plaintiff Thomas Jocks brought false arrest and malicious prosecution claims under state law and 42 U.S.C. § 1983 against Officer Augusto Tavernier and Detective Michael Oggeri. The United States District Court for the Eastern District of New York (Thomas C. Platt, Sr., *District Judge* ) dismissed the claims against Oggeri and, after a jury trial, awarded judgment on both claims against Tavernier for a total of more than $600,000 in damages. Tavernier appeals the judgment against him, and Jocks appeals the dismissal of his claims against Oggeri. Tavernier also appeals from the district court's refusal to order New York City to indemnify him. New York City appeals an award of sanctions. We vacate the district court's judgments against Tavernier and in favor of Oggeri and remand both for a new trial. We also vacate the award of sanctions.

### BACKGROUND

This case arises out of an altercation between a truck driver and an off-duty **\*132** New York City police officer near the Long Island Expressway on October 11, 1994. Depending upon whose testimony at trial is credited, the incident could be described as either a dedicated trucker struggling to eliminate a public hazard on the highway, arrested at gunpoint and maliciously harassed with criminal charges for his trouble; or an aggressive assailant striking an off-duty police officer without justification and being promptly and appropriately arrested. In our recitation of the facts, we lay out the respective positions.

No party disputes the initial events that led to the incident. Plaintiff Thomas Jocks, a professional truck driver, was driving his tractor trailer east on the Long Island Expressway when the engine failed. Jocks attempted to drive the truck onto the shoulder to avoid blocking traffic. When the truck came to a stop, approximately four feet of the trailer still projected into the right-hand eastbound lane of the Expressway. After being unable to restart the truck, Jocks disengaged the tractor from the trailer and moved it forward for safety reasons. He then placed three emergency reflective triangles at hundred-foot intervals behind the truck, as required by state regulations. Jocks tried unsuccessfully to flag down passing motorists and noticed that a hill obstructed motorists' view of the truck, forcing them to swerve to avoid it.

Jocks then ran approximately three-quarters of a mile to a gas station and convenience store. He first went into the convenience store, but the clerk, whose English skills were limited, refused to allow Jocks to use the store phone. Jocks then went outside to the only pay phone in the vicinity. The phone was designed with a longer cord to be used from a vehicle, and defendant Augusto Tavernier, an off-duty New York City police officer, was using it while seated in his van.

At this point, the stories related by the two men diverge. Jocks testified that he took the following steps to convince Tavernier of the emergency. Upon approaching the vehicle, Jocks informed Tavernier that there was an emergency because his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

truck was blocking the right-hand lane of the Expressway. Tavernier replied that he should find another phone and continued his conversation. Jocks told him again that the situation was an emergency. Tavernier again refused to yield the phone and swore at Jocks. Jocks knocked on the windshield of the van and informed him yet again of the emergency.

After Tavernier continued to ignore Jocks, Jocks disconnected his call by pressing down the hook of the telephone. Tavernier then threw the receiver at Jocks. Tavernier attempted to get out of his vehicle, but he was unable because the phone stand blocked the door. Tavernier drove the car forward 15 to 20 feet. Jocks began dialing 911 when Tavernier charged him and screamed at him, "[I]f I can't use the phone—you can't use the phone." Tavernier pushed Jocks out of the way and hung up the phone. Jocks and Tavernier yelled at each other briefly, and Jocks reiterated that the situation was an emergency. Tavernier then said, "[W]hy don't I blow your fucking brains out," and drew his service pistol. Jocks threw the phone handset back at Tavernier, striking him in the mouth, and ran towards the gas station. Tavernier ran him down, said "freeze, police," and pressed the gun into the back of Jocks's head as he walked him into the gas station. Tavernier repeated his threat to "blow [Jocks's] brains out." Shortly thereafter, an off-duty Nassau County police officer arrived, ordered Tavernier to put down his weapon and show identification, and stabilized the situation *133 until the Nassau County police arrived. As soon as the uniformed police arrived, the off-duty police officer left and a uniformed police officer arrested Jocks based on Tavernier's account of the events.

Tavernier's testimony differs from that of Jocks in numerous important aspects. He testified that Jocks approached, waited for a minute or two, and then simply told Tavernier that he needed the phone, without mentioning an emergency. Tavernier refused to end his call and told Jocks to look for another phone down the road. Jocks then ended

Tavernier's call by pushing the receiver hook down, without requesting the phone again or describing an emergency. Tavernier dropped the phone out of the car, drove forward, and walked back to Jocks. Tavernier said, "If I can't use the phone, you can't use the phone either." As Tavernier reached to hang up the phone, Jocks swung the handset on its cable and struck him on the arm and in the face. Tavernier then drew his gun and displayed his shield and placed Jocks under arrest. An off-duty police officer arrived and called the Nassau County police, who took Jocks into custody.

There is also a dispute over what happened after Jocks was taken to the Second Precinct station. According to Jocks, Detective Michael Oggeri, the officer assigned to the case, informed him of his *Miranda* rights upon his arrival and Jocks expressly refused to make a statement. Soon thereafter, Oggeri discussed the case with another officer in front of Jocks, and then asked Jocks whether the other officer had described the incident accurately. Correcting the officer's description, Jocks described the same sequence of events to which he testified at trial. Oggeri later presented to Jocks a statement, in which Jocks admitted hitting Tavernier in the mouth with the phone, and asked Jocks to sign it. Jocks refused, both because the statement was inaccurate and because he refused to sign any statement without his lawyer. Oggeri described the events differently, stating that Jocks spontaneously made the statement before being read his *Miranda* rights. Although he does not dispute that Jocks refused to sign the written statement, Oggeri maintains that it accurately reflected Jocks's verbal statement. Because the events in the precinct house were only relevant to claims that were decided against Jocks as a matter of law, we resolve all of the inconsistencies in his favor.

Jocks was kept in a holding cell until his arraignment the following morning. Over the following year, Jocks was required to make 28 court appearances, culminating in a not-guilty verdict on charges of Felony Assault and Criminal Possession

of a Weapon. The litigation cost him about $20,000 in legal fees. Jocks also was terminated from his job as a truck driver, which he believes was due to the criminal case against him. None of his subsequent jobs has paid as well as his truck driving position. Jocks claims that the incident caused him embarrassment and difficulty sleeping. Perhaps most importantly to Jocks, at the time of his encounter with Tavernier, Jocks had full custody of his then-fourteen year old daughter, but as a result of his legal problems, he agreed to joint custody with his ex-wife. His daughter now lives with her mother.

Jocks brought claims under state law and 42 U.S.C. § 1983 against Tavernier and Oggeri, as well as Nassau County, the Nassau County Police Department, New York City, and the New York City Police Department, alleging false arrest and malicious prosecution. At the conclusion of the plaintiff's evidence at trial, the district court granted judgment as a matter of law in favor of all defendants except Tavernier. The jury found in Jocks's favor on both the **134 false arrest and malicious prosecution claims against Tavernier, awarding Jocks $300,000 and $322,000, respectively. After the trial, Tavernier renewed his motion for judgment as a matter of law and moved in the alternative for a new trial or remittitur, all of which were denied.

## DISCUSSION

Defendant Tavernier appeals from the district court's decisions denying him judgment as a matter of law, a new trial on the merits, and remittitur of the damages, and denying his cross-claim against New York City for indemnification. Jocks cross-appeals the district court's grant of judgment as a matter of law in favor of defendant Oggeri. Finally, the New York City Corporation Counsel appeals from the district court's decision to award sanctions against it.

## I. Tavernier's Claims for Judgment as a Matter of Law

Tavernier argues that the district court erred when it denied his post-trial motion for judgment as a matter of law under Fed.R.Civ.P. 50. Whether the issue is raised

> on a motion for summary judgment (before trial), on a motion for a judgment as a matter of law (at trial but prior to submission to the fact finder), on a motion for a judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after drawing all reasonable inferences in favor of the non-moving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor.

*McCarthy v. New York City Technical Coll.,* 202 F.3d 161, 167 (2d Cir.2000) (internal quotations omitted). Appellate review is *de novo. New Eng. Ins. Co. v. Healthcare Underwriters Mut. Ins. Co.,* 295 F.3d 232, 240 (2d Cir.2002).

[1] Before considering the individual constitutional torts presented in this case, we must address the general § 1983 requirement of action under color of law. Although Tavernier claims in conclusory fashion that his actions were not under color of law, he makes no arguments of substance supporting his position. According to Tavernier's own account, he displayed his shield and identified himself as a police officer at the same time as he drew his pistol. Jocks testified that Tavernier had threatened him with the pistol before he identified himself as a police officer. Thus, according to either account, by the time Tavernier restrained Jocks, he had indicated that he was a police officer. We have no doubt that when an officer identifies himself as a police officer and uses his service pistol, he acts under color of law. See *Stengel v. Belcher,* 522 F.2d 438, 441 (6th Cir.1975).

[2] Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are "substantially the same" as claims for false arrest or malicious prosecution under state law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (false arrest); *Conway v. Vill. of*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Mount Kisco,* 750 F.2d 205, 214 (2d Cir.1984) (holding that 42 U.S.C. § 1988 requires the use of state law rules to determine the elements of malicious prosecution).

**A. False Arrest**

[3][4][5] Under New York state law, to prevail on a claim of false arrest a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise **\*135** privileged." *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975). Although Tavernier maintains that he did not arrest Jocks, this claim is frivolous. He identified himself as a police officer, physically seized Jocks, transported him into the gas station office at gunpoint, and detained him until the Nassau County Police arrived. The only element seriously at issue here is whether the confinement was privileged. If probable cause existed, Tavernier as a police officer would be privileged to make an arrest. An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852; *see also Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citations omitted).

Tavernier argues that probable cause existed because striking another individual with a phone handset satisfies the elements of the crime of assault. Although Jocks concedes that the elements of assault were present, he argues that Tavernier lacked probable cause because the act was either committed in self-defense or necessary as an emergency measure. Puzzlingly, Tavernier responds that no doctrine of emergency measures exists, and that, in any event, claims of self-defense or emergency measures would simply be defenses to assault and would not eliminate probable cause.

[6][7][8][9] We believe that under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause. Under New York law, defenses are either exculpatory (eliminating culpability) or mitigating (reducing culpability). *People v. Valles,* 62 N.Y.2d 36, 476 N.Y.S.2d 50, 464 N.E.2d 418, 419 (1984). Justification, including both emergency measures and self-defense, is an exculpatory defense. *Id.;* N.Y. Penal Law §§ 35.05, 35.15 (McKinney 1997). In *Valles,* the New York Court of Appeals held that exculpatory defenses must be presented to a grand jury, whereas mitigating defenses need not, because exculpatory defenses are relevant to the grand jury's role in "protect[ing] citizens from having to defend against unfounded accusations" to which there are complete defenses. *Valles,* 476 N.Y.S.2d 50, 464 N.E.2d at 419. Although a grand jury's decision of whether probable cause exists to indict is distinct from the probable cause determination of whether an arrest is privileged, the interest in protecting the public against improper arrests is parallel to the interest in protecting the innocent against the burden of answering to an indictment. Defenses which negate the existence of a crime should similarly negate probable cause. Of course, just as probable cause may exist although a suspect is in fact innocent, probable cause may exist where the police do not know of the existence or validity of an exculpatory defense.

Tavernier argues that, even if justification can negate probable cause, he did not need to investigate potential defenses before arresting Jocks because our jurisprudence does not require him to verify whether the defense is true. *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123 (2d Cir.1997). In *Ricciuti,* we rejected the plaintiff's argument that because the police had heard his claim that he was acting in self-defense, the police were obligated to investigate his defense before arresting him. *Id.* at 128. We held that probable cause to arrest should be determined based on what the officer knew at the time of the arrest. We did not impose a duty **\*136** on the arresting officer to investigate exculpatory defenses offered by the person being arrested

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

or to assess the credibility of unverified claims of justification before making an arrest. On the other hand, we do not read *Ricciuti* to permit an officer to deliberately disregard facts known to him which establish justification.

[10] Under the circumstances of this case, a reasonable jury could have concluded that Tavernier should have known that Jocks was acting in self-defense. N.Y. Penal Law § 35.15 states,

A person may ... use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself ... from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person ....

According to Jocks's version, which we must accept on appeal, Tavernier had pulled his gun and threatened Jocks with it. Jocks could have been acting under a threat of "imminent ... unlawful physical force." *Id.* On this version of the facts, Tavernier knew that Jocks's actions were not criminal because Jocks was acting in self-defense; a jury could therefore find that the arrest lacked probable cause. The fact that his response would likely have been insufficient against a gun does not alter the self-defense calculus. Consequently, the district court correctly denied Tavernier's motion claiming entitlement to judgment as a matter of law on the self-defense issue.

[11] Jocks also claims that his actions constituted emergency measures and thus did not provide probable cause. N.Y. Penal Law § 35.05 provides, in part,

conduct which would otherwise constitute an offense is justifiable and not criminal when: ... 2. Such conduct is necessary as an emergency measure to avoid an imminent public or private injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor, and which is of such gravity that, according to ordinary standards of intelligence and mor-

ality, the desirability and urgency of avoiding such injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue ....

We hold that Tavernier was entitled to partial judgment as a matter of law on this issue. He observed Jocks throwing the telephone at him, conduct that amounted to an assault and established probable cause for an arrest. It is true that Tavernier heard Jocks's unsubstantiated claims about the emergency created by the stalled truck, but under *Ricciuti,* Tavernier was neither compelled to accept these assertions at face value nor to investigate them.

B. Malicious Prosecution

[12][13] A malicious prosecution claim under New York law requires the plaintiff to prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997) (internal quotation marks omitted). Additionally, there must be a post-arraignment seizure for a § 1983 malicious prosecution claim; however, the requirements of attending criminal proceedings and obeying the conditions of bail suffice on that score. *Id.* at 946. Tavernier's only significant argument is that he had probable cause to commence the proceeding. This is essentially the same as the argument on the false arrest claim, and we hold that Tavernier was entitled to partial judgment as a matter of law on the **\*137** emergency measure justification but not on the self-defense justification.

II. Tavernier's Motion for a New Trial

[14] Tavernier moved after the verdict for a new trial under Fed.R.Civ.P. 59(a). On appeal, he argues both that the jury's verdict was against the weight of the evidence and that a new trial should have been ordered because of errors in the trial. The appeal on the basis of the weight of the evidence is meritless. Under our precedents, a trial court's con-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

clusion that the jury's verdict was not against the weight of the evidence is not reviewable on appeal because of Seventh Amendment concerns. *Robinson v. Cattaraugus County,* 147 F.3d 153, 160 (2d Cir.1998).

However, Tavernier is correct that a new trial must be granted because of legal errors at the trial. As discussed above in reference to Tavernier's motion for judgment as a matter of law, we hold that the district court should not have instructed the jury on an emergency measures defense.

[15][16] A new trial is required if errors in instructing the jury, considered as a whole, "prejudiced the objecting party." *Girden v. Sandals Int'l,* 262 F.3d 195, 203 (2d Cir.2001). If the jury concluded that Jocks was acting in self-defense, as seems likely, then Tavernier was not prejudiced by the instruction. However, in light of the general verdict and the possibility that the jury based its decision in Jocks's favor on the emergency measures doctrine, which should not have been charged, we must vacate the district court's denial of a new trial to Tavernier and order a new trial.

Because a new trial is required on the jury charge, it is unnecessary for us to consider the evidentiary issues raised by Tavernier.[FN1] We likewise need not consider whether the district judge correctly denied remittitur, although we note in passing that allowing significant recoveries to compensate for Jocks's lost job and for the loss of full custody of his daughter was probably not unreasonable. We similarly need not address Tavernier's cross-claim for indemnification by the New York City Police Department because the grant of a new trial has rendered this claim moot.

FN1. Tavernier argues that he was prejudiced by the district court's exclusion of testimony of two witnesses as to the events at the payphone. After Tavernier represented that there were three witnesses to those events, but that all three were unavailable, the parties entered into a stipulation as to

the testimony of one of them, but restricted its use to the issue of the reliance of Oggeri on the statements as related to his probable cause in detaining Jocks. Later in the trial, when two of the three witnesses became available, the district court refused to allow their testimony for any purpose on the basis that the stipulation had settled the question. In light of the importance of the events at the payphone to Tavernier's liability, the exclusion of the two witnesses was probably error. However, this issue is mooted by our independent decision to remand for a new trial.

III. Judgment for Oggeri as a Matter of Law

[17] The trial court granted judgment as a matter of law to Detective Oggeri on both the false arrest and malicious prosecution claims. The false arrest claim was properly dismissed. Even if Oggeri is assumed to have arrested Jocks, he had probable cause to do so. Unlike Tavernier, who knew of the valid defense according to Jocks, all that Oggeri had before him was the statement of a fellow police officer that he had been assaulted and Tavernier's obvious injuries. Jocks did not make a statement to the Nassau County Police initially, and his excited statement later, even crediting his version, did not dissipate probable cause. *See* **138***Ricciuti,* 124 F.3d at 128. Even taking the evidence in the light most favorable to Jocks, no claim of false arrest was made out against Oggeri.

[18][19][20] The malicious prosecution claim, however, was improperly dismissed. Jocks claims that Oggeri violated his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and falsified evidence against him. *Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983. *See Deshawn E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998). The appropriate remedy for violations of *Miranda* rights is exclusion of the evidence at trial. *Id.* Although Jocks argues that there was coercion, evidence of coercion is absent. In

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

particular, making provocative statements in front of a suspect who has insisted on having his lawyer present and asking if the statements are accurate is simply a run-of-the-mill *Miranda* violation, which can taint the evidence but is not independently actionable as a civil rights claim.

However, the trial court, in dismissing the malicious prosecution claim against Oggeri, rejected the argument that the fabrication of evidence is a civil rights violation. In so doing, the district court erred. We have held that "[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti, 124 F.3d at 130.* Oggeri asserts that *Ricciuti* only applies to false evidence created to justify an arrest without probable cause, but in *Ricciuti* we specifically held that the police had probable cause to arrest but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence. *Id.* at 128, 130.

[21] Jocks testified that the statement written by Oggeri was false; that it had been edited to favor the police; and that for that reason he refused to sign the statement after Oggeri recorded it. Oggeri testified that the statement was verbatim and accurate, although he did admit that he wrote the statement down fifteen to twenty-five minutes after it had been made. It is undisputed that the statement was passed on to the prosecution. Although there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit Jocks's testimony and reject Oggeri's. Consequently, because judgment as a matter of law should not have been granted in favor of Oggeri, we vacate and remand for a new trial.

IV. Sanctions

The district court imposed sanctions on New York City for its failure to produce Captain Robert Morgan of the New York Police Department as a witness at the trial. Captain Morgan investigated the incident on behalf of the NYPD to determine whether Tavernier's conduct was proper. Both Jocks and Tavernier intended to call Captain Morgan at trial. On Friday February 25, 2000, Jocks and Tavernier attempted to serve Morgan with subpoenas to appear at the trial, which was scheduled to begin the next business day. The process servers were not permitted past the front desk of the precinct house where Morgan worked, and the subpoenas were not delivered to Morgan by the desk officer. Morgan left for a vacation without having seen the subpoenas. When the court became aware of Morgan's absence the following Wednesday, it ordered Corporation**139** Counsel to find Morgan and have him back to court by the next day. When Morgan did not appear until Thursday afternoon, the district court sanctioned New York City for failing to obey a court order and failing to arrange for Captain Morgan's appearance. The district court ordered New York City to pay $5566.35.

[22] While we appreciate the district court's irritation with Corporation Counsel, we do not think that the sanctions order can be sustained under the court's inherent powers to sanction a party for willful disobedience of an order. The first relevant court order was the Wednesday morning order that Morgan be produced in court by Thursday morning. Corporation Counsel's inability to produce Morgan until Thursday afternoon is insufficient for a finding of contempt, because Corporation Counsel was "reasonably diligent" in carrying out the court's instructions. *See, e.g., EEOC v. Local 638,* 81 F.3d 1162, 1171 (2d Cir.1996). We thus vacate the sanctions order.

CONCLUSION

We VACATE the judgments against Tavernier and in favor of Oggeri and REMAND for a new trial. We also VACATE the sanctions order against the City.

C.A.2 (N.Y.),2003.
Jocks v. Tavernier

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

316 F.3d 128
Case: 10-3523       Document: 45        Filed: 09/21/2011      Pages: 102
**(Cite as: 316 F.3d 128)**

316 F.3d 128

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2218, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

Supreme Court of the United States
MARYLAND, Petitioner,
v.
Michael Blaine SHATZER, Sr.,

No. 08–680.
Argued Oct. 5, 2009.
Decided Feb. 24, 2010.

**Background:** Defendant was convicted in the Maryland Circuit Court, Washington County, John H. McDowell and M. Kenneth Long, Jr., JJ., of child sexual abuse. Defendant noted a timely appeal to the Maryland Court of Special Appeals. The Maryland Court of Appeals granted certiorari on its own initiative, and reversed and remanded, 405 Md. 585, 954 A.2d 1118. Certiorari was granted.

**Holdings:** The Supreme Court, Scalia, J., held that:
(1) the *Edwards* rule, under which a suspect who has invoked his right to the presence of counsel during custodial interrogation is not subject to further interrogation until either counsel has been made available or the suspect himself further initiates exchanges with the police, does not apply if a break in custody lasting 14 days has occurred, and
(2) defendant's return to the general prison population, after he had invoked his right to the presence of counsel during custodial interrogation regarding allegations of criminal conduct separate from the conduct underlying the defendant's convictions, constituted a break in custody.

Maryland Court of Appeals reversed; remanded.

Justice Thomas joined as to Part III and filed an opinion concurring in part and concurring in the judgment.

Justice Stevens filed an opinion concurring in the judgment.

## West Headnotes

**[1] Constitutional Law 92 ☞3855**

92 Constitutional Law
  92XXVII Due Process
    92XXVII(A) In General
      92k3848 Relationship to Other Constitutional Provisions; Incorporation
        92k3855 k. Fifth Amendment. Most Cited Cases

The Fifth Amendment protection against self-incrimination applies to the States by virtue of the Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14.

**[2] Criminal Law 110 ☞411.10**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)10 Warnings
        110k411.10 k. Right to remain silent. Most Cited Cases
    (Formerly 110k412.2(3))

**Criminal Law 110 ☞411.11**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)10 Warnings
        110k411.11 k. Right to counsel. Most Cited Cases
    (Formerly 110k412.2(3))

**Criminal Law 110 ☞411.84**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Admissions by or on Behalf of Accused
    110XVII(M)16 Invocation or Rights
    110k411.82 Effect of Invocation
      110k411.84 k. Right to remain silent. Most Cited Cases
 (Formerly 110k412.1(4))

Police officers must warn a suspect prior to questioning that he has a right to remain silent and a right to the presence of an attorney, and after the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. U.S.C.A. Const.Amend. 5.

**[3] Criminal Law 110 ☞411.85**

110 Criminal Law
 110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)16 Invocation or Rights
    110k411.82 Effect of Invocation
     110k411.85 k. Counsel. Most Cited Cases
 (Formerly 110k412.2(4))

If, after police officers have warned a suspect prior to questioning that he has a right to the presence of an attorney, the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. U.S.C.A. Const.Amend. 5.

**[4] Criminal Law 110 ☞411.92**

110 Criminal Law
 110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)17 Waiver of Rights
    110k411.92 k. Form and sufficiency in general. Most Cited Cases
 (Formerly 110k412.2(5))

A suspect can waive his *Miranda* rights. U.S.C.A. Const.Amend. 5.

**[5] Criminal Law 110 ☞411.92**

110 Criminal Law

110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)17 Waiver of Rights
    110k411.92 k. Form and sufficiency in general. Most Cited Cases
 (Formerly 110k412.2(5))

To establish a valid waiver of *Miranda* rights, the State must show that the waiver was knowing, intelligent, and voluntary. U.S.C.A. Const.Amend. 5.

**[6] Criminal Law 110 ☞411.85**

110 Criminal Law
 110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)16 Invocation or Rights
    110k411.82 Effect of Invocation
     110k411.85 k. Counsel. Most Cited Cases
 (Formerly 110k412.2(4))

**Criminal Law 110 ☞411.86(6)**

110 Criminal Law
 110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)16 Invocation or Rights
    110k411.82 Effect of Invocation
     110k411.86 Reinitiating Interrogation
      110k411.86(6) k. Initiation by defendant. Most Cited Cases
 (Formerly 110k412.2(5))

**Criminal Law 110 ☞411.94**

110 Criminal Law
 110XVII Evidence
   110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
    110XVII(M)17 Waiver of Rights
    110k411.94 k. Counsel. Most Cited

Page 3

130 S.Ct. 1213, 176 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 12,140, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

Cases

(Formerly 110k412.2(4))

When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights, and he is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. U.S.C.A. Const.Amend. 5.

**[7] Criminal Law 110 ⬤⟞411.85**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
            110XVII(M)16 Invocation or Rights
                110k411.82 Effect of Invocation
                    110k411.85 k. Counsel. Most Cited Cases
        (Formerly 110k412.2(4))

**Criminal Law 110 ⬤⟞411.86(6)**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
            110XVII(M)16 Invocation or Rights
                110k411.82 Effect of Invocation
                    110k411.86 Reinitiating Interrogation
                        110k411.86(6) k. Initiation by defendant. Most Cited Cases
        (Formerly 110k412.2(4))

The rationale of *Edwards* rule, under which an accused who has invoked his right to the presence of counsel during custodial interrogation is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, is that once a suspect indicates that he is not capable

of undergoing custodial questioning without advice of counsel, any subsequent *Miranda* waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of inherently compelling pressures and not the purely voluntary choice of the suspect. U.S.C.A. Const.Amend. 5.

**[8] Criminal Law 110 ⬤⟞413.37**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
            110XVII(M)19 Determination of Admissibility of Statement, Confession, or Admission
                110k413.30 Presumptions and Burden of Proof
                    110k413.37 k. Waiver of rights. Most Cited Cases
        (Formerly 110k414, 110k412.2(4))

The *Edwards* presumption of the involuntariness of a *Miranda* waiver by a suspect who has previously invoked the right to counsel during custodial interrogation ensures that police will not take advantage of the mounting coercive pressures of prolonged police custody by repeatedly attempting to question a suspect who previously requested counsel until the suspect is badgered into submission. U.S.C.A. Const.Amend. 5.

**[9] Criminal Law 110 ⬤⟞411.85**

110 Criminal Law
    110XVII Evidence
        110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
            110XVII(M)16 Invocation or Rights
                110k411.82 Effect of Invocation
                    110k411.85 k. Counsel. Most Cited Cases
        (Formerly 110k412.2(4))

**Criminal Law 110 ⬤⟞411.86(6)**

110 Criminal Law

Page 4

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 11,045, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

110XVII Evidence

110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused

110XVII(M)16 Invocation or Rights

110k411.82 Effect of Invocation

110k411.86 Reinitiating Interrogation

110k411.86(6) k. Initiation by defendant. Most Cited Cases

(Formerly 110k412.2(4))

The *Edwards* rule, under which an accused who has invoked his right to the presence of counsel during custodial interrogation is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, is not a constitutional mandate, but judicially prescribed prophylaxis, and thus, it is the Supreme Court's obligation to justify its expansion. U.S.C.A. Const.Amend. 5.

**[10] Courts 106 ⊂⇒89**

106 Courts

106II Establishment, Organization, and Procedure

106II(G) Rules of Decision

106k88 Previous Decisions as Controlling or as Precedents

106k89 k. In general. Most Cited Cases

A judicially crafted rule is justified only by reference to its prophylactic purpose, and applies only where its benefits outweigh its costs.

**[11] Criminal Law 110 ⊂⇒324**

110 Criminal Law

110XVII Evidence

110XVII(B) Presumptions and Inferences

110k305 Presumptions

110k324 k. Operation and effect. Most Cited Cases

The justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time.

**[12] Criminal Law 110 ⊂⇒410.76**

110 Criminal Law

110XVII Evidence

110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused

110XVII(M)9 Voluntariness in General

110k410.76 k. Necessity of showing voluntary character. Most Cited Cases

(Formerly 110k517.1(1))

Voluntary confessions are not merely a proper element in law enforcement; they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law.

**[13] Criminal Law 110 ⊂⇒411.86(4)**

110 Criminal Law

110XVII Evidence

110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused

110XVII(M)16 Invocation or Rights

110k411.82 Effect of Invocation

110k411.86 Reinitiating Interrogation

110k411.86(4) k. Other offenses. Most Cited Cases

(Formerly 110k412.2(4))

The *Edwards* rule, regarding subsequent custodial interrogation after a suspect has invoked his right to counsel, applies when the subsequent interrogation pertains to a different crime, when it is conducted by a different law enforcement authority, and even when the suspect has met with an attorney after the first interrogation. U.S.C.A. Const.Amend. 5.

**[14] Criminal Law 110 ⊂⇒411.86(5)**

110 Criminal Law

110XVII Evidence

110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused

110XVII(M)16 Invocation or Rights

110k411.82 Effect of Invocation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 11148, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

110k411.86 Reinitiating Interrogation

110k411.86(5) k. Lapse of time.
Most Cited Cases

(Formerly 110k412.2(4))

The *Edwards* rule, under which a suspect who has invoked his right to the presence of counsel during custodial interrogation is not subject to further interrogation until either counsel has been made available or the suspect himself further initiates exchanges with the police, does not apply if a break in custody lasting 14 days has occurred. U.S.C.A. Const.Amend. 5.

**[15] Criminal Law 110 ⟝411.86(5)**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)16 Invocation or Rights
        110k411.82 Effect of Invocation
          110k411.86 Reinitiating Interrogation
            110k411.86(5) k. Lapse of time.
Most Cited Cases

(Formerly 110k412.2(4))

State prisoner's return to the general prison population, after he had invoked his right to the presence of counsel during custodial interrogation regarding allegations of criminal conduct separate from the conduct underlying the prisoner's convictions, constituted a break in custody, for purposes of determining whether the *Edwards* rule prohibited later interrogation. U.S.C.A. Const.Amend. 5.

**[16] Criminal Law 110 ⟝411.23**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)11 Custody
        110k411.21 What Constitutes Custody
          110k411.23 k. Warnings. Most Cited Cases

(Formerly 110k412.2(2))

To determine whether a suspect was in custody for *Miranda* purposes, the court asks whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. U.S.C.A. Const.Amend. 5.

**[17] Criminal Law 110 ⟝411.23**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)11 Custody
        110k411.21 What Constitutes Custody
          110k411.23 k. Warnings. Most Cited Cases

(Formerly 110k412.2(2))

The freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody, and it is not accorded talismanic power, because *Miranda* is to be enforced only in those types of situations in which the concerns that powered the decision are implicated. U.S.C.A. Const.Amend. 5.

**[18] Criminal Law 110 ⟝411.25**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)11 Custody
        110k411.21 What Constitutes Custody
          110k411.25 k. Investigatory stops.
Most Cited Cases

(Formerly 110k412.2(2))

**Criminal Law 110 ⟝411.26**

110 Criminal Law
  110XVII Evidence
    110XVII(M) Statements, Confessions, and Admissions by or on Behalf of Accused
      110XVII(M)11 Custody
        110k411.21 What Constitutes Custody

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2343, 2010 Daily Journal D.A.R. 2731,
22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

110k411.26 k. Traffic stops. Most Cited Cases

(Formerly 110k412.2(2))

The temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody. U.S.C.A. Const.Amend. 5.

***1215** Syllabus FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

In 2003, a police detective tried to question respondent Shatzer, who was incarcerated at a Maryland prison pursuant to a prior conviction, about allegations that he had sexually abused his son. Shatzer **1216** invoked his *Miranda* right to have counsel present during interrogation, so the detective terminated the interview. Shatzer was released back into the general prison population, and the investigation was closed. Another detective reopened the investigation in 2006 and attempted to interrogate Shatzer, who was still incarcerated. Shatzer waived his *Miranda* rights and made inculpatory statements. The trial court refused to suppress those statements, reasoning that *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, did not apply because Shatzer had experienced a break in *Miranda* custody prior to the 2006 interrogation. Shatzer was convicted of sexual child abuse. The Court of Appeals of Maryland reversed, holding that the mere passage of time does not end the *Edwards* protections, and that, assuming, *arguendo,* a break-in-custody exception to *Edwards* existed, Shatzer's release back into the general prison population did not constitute such a break.

*Held:* Because Shatzer experienced a break in *Miranda* custody lasting more than two weeks between the first and second attempts at interrogation, *Edwards* does not mandate suppression of his 2006 statements. Pp. 1219 – 1227.

(a) *Edwards* created a presumption that once a suspect invokes the *Miranda* right to the presence of counsel, any waiver of that right in response to a subsequent police attempt at custodial interrogation is involuntary. *Edwards* ' fundamental purpose is to "[p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel," *Patterson v. Illinois,* 487 U.S. 285, 291, 108 S.Ct. 2389, 101 L.Ed.2d 261, by "prevent[ing] police from badgering [him] into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293. It is easy to believe that a suspect's later waiver was coerced or badgered when he has been held in uninterrupted *Miranda* custody since his first refusal to waive. He remains cut off from his normal life and isolated in a "police-dominated atmosphere," *Miranda v. Arizona,* 384 U.S. 436, 456, 86 S.Ct. 1602, 16 L.Ed.2d 694, where his captors "appear to control [his] fate," *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243. But where a suspect has been released from custody and returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart has been coerced. Because the *Edwards* presumption has been established by opinion of this Court, it is appropriate for this Court to specify the period of release from custody that will terminate its application. See *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49. The Court concludes that the appropriate period is 14 days, which provides ample time for the suspect to get reacclimated to his normal life, consult with friends and counsel, and shake off any residual coercive effects of prior custody. Pp. 1219 – 1224.

(b) Shatzer's release back into the general prison population constitutes a break in *Miranda* custody. Lawful imprisonment imposed upon conviction does not create the coercive pressures produced by investigative custody that justify *Edwards.* When previously incarcerated suspects are released

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2143, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives before the attempted interrogation. Their continued detention is relatively disconnected from their prior unwillingness to cooperate in an investigation. The "inherently compelling pressures" of custodial interrogation **\*1217** ended when Shatzer returned to his normal life. Pp. 1224 – 1225.

405 Md. 585, 954 A.2d 1118, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, GINSBURG, BREYER, ALITO, and SOTOMAYOR, JJ., joined, and in which THOMAS, J., joined as to Part III. THOMAS, J., filed an opinion concurring in part and concurring in the judgment. STEVENS, J., filed an opinion concurring in the judgment.

Douglas F. Gansler, Baltimore, MD, for petitioner.

Toby J. Heytens, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting the petitioner.

Celia A. Davis, Baltimore, MD, for respondent.

Celia A. Davis, Baltimore, MD, for respondent.

Nancy S. Forster, Public Defender of Maryland, Celia Anderson Davis, Counsel of Record, Brian L. Zavin, Assistant Public Defenders, Office of the Public Defender, Appellate Division, Baltimore, MD, for Respondent.

Douglas F. Gansler, Attorney General of Maryland, Brian S. Kleinbord, Counsel of Record, Mary Ann Rapp Ince, Diane E. Keller, Assistant Attorneys General, Office of the Attorney General, Baltimore, Maryland, for Petitioner.

For U.S. Supreme Court briefs, see:2009 WL 977964 (Pet.Brief)2009 WL 1538536 (Resp.Brief)

Justice SCALIA delivered the opinion of the Court.

We consider whether a break in custody ends the presumption of involuntariness established in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

I

In August 2003, a social worker assigned to the Child Advocacy Center in the Criminal Investigation Division of the Hagerstown Police Department referred to the department allegations that respondent Michael Shatzer, Sr., had sexually abused his 3–year–old son. At that time, Shatzer was incarcerated at the Maryland Correctional Institution–Hagerstown, serving a sentence for an unrelated child-sexual-abuse offense. Detective Shane Blankenship was assigned to the investigation and interviewed Shatzer at the correctional institution on August 7, 2003. Before asking any questions, Blankenship reviewed Shatzer's *Miranda* rights with him, and obtained a written waiver of those rights. When Blankenship explained that he was there to question Shatzer about sexually abusing his son, Shatzer expressed confusion—he had thought Blankenship was an attorney there to discuss the prior crime for which he was incarcerated. Blankenship clarified the purpose of his visit, and Shatzer declined to speak without an attorney. Accordingly, Blankenship ended the interview, and Shatzer was released back into the general prison population. Shortly thereafter, Blankenship closed the investigation.

Two years and six months later, the same social worker referred more specific allegations to the department about the same incident involving Shatzer. Detective Paul Hoover, from the same division, was assigned to the investigation. He and the social worker interviewed the victim, **\*1218** then eight years old, who described the incident in more detail. With this new information in hand, on March 2, 2006, they went to the Roxbury Correctional Institute, to which Shatzer had since been transferred, and interviewed Shatzer in a maintenance room outfitted with a desk and three chairs. Hoover explained that he wanted to ask Shatzer about the al-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

leged incident involving Shatzer's son. Shatzer was surprised because he thought that the investigation had been closed, but Hoover explained they had opened a new file. Hoover then read Shatzer his *Miranda* rights and obtained a written waiver on a standard department form.

Hoover interrogated Shatzer about the incident for approximately 30 minutes. Shatzer denied ordering his son to perform fellatio on him, but admitted to masturbating in front of his son from a distance of less than three feet. Before the interview ended, Shatzer agreed to Hoover's request that he submit to a polygraph examination. At no point during the interrogation did Shatzer request to speak with an attorney or refer to his prior refusal to answer questions without one.

Five days later, on March 7, 2006, Hoover and another detective met with Shatzer at the correctional facility to administer the polygraph examination. After reading Shatzer his *Miranda* rights and obtaining a written waiver, the other detective administered the test and concluded that Shatzer had failed. When the detectives then questioned Shatzer, he became upset, started to cry, and incriminated himself by saying, " 'I didn't force him. I didn't force him.' " 405 Md. 585, 590, 954 A.2d 1118, 1121 (2008). After making this inculpatory statement, Shatzer requested an attorney, and Hoover promptly ended the interrogation.

The State's Attorney for Washington County charged Shatzer with second-degree sexual offense, sexual child abuse, second-degree assault, and contributing to conditions rendering a child in need of assistance. Shatzer moved to suppress his March 2006 statements pursuant to *Edwards.* The trial court held a suppression hearing and later denied Shatzer's motion. The *Edwards* protections did not apply, it reasoned, because Shatzer had experienced a break in custody for *Miranda* purposes between the 2003 and 2006 interrogations. No. 21–K–06–37799 (Cir. Ct. Washington Cty., Md., Sept. 14, 2006), App. 55. Shatzer pleaded not guilty, waived his right to a jury trial, and pro-

ceeded to a bench trial based on an agreed statement of facts. In accordance with the agreement, the State described the interview with the victim and Shatzer's 2006 statements to the detectives. Based on the proffered testimony of the victim and the "admission of the defendant as to the act of masturbation," the trial court found Shatzer guilty of sexual child abuse of his son.[FN1] No. 21–K–06–37799 (Cir. Ct. Washington Cty., Md., Sept. 21, 2006), *id.,* at 70, 79.

> FN1. The State filed a *nolle prosequi* to the second-degree sexual offense charge, and consented to dismissal of the misdemeanor charges as barred by the statute of limitations.

Over the dissent of two judges, the Court of Appeals of Maryland reversed and remanded. The court held that "the passage of time *alone* is insufficient to [end] the protections afforded by *Edwards,* " and that, assuming, *arguendo,* a break-in-custody exception to *Edwards* existed, Shatzer's release back into the general prison population between interrogations did not constitute a break in custody. 405 Md., at 606–607, 954 A.2d, at 1131. We granted certiorari, 555 U.S. ——, 129 S.Ct. 1043, 173 L.Ed.2d 468 (2009).

***1219** II

[1] The Fifth Amendment, which applies to the States by virtue of the Fourteenth Amendment, *Malloy v. Hogan,* 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const., Amdt. 5. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the "inherently compelling pressures" of custodial interrogation. *Id.,* at 467, 86 S.Ct. 1602. The Court observed that "incommunicado interrogation" in an "unfamiliar," "police-dominated atmosphere," *id.,* at 456–457, 86 S.Ct. 1602, involves psychological pressures "which work to undermine the individual's will to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

resist and to compel him to speak where he would not otherwise do so freely," *id.,* at 467, 86 S.Ct. 1602. Consequently, it reasoned, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.,* at 458, 86 S.Ct. 1602.

[2][3][4][5] To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. *Id.,* at 444, 86 S.Ct. 1602. After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. *Id.,* at 473–474, 86 S.Ct. 1602. Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. *Id.,* at 474, 86 S.Ct. 1602. Critically, however, a suspect can waive these rights. *Id.,* at 475, 86 S.Ct. 1602. To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)." *Id.,* at 475, 86 S.Ct. 1602.

[6][7][8] In *Edwards,* the Court determined that *Zerbst 's* traditional standard for waiver was not sufficient to protect a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel; "additional safeguards" were necessary. 451 U.S., at 484, 101 S.Ct. 1880. The Court therefore superimposed a "second layer of prophylaxis," *McNeil v. Wisconsin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). *Edwards* held:

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.... [He] is not subject to further interrogation by the authorities un-

til counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S., at 484–485, 101 S.Ct. 1880.

The rationale of *Edwards* is that once a suspect indicates that "he is not capable of undergoing [custodial] questioning without advice of counsel," "any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is the product of the 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Under this rule, a voluntary *Miranda* waiver is sufficient at the time of an initial attempted interrogation to protect a suspect's right to have counsel present, but it is not sufficient**\*1220** at the time of subsequent attempts if the suspect initially requested the presence of counsel. The implicit assumption, of course, is that the subsequent requests for interrogation pose a significantly greater risk of coercion. That increased risk results not only from the police's persistence in trying to get the suspect to talk, but also from the continued pressure that begins when the individual is taken into custody as a suspect and sought to be interrogated—pressure likely to "increase as custody is prolonged," *Minnick v. Mississippi,* 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990). The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of "prolonged police custody," *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093, by repeatedly attempting to question a suspect who previously requested counsel until the suspect is "badgered into submission," *id.,* at 690, 108 S.Ct. 2093 (KENNEDY, J., dissenting).

[9] We have frequently emphasized that the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis. See, *e.g., Montejo v. Louisiana,* 556 U.S. ——, ——, 129 S.Ct. 2079, 2085–86, 173 L.Ed.2d 955 (2009); *Michigan v. Harvey,* 494 U.S. 344, 349, 110 S.Ct. 1176, 108

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 11045, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

L.Ed.2d 293 (1990); *Solem v. Stumes,* 465 U.S. 638, 644, n. 4, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). Because *Edwards* is "our rule, not a constitutional command," "it is our obligation to justify its expansion." *Roberson, supra,* at 688, 108 S.Ct. 2093 (KENNEDY, J., dissenting). Lower courts have uniformly held that a break in custody ends the *Edwards* presumption, see, *e.g., People v. Storm,* 28 Cal.4th 1007, 1023–1024, and n. 6, 124 Cal.Rptr.2d 110, 52 P.3d 52, 61–62, and n. 6 (2002) (collecting state and federal cases), but we have previously addressed the issue only in dicta, see *McNeil, supra,* at 177, 111 S.Ct. 2204 (*Edwards* applies "assuming there has been no break in custody").

[10] A judicially crafted rule is "justified only by reference to its prophylactic purpose," *Davis v. United States,* 512 U.S. 452, 458, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (internal quotation marks omitted), and applies only where its benefits outweigh its costs, *Montejo, supra,* at ——, 129 S.Ct., at 2089. We begin with the benefits. *Edwards '* presumption of involuntariness has the incidental effect of "conserv[ing] judicial resources which would otherwise be expended in making difficult determinations of voluntariness." *Minnick, supra,* at 151, 111 S.Ct. 486. Its fundamental purpose, however, is to "[p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel," *Patterson v. Illinois,* 487 U.S. 285, 291, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), by "prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Harvey, supra,* at 350, 110 S.Ct. 1176. Thus, the benefits of the rule are measured by the number of coerced confessions it suppresses that otherwise would have been admitted. See *Montejo, supra,* at ——, 129 S.Ct., at 2089.

It is easy to believe that a suspect may be coerced or badgered into abandoning his earlier refusal to be questioned without counsel in the paradigm *Edwards* case. That is a case in which the suspect has been arrested for a particular crime and is held

in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, "thrust into" and isolated in an "unfamiliar," "police-dominated atmosphere," *Miranda,* 384 U.S., at 456–457, 86 S.Ct. 1602, where his captors "appear to control [his] fate," **\*1221** *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). That was the situation confronted by the suspects in *Edwards, Roberson,* and *Minnick,* the three cases in which we have held the *Edwards* rule applicable. Edwards was arrested pursuant to a warrant and taken to a police station, where he was interrogated until he requested counsel. *Edwards,* 451 U.S., at 478–479, 101 S.Ct. 1880. The officer ended the interrogation and took him to the county jail,[FN2] but at 9:15 the next morning, two of the officer's colleagues reinterrogated Edwards at the jail. *Id.,* at 479, 101 S.Ct. 1880. Roberson was arrested "at the scene of a just-completed burglary" and interrogated there until he requested a lawyer. *Roberson,* 486 U.S., at 678, 108 S.Ct. 2093. A different officer interrogated him three days later while he "was still in custody pursuant to the arrest." *Ibid.* Minnick was arrested by local police and taken to the San Diego jail, where two FBI agents interrogated him the next morning until he requested counsel. *Minnick,* 498 U.S., at 148–149, 111 S.Ct. 486. Two days later a Mississippi Deputy Sheriff reinterrogated him at the jail. *Id.,* at 149, 111 S.Ct. 486. None of these suspects regained a sense of control or normalcy after they were initially taken into custody for the crime under investigation.

> FN2. Jail is a "local government's detention center where persons awaiting trial or those convicted of misdemeanors are confined." Black's Law Dictionary 910 (9th ed. 2009). Prison, by contrast, is a "state or federal facility of confinement for convicted criminals, esp. felons." *Id.,* at 1314.

[11] When, unlike what happened in these

Page 11

130 S.Ct. 1213, 176 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2643, 2010 Daily Journal D.A.R. 2731,
22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

three cases, a suspect has been released from his pretrial custody and has returned to his normal life for some time before the later attempted interrogation, there is little reason to think that his change of heart regarding interrogation without counsel has been coerced. He has no longer been isolated. He has likely been able to seek advice from an attorney, family members, and friends.[FN3] And he knows from his earlier experience that he need only demand counsel to bring the interrogation to a halt; and that investigative custody does not last indefinitely. In these circumstances, it is far fetched to think that a police officer's asking the suspect whether he would like to waive his *Miranda* rights will any more "wear down the accused," *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) *(per curiam),* than did the first such request at the original attempted interrogation—which is of course not deemed coercive. His change of heart is less likely attributable to "badgering" than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest. Uncritical extension of *Edwards* to this situation would not significantly increase the number of genuinely coerced confessions excluded. The "justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time." *Coleman v. Thompson,* 501 U.S. 722, 737, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

FN3. Justice STEVENS points out, *post,* at 1232 (opinion concurring in judgment), that in *Minnick,* actual pre-reinterrogation consultation with an attorney during *continued* custody did not suffice to avoid application of *Edwards.* That does not mean that the ability to consult freely with attorneys and others does not reduce the level of coercion at all, or that it is "only questionably relevant," *post,* at 1232, to whether termination of custody reduces the coercive pressure that is the basis for *Edwards'* super-prophylactic rule.

[12] At the same time that extending the *Edwards* rule yields diminished benefits, extending the rule also increases its **\*1222** costs: the in-fact voluntary confessions it excludes from trial, and the voluntary confessions it deters law enforcement officers from even trying to obtain. Voluntary confessions are not merely "a proper element in law enforcement," *Miranda, supra,* at 478, 86 S.Ct. 1602, they are an "unmitigated good," *McNeil,* 501 U.S., at 181, 111 S.Ct. 2204, " 'essential to society's compelling interest in finding, convicting, and punishing those who violate the law,' " *ibid.* (quoting *Moran v. Burbine,* 475 U.S. 412, 426, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

[13] The only logical endpoint of *Edwards* disability is termination of *Miranda* custody and any of its lingering effects. Without that limitation—and barring some purely arbitrary time-limit[FN4]—every *Edwards* prohibition of custodial interrogation of a particular suspect would be eternal. The prohibition applies, of course, when the subsequent interrogation pertains to a different crime, *Roberson, supra,* when it is conducted by a different law enforcement authority, *Minnick,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489, and even when the suspect has met with an attorney after the first interrogation, *ibid.* And it not only prevents questioning *ex ante*; it would render invalid *ex post,* confessions invited and obtained from suspects who (unbeknownst to the interrogators) have acquired *Edwards* immunity previously in connection with any offense in any jurisdiction.[FN5] In a country that harbors a large number of repeat offenders,[FN6] this consequence is disastrous.

FN4. The State's alternative argument in the present case is that the substantial lapse in time between the 2003 and 2006 attempts at interrogation independently ended the *Edwards* presumption. Our disposition makes it unnecessary to address that argument.

FN5. This assumes that *Roberson*'s extension of *Edwards* to subsequent interroga-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2216, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

tion for a different crime, and *Minnick's* extension of *Edwards* to subsequent interrogation by a different law enforcement agency would apply even when the place of custody and the identity of the custodial agency are not the same (as they were in *Roberson* and *Minnick*) as those of the original interrogation. That assumption would seem reasonable if the *Edwards*-suspending effect of a termination of custody is rejected. Reinterrogation in different custody or by a different interrogating agency would seem, if anything, *less* likely than termination of custody to reduce coercive pressures. At the original site, and with respect to the original interrogating agency, the suspect has already experienced cessation of interrogation when he demands counsel—which he may have no reason to expect elsewhere.

FN6. According to a recent study, 67.5% of prisoners released from 15 States in 1994 were rearrested within three years. See Dept. of Justice, Bureau of Justice Statistics, Special Report, Recidivism of Prisoners Released in 1994 (NCJ 193427, 2002).

We conclude that such an extension of *Edwards* is not justified; we have opened its "protective umbrella," *Solem,* 465 U.S., at 644, n. 4, 104 S.Ct. 1338, far enough. The protections offered by *Miranda,* which we have deemed sufficient to ensure that the police respect the suspect's desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects.

If Shatzer's return to the general prison population qualified as a break in custody (a question we address in Part III, *infra*), there is no doubt that it lasted long enough (2 1/2 years) to meet that durational requirement. But what about a break that has

lasted only one year? Or only one week? It is impractical to leave the answer to that question for clarification in future case-by-case adjudication; law enforcement officers need to know, **\*1223** with certainty and beforehand, when renewed interrogation is lawful. And while it is certainly unusual for this Court to set forth precise time limits governing police action, it is not unheard-of. In *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), we specified 48 hours as the time within which the police must comply with the requirement of *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), that a person arrested without a warrant be brought before a magistrate to establish probable cause for continued detention.

[14] Like *McLaughlin,* this is a case in which the requisite police action (there, presentation to a magistrate; here, abstention from further interrogation) has not been prescribed by statute but has been established by opinion of this Court. We think it appropriate to specify a period of time to avoid the consequence that continuation of the *Edwards* presumption "will not reach the correct result most of the time." *Coleman, supra,* at 737, 111 S.Ct. 2546. It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.

The 14–day limitation meets Shatzer's concern that a break-in-custody rule lends itself to police abuse. He envisions that once a suspect invokes his *Miranda* right to counsel, the police will release the suspect briefly (to end the *Edwards* presumption) and then promptly bring him back into custody for reinterrogation. But once the suspect has been out of custody long enough (14 days) to eliminate its coercive effect, there will be nothing to gain by such gamesmanship—nothing, that is, except the entirely appropriate gain of being able to interrogate a suspect who has made a valid waiver of his *Miranda* rights.FN7

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2216, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

FN7. A defendant who experiences a 14–day break in custody after invoking the *Miranda* right to counsel is not left without protection. *Edwards* establishes a *presumption* that a suspect's waiver of *Miranda* rights is involuntary. See *Arizona v. Roberson,* 486 U.S. 675, 681, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Even without this "second layer of prophylaxis," *McNeil v. Wisconsin,* 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), a defendant is still free to claim the prophylactic protection of *Miranda*—arguing that his waiver of *Miranda* rights was in fact involuntary under *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). See *Miranda,* 384 U.S., at 475, 86 S.Ct. 1602.

Shatzer argues that ending the *Edwards* protections at a break in custody will undermine *Edwards* ' purpose to conserve judicial resources. To be sure, we have said that "[t]he merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application." *Minnick,* 498 U.S., at 151, 111 S.Ct. 486. But clarity and certainty are not goals in themselves. They are valuable only when they reasonably further the achievement of some substantive end—here, the exclusion of compelled confessions. Confessions obtained after a 2–week break in custody and a waiver of *Miranda* rights are most unlikely to be compelled, and hence are unreasonably excluded. In any case, a break-in-custody exception will dim only marginally, if at all, the bright-line nature of *Edwards.* In every case involving *Edwards,* the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress. Now, in cases where there is an alleged break in custody, they simply have to repeat the inquiry for the time between the initial invocation and reinterrogation. In most cases that determination will be easy. And when it is determined that the defendant**\*1224** pleading *Edwards* has been out of custody for two weeks before the contested interrogation, the court is spared the fact-intensive inquiry into whether he ever, anywhere, asserted his *Miranda* right to counsel.

### III

[15] The facts of this case present an additional issue. No one questions that Shatzer was in custody for *Miranda* purposes during the interviews with Detective Blankenship in 2003 and Detective Hoover in 2006. Likewise, no one questions that Shatzer triggered the *Edwards* protections when, according to Detective Blankenship's notes of the 2003 interview, he stated that " 'he would not talk about this case without having an attorney present,' " 405 Md., at 589, 954 A.2d, at 1120. After the 2003 interview, Shatzer was released back into the general prison population where he was serving an unrelated sentence. The issue is whether that constitutes a break in *Miranda* custody.

[16][17][18] We have never decided whether incarceration constitutes custody for *Miranda* purposes, and have indeed explicitly declined to address the issue. See *Perkins,* 496 U.S., at 299, 110 S.Ct. 2394. See also *Bradley v. Ohio,* 497 U.S. 1011, 1013, 110 S.Ct. 3258, 111 L.Ed.2d 768 (1990) (Marshall, J., dissenting from denial of certiorari). Whether it does depends upon whether it exerts the coercive pressure that *Miranda* was designed to guard against—the "danger of coercion [that] results from the *interaction* of custody and official interrogation." *Perkins, supra,* at 297, 110 S.Ct. 2394 (emphasis added). To determine whether a suspect was in *Miranda* custody we have asked whether "there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *New York v. Quarles,* 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); see also *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) *(per curiam).* This test, no doubt, is satisfied by all forms of incarceration. Our cases make clear, however, that the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody. We have declined to accord it

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2243, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

"talismanic power," because *Miranda* is to be enforced "only in those types of situations in which the concerns that powered the decision are implicated." *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop, see *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), does not constitute *Miranda* custody. *McCarty, supra,* at 439–440, 104 S.Ct. 3138. See also *Perkins, supra,* at 296, 110 S.Ct. 2394.

Here, we are addressing the interim period during which a suspect was not interrogated, but was subject to a baseline set of restraints imposed pursuant to a prior conviction. Without minimizing the harsh realities of incarceration, we think lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda.*

Interrogated suspects who have previously been convicted of crime live in prison. When they are released back into the general prison population, they return to their accustomed surroundings and daily routine—they regain the degree of control they had over their lives prior to the interrogation. Sentenced prisoners, in contrast to the *Miranda* paradigm, are not isolated with their accusers. They live among other inmates, guards, and workers, and often can receive visitors and communicate with people on the outside by mail or telephone.

Their detention, moreover, is relatively disconnected from their prior unwillingness\***1225** to cooperate in an investigation. The former interrogator has no power to increase the duration of incarceration, which was determined at sentencing.[FN8] And even where the possibility of parole exists, the former interrogator has no apparent power to decrease the time served. This is in stark contrast to the circumstances faced by the defendants in *Edwards, Roberson,* and *Minnick,* whose continued detention as suspects rested with those controlling their interrogation, and who confronted the uncertainties of what final charges they would face,

whether they would be convicted, and what sentence they would receive.

> [FN8]. We distinguish the duration of incarceration from the duration of what might be termed interrogative custody. When a prisoner is removed from the general prison population and taken to a separate location for questioning, the duration of *that separation* is assuredly dependent upon his interrogators. For which reason once he has asserted a refusal to speak without assistance of counsel *Edwards* prevents any efforts to get him to change his mind during that interrogative custody.

Shatzer's experience illustrates the vast differences between *Miranda* custody and incarceration pursuant to conviction. At the time of the 2003 attempted interrogation, Shatzer was already serving a sentence for a prior conviction. After that, he returned to the general prison population in the Maryland Correctional Institution–Hagerstown and was later transferred, for unrelated reasons, down the street to the Roxbury Correctional Institute. Both are medium-security state correctional facilities. See Maryland Div. of Correction Inmate Handbook 7 (2007), online at http:// dpscs. md. gov/ rehabservs/ doc/pdfs/2007_Inmate_Handbook.pdf (all Internet materials as visited Feb. 22, 2010, and available in Clerk of Court's case file). Inmates in these facilities generally can visit the library each week, *id.,* at 28; have regular exercise and recreation periods, *id.,* at 17; can participate in basic adult education and occupational training, *id.,* at 26, 7; are able to send and receive mail, *id.,* at 21–22, 16; and are allowed to receive visitors twice a week, see http:// dpscs. md. gov/ locations/ mcih. shtml; http:// www. dpscs.state.md.us/locations/rci.shtml. His continued detention after the 2003 interrogation did not depend on what he said (or did not say) to Detective Blankenship, and he has not alleged that he was placed in a higher level of security or faced any continuing restraints as a result of the 2003 interrogation. The "inherently compelling pressures" of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2213, 2010 Daily Journal D.A.R. 2731,
22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

custodial interrogation ended when he returned to his normal life.

### IV

A few words in response to Justice STEVENS' concurrence: It claims we ignore that "[w]hen police tell an indigent suspect that he has the right to an attorney" and then "reinterrogate" him without providing a lawyer, "the suspect is likely to feel that the police lied to him and that he really does not have any right to a lawyer." *Post,* at 1229 (opinion concurring in judgment) (hereinafter concurrence). See also *post,* at 1230, 1232, n. 11, 1234, n. 16. The fallacy here is that we are not talking about "reinterrogating" the suspect; we are talking about *asking his permission* to be interrogated. An officer has in no sense lied to a suspect when, after advising, as *Miranda* requires, "You have the right to remain silent, and if you choose to speak you have the right to the presence of an attorney," he promptly ends the attempted interrogation because the suspect declines to speak without counsel present, and then, two weeks later, reapproaches the suspect and asks, "Are you now willing to speak without a lawyer present?"

**\*1226** The "concer[n] that motivated the *Edwards* line of cases," *post,* at 1229, n. 2, is that the suspect will be coerced into saying yes. That concern guides our decision today. Contrary to the concurrence's conclusion, *post,* at 1229 – 1230, 1231, there is no reason to believe a suspect will view confession as " 'the only way to end his interrogation' " when, before the interrogation begins, he is told that he can avoid it by simply requesting that he not be interrogated without counsel present—an option that worked before. If, as the concurrence argues will often be the case, *post,* at 1231, a break in custody does not change the suspect's mind, he need only say so.

The concurrence also accuses the Court of "ignor[ing] that when a suspect asks for counsel, until his request is answered, there are still the same 'inherently compelling' pressures of custodial interrogation on which the *Miranda* line of cases is

based." *Post,* at 1230. We do not ignore these pressures; nor do we suggest that they disappear when custody is recommended after a break, see *post,* at 1231. But if those pressures are merely "the same" as before, then *Miranda* provides sufficient protection—as it did before. The *Edwards* presumption of involuntariness is justified only in circumstances where the coercive pressures have increased so much that suspects' waivers of *Miranda* rights are likely to be involuntary most of the time. Contrary to the concurrence's suggestion, *post,* at 1229 – 1230, it is only in those narrow circumstances—when custody is unbroken—that the Court has concluded a "fresh se[t] of *Miranda* warnings" is not sufficient. See *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093.

In the last analysis, it turns out that the concurrence accepts our principal points. It agrees that *Edwards* prophylaxis is not perpetual; it agrees that a break in custody reduces the inherently compelling pressure upon which *Edwards* was based; it agrees that Shatzer's release back into the general prison population constituted a break in custody; and it agrees that in this case the break was long enough to render *Edwards* inapplicable. *Post,* at 1234. We differ in two respects: Instead of terminating *Edwards* protection when the custodial pressures that were the basis for that protection dissipate, the concurrence would terminate it when the suspect would no longer "feel that he has 'been denied the counsel he has clearly requested,' " *post,* at 1234. This is entirely unrelated to the rationale of *Edwards.* If confidence in the police's promise to provide counsel were the touchstone, *Edwards* would not have applied in *Minnick,* where the suspect in continuing custody actually met with appointed counsel. The concurrence's rule is also entirely unrelated to the existence of a break in custody. While that may relieve the accumulated coercive pressures of custody that are the foundation for *Edwards,* it is hard to see how it bolsters the suspect's confidence that if he asks for counsel he will get one.

And secondly, the concurrence differs from us

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2216, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

in declining to say *how long* after a break in custody the termination of *Edwards* protection occurs. Two and one-half years, it says, is clearly enough—but it gives law enforcement authorities no further guidance. The concurrence criticizes our use of 14 days as arbitrary and unexplained, *post,* at 1231, and n. 7. But in fact that rests upon the same basis as the concurrence's own approval of a 2 1/2 - year break in custody: how much time will justify "treating the second interrogation as no more coercive than the first," *post,* at 1234. Failure to say where the line falls short of 2 1/2 years, and leaving that for future case-by-case determination, is certainly less helpful, but not at all less arbitrary.

**\*1227 \* \* \***

Because Shatzer experienced a break in *Miranda* custody lasting more than two weeks between the first and second attempts at interrogation, *Edwards* does not mandate suppression of his March 2006 statements. Accordingly, we reverse the judgment of the Court of Appeals of Maryland, and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice THOMAS, concurring in part and concurring in the judgment.

I join Part III of the Court's opinion, which holds that release into the general prison population constitutes a break in custody. I do not join the Court's decision to extend the presumption of involuntariness established in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), for 14 days after custody ends.

It is not apparent to me that the presumption of involuntariness the Court recognized in *Edwards* is justifiable even in the custodial setting to which *Edwards* applies it. See, *e.g., Minnick v. Mississippi,* 498 U.S. 146, 160, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (SCALIA, J., dissenting). Accordingly, I would not extend the *Edwards* rule "beyond the circumstances present in *Edwards* itself." *Id.,* at 162, 111 S.Ct. 486. But even if one believes that the

Court is obliged to apply *Edwards* to any case involving continuing custody, the Court's opinion today goes well beyond that. It extends the presumption of involuntariness *Edwards* applies in custodial settings to interrogations that occur after custody ends.

The Court concedes that this extension, like the *Edwards* presumption itself, is not constitutionally required. The Court nevertheless defends the extension as a judicially created prophylaxis against compelled confessions. Even if one accepts that such prophylaxis is both permissible generally and advisable for some period following a break in custody,[FN1] the Court's 14–day rule fails to satisfy the criteria our precedents establish for the judicial creation of such a safeguard.

> FN1. At a minimum the latter proposition is questionable. I concede that some police officers might badger a suspect during a subsequent interrogation after a break in custody, or might use catch-and-release tactics to suggest they will not take no for an answer. But if a suspect reenters custody after being questioned and released, he need only invoke his right to counsel to ensure *Edwards'* protection for the duration of the subsequent detention. And, if law enforcement officers repeatedly release and recapture a suspect to wear down his will—such that his participation in a subsequent interrogation is no longer truly voluntary—the "high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)," will protect against the admission of the suspect's statements in court. *Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The *Zerbst* inquiry takes into account the totality of the circumstances surrounding the waiver—including any improper pressures by police. See *id.,* at 464, 58 S.Ct. 1019;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2240, 2010 Daily Journal D.A.R. 2731,
22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

cf. *ante,* at 1223, n. 6 (stating that "[e]ven without [ *Edwards'*] second layer of prophylaxis, a defendant is still free to claim the prophylactic protection of *Miranda* —arguing that his waiver of *Miranda* rights was in fact involuntary under *Johnson v. Zerbst* " (internal quotation marks and citation omitted)).

Our precedents insist that judicially created prophylactic rules like those in *Edwards* and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), maintain "the closest possible fit" between the rule and the Fifth Amendment interests they seek to protect. *United States v. Patane,* 542 U.S. 630, 640–641, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004) (plurality opinion); see generally *Montejo v. Louisiana,* 556 U.S. ——, ——, 129 S.Ct., at 2092; ***1228****Chavez v. Martinez,* 538 U.S. 760, 772, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality opinion). The Court's 14–day rule does not satisfy this test. The Court relates its 14–day rule to the Fifth Amendment simply by asserting that 14 days between release and recapture should provide "plenty of time for the suspect ... to shake off any residual coercive effects of his prior custody," *ante,* at 1223.

This *ipse dixit* does not explain why extending the *Edwards* presumption for 14 days following a break in custody—as opposed to 0, 10, or 100 days—provides the "closest possible fit" with the Self–Incrimination Clause, *Patane, supra,* at 640–641, 124 S.Ct. 2620; see *ante,* at 1223 (merely stating that "[i]t seems to us that" the appropriate "period is 14 days"). Nor does it explain how the benefits of a prophylactic 14–day rule (either on its own terms or compared with other possible rules) "outweigh its costs" (which would include the loss of law enforcement information as well as the exclusion of confessions that are in fact voluntary). *Ante,* at 1220 (citing *Montejo, supra,* at ——, 129 S.Ct. at 2089).

To be sure, the Court's rule has the benefit of providing a bright line. *Ante,* at 1223. But bright-

line rules are not necessary to prevent Fifth Amendment violations, as the Court has made clear when refusing to adopt such rules in cases involving other *Miranda* rights. See, *e.g., Michigan v. Mosley,* 423 U.S. 96, 103–104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). And an otherwise arbitrary rule is not justifiable merely because it gives clear instruction to law enforcement officers.[FN2]

> FN2. Though the Court asserts that its 14–day rule will tell "law enforcement officers ... with certainty and beforehand, when renewed interrogation is lawful," *ante,* at 1222 – 1223, that is not so clear. Determining whether a suspect was previously in custody, and when the suspect was released, may be difficult without questioning the suspect, especially if state and federal authorities are conducting simultaneous investigations.

As the Court concedes, "clarity and certainty are not goals in themselves. They are valuable only when they reasonably further the achievement of some substantive end—here, the exclusion of compelled confessions" that the Fifth Amendment prohibits. *Ante,* at 1223. The Court's arbitrary 14–day rule fails this test, even under the relatively permissive criteria set forth in our precedents. Accordingly, I do not join that portion of the Court's opinion.

Justice STEVENS, concurring in the judgment.

While I agree that the presumption from *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), is not "eternal," *ante,* at 1222, and does not mandate suppression of Shatzer's statement made after a 2 1/2 -year break in custody, I do not agree with the Court's newly announced rule: that *Edwards* *always* ceases to apply when there is a 14–day break in custody, *ante,* at 1223.

In conducting its "cost-benefit" analysis, the Court demeans *Edwards* as a " 'second layer' " of "judicially prescribed prophylaxis," *ante,* at 1219, 1220, 1223, n. 7; see also *ante,* at 1220 (describing *Edwards* as " 'our rule, not a constitutional com-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2243, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135
(Cite as: 130 S.Ct. 1213)

mand' " (quoting *Arizona v. Roberson,* 486 U.S. 675, 688, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (KENNEDY, J., dissenting))). The source of the holdings in the long line of cases that includes both *Edwards* and *Miranda,* however, is the Fifth Amendment's protection against compelled self-incrimination applied to the "compulsion inherent in custodial" interrogation, *Miranda v. Arizona,* 384 U.S. 436, 458, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and the "significan[ce]" of "the assertion of the right to counsel," **1229**Edwards,* 451 U.S., at 485, 101 S.Ct. 1880.[FN1] The Court's analysis today is insufficiently sensitive to the concerns that motivated the *Edwards* line of cases.

> FN1. See *Dickerson v. United States,* 530 U.S. 428, 438, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (holding that "the protections announced in *Miranda* " are "constitutionally required"); *Shea v. Louisiana,* 470 U.S. 51, 52, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985) ("In *Edwards* ..., this Court ruled that a criminal defendant's rights under the Fifth and Fourteenth Amendments were violated by the use of his confession obtained by police-instigated interrogation—without counsel present—after he requested an attorney"); *Oregon v. Bradshaw,* 462 U.S. 1039, 1043, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion) ("[The] subsequent incriminating statements made without [an] attorney present violated the rights secured to the defendant by the Fifth and Fourteenth Amendments to the United States Constitution"); *Miranda,* 384 U.S., at 458, 86 S.Ct. 1602 (examining the "history and precedent underlying the Self–Incrimination Clause to determine its applicability in this situation").

## I

The most troubling aspect of the Court's time-based rule is that it disregards the compulsion caused by a second (or third, or fourth) interroga-

tion of an indigent suspect who was told that if he requests a lawyer, one will be provided for him. When police tell an indigent suspect that he has the right to an attorney, that he is not required to speak without an attorney present, and that an attorney will be provided to him at no cost before questioning, the police have made a significant promise. If they cease questioning and then reinterrogate the suspect 14 days later without providing him with a lawyer, the suspect is likely to feel that the police lied to him and that he really does not have any right to a lawyer.[FN2]

> FN2. The Court states that this argument rests on a "fallacy" because "we are not talking about 'reinterrogating' the suspect; we are talking about asking his permission to be interrogated." *Ante,* at 1225 (emphasis deleted). Because, however, a suspect always has the right to remain silent, this is a distinction without a difference: Any time that the police interrogate or reinterrogate, and read a suspect his *Miranda* rights, the suspect may decline to speak. And if this is a "fallacy," it is the same "fallacy" upon which this Court has relied in the *Edwards* line of cases that held that police may not continue to interrogate a suspect who has requested a lawyer: Police may not continue to ask such a suspect whether they may interrogate him until that suspect has a lawyer present. The Court's apparent belief that this is a "fallacy" only underscores my concern that its analysis is insufficiently sensitive to the concerns that motivated the *Edwards* line of cases.

When officers informed Shatzer of his rights during the first interrogation, they presumably informed him that if he requested an attorney, one would be appointed for him before he was asked any further questions. But if an indigent suspect requests a lawyer, "any further interrogation" (even 14 days later) "without counsel having been

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 11,456, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

provided will surely exacerbate whatever compulsion to speak the suspect may be feeling." *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093. When police have not honored an earlier commitment to provide a detainee with a lawyer, the detainee likely will "understan[d] his (expressed) wishes to have been ignored" and "may well see further objection as futile and confession (true or not) as the only way to end his interrogation." *Davis v. United States,* 512 U.S. 452, 472–473, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (Souter, J., concurring in judgment). Cf. *Cooper v. Dupnik,* 963 F.2d 1220, 1225 (C.A.9 1992) (en banc) (describing an elaborate police task force plan to ignore a suspect's requests for counsel, on the theory that such would induce hopelessness and thereby elicit an admission). Simply giving a "fresh se[t] of *Miranda* warnings" will not " 'reassure' a suspect who has been denied **\*1230** the counsel he has clearly requested that his rights have remained untrammeled." *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093.

II

The Court never explains why its rule cannot depend on, in addition to a break in custody and passage of time, a concrete event or state of affairs, such as the police having honored their commitment to provide counsel. Instead, the Court simply decides to create a time-based rule, and in so doing, disregards much of the analysis upon which *Edwards* and subsequent decisions were based. "[T]he assertion of the right to counsel" "[i]s a significant event." [FN3] *Edwards,* 451 U.S., at 485, 101 S.Ct. 1880. As the Court today acknowledges, the right to counsel, like the right to remain silent, is one that police may "coerc[e] or badge[r]," *ante,* at 1220, a suspect into abandoning. [FN4] However, as discussed above, the Court ignores the effects not of badgering but of reinterrogating a suspect who took the police at their word that he need not answer questions without an attorney present. See *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093. The Court, moreover, ignores that when a suspect asks for counsel, until his request is answered, there are still the same "inherently compelling" pressures of cus-

todial interrogation on which the *Miranda* line of cases is based, see 486 U.S., at 681, 108 S.Ct. 2093, [FN5] and that the concern about compulsion is especially serious for a detainee who has requested a lawyer, an act that signals his "inability to cope with the pressures of custodial interrogation," *id.,* at 686, 108 S.Ct. 2093. [FN6]

FN3. Indeed, a lawyer has a "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). Counsel can curb an officer's overbearing conduct, advise a suspect of his rights, and ensure that there is an accurate record of any interrogation. "Because of this special ability of the lawyer to help the client preserve his Fifth Amendment rights once the client becomes enmeshed in the adversary process, the Court found that the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege." *Arizona v. Roberson,* 486 U.S. 675, 682, n. 4, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988) (internal quotation marks omitted). Thus, "once the accused has requested counsel," courts must be especially wary of "coercive form[s] of custodial interrogation." *Bradshaw,* 462 U.S., at 1051, 103 S.Ct. 2830 (Powell, J., concurring in judgment).

FN4. See *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (subsequent confession suggests the police "badger [ed] a defendant into waiving his previously asserted *Miranda* rights").

FN5. See *Minnick v. Mississippi,* 498 U.S. 146, 155, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) ("[N]either admissions nor waivers are effective unless there are both particular and systemic assurances that the coercive pressures of custody were not the in-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2243, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

ducing cause"); cf. *Smith v. Illinois,* 469 U.S. 91, 98, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) *(per curiam)* ("[T]he authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—might otherwise wear down the accused and persuade him to incriminate himself notwithstanding his earlier request for counsel's assistance").

FN6. See *Roberson,* 486 U.S., at 681, 108 S.Ct. 2093 ("[I]f a suspect believes that he is not capable of undergoing such questioning without advice of counsel, then it is presumed that any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the 'inherently compelling pressures' "); *Michigan v. Mosley,* 423 U.S. 96, 110, n. 2, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (White, J., concurring in result) ("[T]he accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a statement without counsel's presence may properly be viewed with skepticism").

**\*1231** Instead of deferring to these well-settled understandings of the *Edwards* rule, the Court engages in its own speculation that a 14–day break in custody eliminates the compulsion that animated *Edwards.* But its opinion gives no strong basis for believing that this is the case.[FN7] A 14–day break in custody does not eliminate the rationale for the initial *Edwards* rule: The detainee has been told that he may remain silent and speak only through a lawyer and that if he cannot afford an attorney, one will be provided for him. He has asked for a lawyer. He does not have one. He is in custody. And police are still questioning him. A 14–day break in custody does not change the fact that custodial interrogation is inherently compelling. It is unlikely to change the fact that a detainee "considers himself

unable to deal with the pressures of custodial interrogation without legal assistance." *Roberson,* 486 U.S., at 683, 108 S.Ct. 2093.[FN8] And in some instances, a 14–day break in custody may make matters worse[FN9] "[w]hen a suspect understands his (expressed) wishes to have been ignored" and thus "may well see further objection as futile and confession (true or not) as the only way to end his interrogation." *Davis,* 512 U.S., at 472–473, 114 S.Ct. 2350 (Souter, J., concurring in judgment).[FN10]

FN7. Today's decision, moreover, offers no reason for its 14–day time period. To be sure, it may be difficult to marshal conclusive evidence when setting an arbitrary time period. But in light of the basis for *Edwards,* we should tread carefully. Instead, the only reason for choosing a 14–day time period, the Court tells us, is that "[i]t seems to us that period is 14 days." *Ante,* at 1223. That time period is "plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." *Ibid.* But the Court gives no reason for that speculation, which may well prove inaccurate in many circumstances.

FN8. In *Roberson,* for example, we observed that once a suspect has asserted his right to an attorney, courts must presume he does "not feel sufficiently comfortable with the pressures of custodial interrogation to answer questions without an attorney. This discomfort is precisely the state of mind that *Edwards* presumes to persist....." 486 U.S., at 681, 108 S.Ct. 2093. We held in *Roberson* that just because different police come to speak about a different investigation, that presumption does not change: "[T]here is no reason to assume that a suspect's state of mind is in any way investigation-specific." *Ibid.* Nor

Page 21

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2214, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

is there any reason to believe that it is arrest specific.

FN9. The compulsion is heightened by the fact that "[t]he uncertainty of fate that being released from custody and then re-apprehended entails is, in some circumstances, more coercive than continual custody." Strauss, Reinterrogation, 22 Hastings Const. L.Q. 359, 390 (1995).

FN10. Not only is this a likely effect of re-interrogation, but police may use this effect to their advantage. Indeed, the Court's rule creates a strange incentive to delay formal proceedings, in order to gain additional information by way of interrogation after the time limit lapses. The justification for Fifth Amendment rules "must be consistent with ... practical realities," Roberson, 486 U.S., at 688, 108 S.Ct. 2093 (KENNEDY, J., dissenting), and the reality is that police may operate within the confines of the Fifth Amendment in order to extract as many confessions as possible, see Leo & White, Adapting to Miranda: Modern Interrogators' Strategies for Dealing with the Obstacles Posed by Miranda, 84 Minn. L.Rev. 397 (1999). With a time limit as short as 14 days, police who hope that they can eventually extract a confession may feel comfortable releasing a suspect for a short period of time. The resulting delay will only increase the compelling pressures on the suspect.

The Court ignores these understandings from the Edwards line of cases and instead speculates that if a suspect is reinterrogated and eventually talks, it must be that "further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation **\*1232** is in his interest." Ante, at 1221. But it is not apparent why that is the case. The answer, we are told, is that once a suspect has been out of Miranda custody for 14 days, "[h]e has likely been able to

seek advice from an attorney, family members, and friends." Ante, at 1221. This speculation, however, is overconfident and only questionably relevant. As a factual matter, we do not know whether the defendant has been able to seek advice: First of all, suspects are told that if they cannot afford a lawyer, one will be provided for them. Yet under the majority's rule, an indigent suspect who took the police at their word when he asked for a lawyer will nonetheless be assumed to have "been able to seek advice from an attorney." Second, even suspects who are not indigent cannot necessarily access legal advice (or social advice as the Court presumes) within 14 days. Third, suspects may not realize that they *need* to seek advice from an attorney. Unless police warn suspects that the interrogation will resume in 14 days, why contact a lawyer? When a suspect is let go, he may assume that the police were satisfied. In any event, it is not apparent why interim advice matters. FN11 In Minnick v. Mississippi, 498 U.S. 146, 153, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), we held that it is not sufficient that a detainee happened to speak at some point with a lawyer. See ibid. (noting that "consultation with an attorney" does not prevent "persistent attempts by officials to persuade [a suspect] to waive his rights" or shield against the "coercive pressures that accompany custody"). If the actual interim advice of an attorney is not sufficient, the hypothetical, interim advice of "an attorney, family members, and friends," ante, at 1221, is not enough.

FN11. It is important to distinguish this from the point that I make above about indigent suspects. If the police promise to provide a lawyer and never do so, it sends a message to the suspect that the police have lied and that the rights read to him are hollow. But the mere fact that a suspect consulted a lawyer does not itself reduce the compulsion when police reinterrogate him.

The many problems with the Court's new rule are exacerbated in the very situation in this case: a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 11,045, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135
(Cite as: 130 S.Ct. 1213)

suspect who is in prison. Even if, as the Court assumes, a trip to one's home significantly changes the *Edwards* calculus, a trip to one's prison cell is not the same. A prisoner's freedom is severely limited, and his entire life remains subject to government control. Such an environment is not conducive to "shak[ing] off any residual coercive effects of his prior custody." *Ante,* at 1223.[FN12] Nor can a prisoner easily "seek advice from an attorney, family members, and friends," *ante,* at 1221, especially not within 14 days; prisoners are frequently subject to restrictions on communications. Nor, in most cases, can he live comfortably knowing that he cannot be badgered by police; prison is not like a normal situation in which a suspect "is in control, and need only shut his door or walk away to avoid police badgering." *Montejo v. Louisiana,* 556 U.S. ——, ——, 129 S.Ct., at 2090. Indeed, for a person whose every move is controlled by the State, it is likely that "his sense of dependence on, and trust in, counsel **1233** as the guardian of his interests in dealing with government officials intensified." *United States v. Green,* 592 A.2d 985, 989 (D.C.1991); cf. *Minnick,* 498 U.S., at 153, 111 S.Ct. 486 (explaining that coercive pressures "may increase as custody is prolonged").[FN13] The Court ignores these realities of prison, and instead rests its argument on the supposition that a prisoner's "detention ... is relatively disconnected from their prior unwillingness to cooperate in an investigation." *Ante,* at 1216. But that is not necessarily the case. Prisoners are uniquely vulnerable to the officials who control every aspect of their lives; prison guards may not look kindly upon a prisoner who refuses to cooperate with police. And cooperation frequently is relevant to whether the prisoner can obtain parole. See, *e.g.,* Code of Md. Regs., tit. 12, § 08.01.18(A)(3) (2008). Moreover, even if it is true as a factual matter that a prisoner's fate is not controlled by the police who come to interrogate him, how is the prisoner supposed to know that? As the Court itself admits, compulsion is likely when a suspect's "captors appear to control [his] fate," *ante,* at 1220 (internal quotation marks omitted). But when a guard informs a suspect that he must go

speak with police, it will "appear" to the prisoner that the guard and police are not independent. "Questioning by captors, who *appear* to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will." *Illinois v. Perkins,* 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (emphasis added).[FN14]

FN12. Cf. *Orozco v. Texas,* 394 U.S. 324, 326, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (holding that a suspect was in custody while being held in own home, despite his comfort and familiarity with the surroundings); *Mathis v. United States,* 391 U.S. 1, 5, 88 S.Ct. 1503, 20 L.Ed.2d 381 (1968) (holding that a person serving a prison sentence for one crime was in custody when he was interrogated in prison about another, unrelated crime); *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("[W]hen an individual is ... deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized").

FN13. Prison also presents a troubling set of incentives for police. First, because investigators know that their suspect is also a prisoner, there is no need formally to place him under arrest. Thus, police generally can interview prisoners even without probable cause to hold them. This means that police can interrogate suspects with little or no evidence of guilt, and police can do so time after time, without fear of being sued for wrongful arrest. Second, because police know that their suspect is otherwise detained, there is no need necessarily to resolve the case quickly. Police can comfortably bide their time, interrogating and reinterrogating their suspect until he slips up. Third, because police need not hold their suspect, they do not need to arraign him or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

130 S.Ct. 1213, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2233, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135
**(Cite as: 130 S.Ct. 1213)**

otherwise initiate formal legal proceedings that would trigger various protections.

FN14. The Court attempts to distinguish detention in prison from the "paradigm *Edwards* case," *ante,* at 1220, but it is not clear why that is so. The difference cannot be simply that convicted prisoners' "detention ... is relatively disconnected from their prior unwillingness to cooperate in an investigation," *ante,* at 1216, because in many instances of pretrial custody, the custody will continue regardless of whether a detainee answers questions. Take *Roberson* for example. Roberson was arrested and being held for one crime when, days later, a different officer interrogated him about a different crime. 486 U.S., at 681, 108 S.Ct. 2093. Regardless of whether he cooperated with the second investigation, he was still being held for the first crime. Yet under the Court's analysis, had Roberson been held long enough that he had become "accustomed" to the detention facility, *ante,* at 1224, there would have been a break in custody between each interrogation. Thus, despite the fact that coercive pressures "may increase as custody is prolonged," *Minnick,* 498 U.S., at 153, 111 S.Ct. 486, the real problem in *Roberson* may have been that the police did not leave him sitting in jail for long enough.

This problem of pretrial custody also highlights a tension with the Court's decision last Term in *Montejo v. Louisiana,* 556 U.S. ——, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). In *Montejo,* the Court overturned *Michigan v. Jackson,* 475 U.S. 625, 636, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), which had protected an accused's Sixth Amendment right to counsel by "forbidding police to initiate interrogation of a criminal defendant once he has requested counsel at an ar-

raignment or similar proceeding." 556 U.S., at ——, 129 S.Ct., at 2082. In so doing, the Court emphasized that because the *Edwards* "regime suffices to protect the integrity of 'a suspect's voluntary choice not to speak outside his lawyer's presence,' before his arraignment, it is hard to see why it would not also suffice to protect that same choice after arraignment." 556 U.S., at ——, 129 S.Ct., at 2090 (quoting *Texas v. Cobb,* 532 U.S. 162, 175, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001) (KENNEDY, J., concurring); citation omitted). But typically, after arraignment, defendants are released on bail or placed in detention facilities, both of which, according to the majority's logic, sometimes constitute breaks in custody. How then, under the Court's decision today, will *Edwards* serve the role that the Court placed on it in *Montejo?*

**\*1234** III

Because, at the very least, we do not know whether Shatzer could obtain a lawyer, and thus would have felt that police had lied about providing one, I cannot join the Court's opinion. I concur in today's judgment, however, on another ground: Even if Shatzer could not consult a lawyer and the police never provided him one, the 2 1/2 -year break in custody is a basis for treating the second interrogation as no more coercive than the first. Neither a break in custody nor the passage of time has an inherent, curative power. But certain things change over time. An indigent suspect who took police at their word that they would provide an attorney probably will feel that he has "been denied the counsel he has clearly requested," *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093, when police begin to question him, without a lawyer, only 14 days later.[FN15] But, when a suspect has been left alone for a significant period of time, he is not as likely to draw such conclusions when the police interrogate him again.[FN16] It is concededly "impossible to de-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2218, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

**(Cite as: 130 S.Ct. 1213)**

termine with precision" where to draw such a line. *Barker v. Wingo,* 407 U.S. 514, 521, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). In the case before us, however, the suspect was returned to the general prison population for 2 1/2 years. I am convinced that this period of time is sufficient. I therefore concur in the judgment.

FN15. The Court responds that "[i]f confidence in the police's promise to provide counsel were the touchstone, *Edwards* would not have applied in *Minnick,* where the suspect in continuing custody actually met with appointed counsel." *Ante,* at 1226. But my view is not that "confidence in the police's promise to provide counsel" is "the touchstone." *Ante,* at 1226. Rather, my view is that although an appropriate break in custody will mitigate many of the reasons that custodial reinterrogation of a suspect who requested counsel is inherently compelling, it will not mitigate the effect of an indigent detainee believing that he has "been denied the counsel he has clearly requested," *Roberson,* 486 U.S., at 686, 108 S.Ct. 2093. If police tell an indigent suspect that he is not required to speak without an attorney, and that they will provide him with an attorney, and that suspect asserts his right to an attorney, but police nonetheless do not provide an attorney and reinterrogate him (even if there was a break in custody between the interrogations), the indigent suspect is likely to feel that the police lied to him or are ignoring his rights. This view is not in tension with *Minnick*. *Minnick* holds only that consultation with an attorney between interrogations is not *sufficient* to end the *Edwards* presumption and therefore that when there has been no break in custody, "counsel's *presence* at interrogation," 498 U.S., at 152, 111 S.Ct. 486, is necessary to address the compulsion with which the *Edwards* line of cases is concerned.

FN16. I do not doubt that some of the compulsion caused by reinterrogating an indigent suspect without providing a lawyer may survive even a break in custody and a very long passage of time. The relevant point here is more limited: A long break in time, far longer than 14 days, diminishes, rather than eliminates, that compulsion.

U.S.Md.,2010.
Maryland v. Shatzer
130 S.Ct. 1213, 175 L.Ed.2d 1045, 78 USLW 4159, 10 Cal. Daily Op. Serv. 2218, 2010 Daily Journal D.A.R. 2731, 22 Fla. L. Weekly Fed. S 135

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2011, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

/s/ *Jane Elinor Notz*
Deputy Solicitor General
jnotz@atg.state.il.us